UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:_____-Civ-

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) Hon._____ ) |
| vs. | ) ) |
| DANIEL FINGERHUT, DIGITAL PLATINUM, INC., DIGITAL PLATINUM, LTD, HUF MEDIYA, LTD (A.K.A. HOOF MEDIA LTD.), TAL VALARIOLA, and ITAY BARAK, | ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| AICEL CARBONERO, | ) ) |
| Relief Defendant. | ) ) |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF AND
PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

The Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

through its attorneys, hereby alleges as follows:

## I.  SUMMARY

1.     Throughout the period of at least October 2013 and continuing through at least

August 2018 ("Relevant Period"), two massive fraudulent solicitation schemes occurred, one

involving binary options and the other digital assets, including Bitcoin and Ethereum.  The

binary options fraud occurred between at least October 2013 and November 2016 ("Binary Options Period"); the digital assets fraud occurred between at least October 2016 and August 2018 ("Digital Assets Period").

2.      During the Binary Options Period, Defendant Digital Platinum Limited ("DPL"), through its control persons, Defendants Tal Valariola ("Valariola") and Itay Barak ("Barak"), willfully aided and abetted All In Publishing LLC's ("AIP") fraudulent binary options affiliate marketing scheme that involved tens of millions of solicitations to prospective customers advising them to open and fund off-exchange binary options trading accounts involving foreign exchange currency pairings ("forex"), metals, and/or swaps through websites operated by unregistered, off-exchange binary options brokers who paid AIP and DPL commissions.  AIP's solicitations offered free access to trading systems that traded binary options automatically on behalf of customers once they opened and funded an account with the recommended broker ("Trading Systems").

3.      AIP's binary options marketing scheme involved at least twenty-four (24) fraudulent binary options campaigns, which DPL willfully aided and abetted by, among other things, willfully providing fraudulent sales videos that they procured for AIP's campaigns, knowing solicitations that AIP created themselves included false or misleading statements, sharing AIP's fraudulent solicitations with brokers and encouraging brokers to use the false or misleading statements in their further solicitations, supplying the Trading Systems that they knew did not operate as marketed, acting as an intermediary with brokers, and managing the funds resulting from their campaigns.

4.      Commencing in June 2014, Defendant Daniel Fingerhut intentionally or recklessly created and/or disseminated solicitations that he knew included false or misleading

statements about the Trading Systems for at least twenty (20) of those fraudulent binary options campaigns on behalf of AIP.

5.    During the Digital Assets Period, Fingerhut, as an agent of DPL and DPL's related entities, Defendants Digital Platinum, Inc. ("DPI") and Huf Mediya, Ltd. ("Huf"), also controlled by Valariola and Barak (Valariola, Barak, DPI, DPL and Huf are hereafter collectively referred to as "Digital Platinum Defendants"), engaged in a similar fraudulent solicitation scheme involving digital assets.  Fingerhut managed Digital Platinum Defendants' affiliate marketing program during this time, including by intentionally or recklessly creating and/or disseminating millions of fraudulent solicitations advising customers and prospective customers to open and fund digital assets trading accounts with brokers who paid Digital Platinum Defendants commissions for doing so.  The fraudulent solicitations promised free access to automated trading software that purported to trade digital assets on behalf of customers automatically with no risk and guaranteed profits ("DA Trading Systems").  DPL and/or Huf, through the acts of control persons Valariola and Barak and other employees and agents of DPL and Huf, selected brokers for these campaigns, supplied the DA Trading Systems, and paid DPI and Fingerhut a portion of the commissions earned resulting from Fingerhut's and his group's solicitations.

6.    Fingerhut intentionally or recklessly created and/or disseminated millions of fraudulent solicitations between June 2014 and August 2018 that contained materially false or misleading statements about the marketed Trading Systems and DA Trading Systems, including: (i) fictitious trading performance and account statements showing consistent profits with no losses; (ii) actors depicted as true users and/or creators of the marketed trading software falsely

3

claiming they had earned significant profits automatically with the software; and/or (iii) false representations of actual live automated trading and results using the advertised software.

7.      Fingerhut had no legitimate source of income between June 2014 and August 2018.  Fingerhut paid off his mortgage with tainted funds in July 2018 and then quit-claimed the deed to his home to Relief Defendant Aicel Carbonero ("Carbonero") for $10 in August 2018. Carbonero did not provide any legitimate services to AIP or Digital Platinum Defendants and does not have any interest in or entitlement to Fingerhut's home.

8.      Upon receipt of an investigative subpoena in August 2018 concerning the Commission's investigations related to affiliate marketing fraud, Fingerhut offered to cooperate, prepare a sworn declaration, and testify as a witness against his former colleagues.  However, rather than fully and truthfully cooperate, Fingerhut intentionally or recklessly made materially false or misleading statements to Staff at the Commission's Division of Enforcement ("Staff") and under oath in an apparent effort to conceal the extent of his role in the fraud and avoid producing responsive documents and information.

9.      By virtue of this conduct and further conduct described below, Defendants have engaged, are engaging, or are about to engage, in acts and practices in violation of the following sections of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2018), and accompanying regulations ("Regulation(s)"), 17 C.F.R. Pts. 1-190 (2019), in that:

(a)      Between June 2014 and October 2016, Fingerhut, while acting as AIP's agent violated Section 4c(b), 4$o$(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(b), 6$o$(1), 9(1) (2018) and Regulations 32.9 and 180.1(a)(1)-(3), 17 C.F.R. §§ 32.9, 180.1(a)(1)-(3) (2019), which prohibit commodity options fraud, fraud by a Commodity Trading Advisor ("CTA"), and deceptive devices, schemes and/or

4

artifices in connection with, among other things, commodities in interstate commerce and/or swap transactions ("swaps fraud");

(b)   Between October 2013 and November 2016, DPL, Valariola, and Barak willfully aided and abetted AIP's and Fingerhut's violations of 7 U.S.C. §§ 6c(b), 9(1) and 17 C.F.R. §§ 32.9 and 180.1(a)(1)-(3), which prohibit commodity options fraud and swaps fraud;

(c)   Between October 2016 and August 2018, Fingerhut and Digital Platinum Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), which prohibits swaps fraud; and

(d)   Between August 2018 and at least May 2019, Fingerhut violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2018), which prohibits false or misleading statements of material facts to the Commission.

10.   Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel Defendants' compliance with the Act and Regulations, and to further enjoin Defendants from engaging in certain commodity options related activities.

11.   In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

12.   Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION & VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2018), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

14.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendants are found in, inhabit, or transact business in the Southern District of Florida, and the acts and practices in violation of the Act and Regulations have occurred within this District, among other places.

## III.     THE PARTIES

15.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and regulations promulgated thereunder.

### Defendant Fingerhut & Relief Defendant

16.     Defendant **Daniel Fingerhut** is a resident of Miami Beach, Florida. Between at least June 2014 and October 2016, Fingerhut created and/or disseminated fraudulent solicitations related to binary options on behalf of AIP. Between October 2016 and August 2018, Fingerhut managed the marketing at DPI and at its related entities, DPL and Huf, and created, disseminated, and oversaw others creating and disseminating fraudulent solicitations related to

6

digital assets and digital assets options.  Fingerhut has never been registered with the Commission in any capacity.

17.      Relief Defendant **Aicel Carbonero** ("Carbonero") is a resident of Miami Beach, Florida.  On August 16, 2018, Fingerhut transferred title of his home to Carbonero through a quit-claim deed for $10.  Carbonero has never been registered with the CFTC in any capacity.

18.      Relief Defendant Carbonero did not perform any legitimate services for AIP or the Digital Platinum Defendants, and does not have any legitimate interest in or entitlement to those funds.

### Digital Platinum Defendants

19.      Defendant Digital Platinum Ltd. ("DPL") is an Israeli company with its principal place of business in Tel Aviv.  Between at least October 2013 and November 2016, DPL willfully aided and abetted AIP, where Fingerhut worked, to carry out the binary options fraud. DPL, through Valariola and Barak, acted as the intermediary between AIP and the recommended brokers, was responsible for the backend operations of the affiliate marketing campaigns, collected and distributed commission payments, procured sales videos for AIP to use in its campaigns, and supplied the marketed Trading Systems, among other things.  Fingerhut began working with DPL and its related entities directly after leaving AIP around October 2016. During the ensuing Digital Assets period, Fingerhut acted as the agent of the Digital Platinum Defendants in managing and carrying out the fraudulent marketing activities involving digital assets.  DPL has never been registered with the Commission in any capacity.

21.      Defendant **Huf Mediya Ltd**. (a.k.a. Hoof Media Ltd.) ("Huf") is a Bulgarian company.  On information and belief, Huf, DPL, and DPI are related entities, and Valariola and Barak are control persons of all three entities.  Fingerhut invoiced Huf for his affiliate marketing

services for DPI and DPL beginning in July 2017 and Valariola directed him to execute a

contract with Huf for his work related to Digital Platinum Defendants in December 2017.

Beginning at least in August 2017, Huf sent DPI and Fingerhut money for the digital assets

campaigns to bank accounts in the United States.  Huf has never been registered with the CFTC

in any capacity.

22.     Defendant **Digital Platinum, Inc.** ("DPI") is an inactive Florida corporation

organized on April 15, 2016 and located in Hollywood, Florida.  The officers and directors of

DPI include Defendants Barak and Valariola.  DPL is the parent company of DPI.  Fingerhut

operated out of DPI's Florida offices and acted as DPI's agent in managing and carrying out the

fraudulent solicitations involving digital assets.  DPI has never been registered with the CFTC in

any capacity.

23.     Defendant **Tal Valariola** ("Valariola") is a resident of Tel Aviv, Israel.  At all

relevant times, Valariola owned and/or controlled DPL, DPI, and Huf.  Between at least October

2013 and November 2016: provided AIP with sales videos that depicted fictitious testimonials

and trading results; knew that AIP  created similar false or misleading solicitations and widely

disseminated them to potential customers; shared AIP's false or misleading solicitations with

brokers to assist their efforts to further induce prospective customers to open and fund an

account; supplied the marketed trading software (which did not perform as promised), served as

the intermediary with brokers; and managed funds and results of campaigns related to the

scheme.  Between at least October 2016 and August 2018, Valariola, on behalf of DPL, DPI, and

Huf, directed, approved, and participated in the digital assets solicitation scheme, including by

retaining Fingerhut to manage the affiliate marketing component of the scheme that included

generating false or misleading solicitations and widely disseminating them to potential

customers.  Valariola, on behalf of DPL, DPI, and Huf, also directly or indirectly supplied the marketed trading software (which did not perform as promised), served as the intermediary with brokers, and managed funds related to the scheme.  Valariola has never been registered with the CFTC in any capacity.

24.     Defendant **Itay Barak** ("Barak") is a resident of Tel Aviv, Israel.  Between at least October 2013 and November 2016, Barak, on behalf of DPL, directly or indirectly provided sales videos that depicted fictitious testimonials and trading results to AIP, knew that AIP created similar false or misleading solicitations and widely disseminate them to potential customers, supplied the marketed trading software (which did not perform as promised), served as the intermediary with brokers, and managed funds and results of campaigns related to the scheme.  Between at least October 2016 and August 2018, Barak, on behalf of DPL, DPI, and Huf, directed, approved, and participated in the digital assets solicitation scheme, including by retaining Fingerhut to manage the affiliate marketing component of the scheme that included generating false or misleading solicitations and widely disseminating them to potential customers. Barak, on behalf of DPL, DPI, and Huf, also directly or indirectly supplied the marketed trading software (which did not perform as promised), served as the intermediary with brokers, and managed funds related to the scheme.  Barak has never been registered with the CFTC in any capacity.

## IV.     OTHER RELEVANT ENTITIES

25.     **All In Publishing, LLC** ("AIP") is a Florida limited liability company with its principal place of business in Miami, Florida.  AIP became inactive after the Binary Options Period. AIP has never been registered with the Commission in any capacity.

26.      **Timothy Atkinson** ("Atkinson") was the owner, member, and president of AIP during the Binary Options Period.  Atkinson has never been registered with the Commission in any capacity.  During the Binary Options Period, Fingerhut created and disseminated binary options solicitations for AIP and reported to Atkinson and another employee of AIP, Jay Passerino.  Atkinson has never been registered with the Commission in any capacity.

27.      On September 27, 2018, Staff filed a binary options solicitation fraud complaint against AIP, Atkinson, Passerino, and Passerino's company Gasher, Inc., in the Southern District of Florida. Complaint, *CFTC v. Atkinson*, No. 18-cv-23992-JEM (S.D. Fla. Filed Sept. 27, 2018) (ECF No. 1) ("*Atkinson* litigation").  Staff sought and obtained emergency relief in the *Atkinson* litigation, *Id*. at ECF 48; the Honorable Jose E. Martinez ("*Atkinson* Court") entered a Consent Order for Permanent Injunction against Atkinson and AIP on May 22, 2019, *Id*. at ECF 206, and a similar order against Passerino and Gasher, Inc. on February 12, 2020.  *Id*. at ECF 237.

28.      **Jay Passerino** ("Passerino") managed DPL, DPI and Huf's operations in the United States during the Digital Assets Period and worked closely with Fingerhut during that time.  Passerino has never been registered with the Commission in any capacity.

29.      **Fingerhut Group, Inc**. ("Fingerhut Group") is a Florida corporation organized on March 13, 2014 and located in Miami Beach, Florida.  Fingerhut voluntarily dissolved Fingerhut Group on April 30, 2018.  Between March 13, 2014 and April 30, 2018, Fingerhut was the president and registered agent of Fingerhut Group.  Fingerhut opened at least one bank account in the name of Fingerhut Group and received deposits into that account for his fraudulent activities at AIP and Digital Platinum Defendants during the Relevant Period.

30.      **Recruiting Hut, LLC** ("Recruiting Hut") is a Florida limited liability company organized on July 2, 2015 and located in Miami Beach, Florida.  On May 3, 2019, Fingerhut

filed articles of dissolution with the State of Florida for Recruiting Hut.  According to corporate records, Fingerhut was the managing member and registered agent for Recruiting Hut at all times relevant.  In Fingerhut's 2018 annual report, Fingerhut identified Recruiting Hut's principal place of business as the address for DPI's office.  Recruiting Hut has never been registered with the Commission in any capacity.

31.     **Media Hut, Inc**. ("Media Hut") is a Florida corporation organized on March 28, 2018 and located in Miami Beach, Florida.  Fingerhut is the president and registered agent of Media Hut.  During the Digital Asset Period, Media Hut received deposits from Digital Platinum Defendants for Fingerhut's fraudulent affiliate marketing services.  Media Hut has never been registered with the CFTC in any capacity.

## V.     FACTS

### A.     Background:  Affiliate Marketing in Binary Options and Digital Assets

32.     Defendants engaged in fraud through affiliate marketing schemes.  Affiliate marketing is a form of performance-based marketing that is predominantly conducted via email solicitations and promotional materials made available on internet websites.  An affiliate marketing campaign is a promotion of a product/service designed to convince the audience to take a specific action, including purchasing a product or service or opening and funding a trading account.  Affiliate marketing is referred to as a "campaign" or "funnel" because the advertising is designed to funnel (i.e., drive) customers to the service provider or product owner.  Affiliate marketing occurs in various business segments, including Internet Marketing ("IM"), Business Opportunities ("BizOp"), Foreign Exchange ("Forex"), Binary Options, and Digital Assets.

33.     A binary option is a type of option contract in which the payout depends entirely on the outcome of a discrete event—usually a "yes/no" proposition.  The yes/no proposition

typically relates to whether the price of a particular asset will rise above or fall below a specified amount at a specified date and time.  For example, the yes/no proposition might be whether the price of silver will be higher than $33.40 per ounce at 11:17 am on a particular day, or if the exchange rate between the US Dollar and the Euro will be above $1.18 at 2:15 pm on a given day.

34.     Once the option holder acquires a binary option through payment of a premium, there is no further decision for the holder to make as to whether to exercise the binary option because binary options exercise automatically.  Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled."  When the binary option expires, the option holder is entitled to a pre-determined amount of money if the customer has made a correct prediction.  If the customer has made an incorrect prediction, he or she gets nothing and loses the entire premium paid.

35.     "Digital assets" is defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  The digital assets relevant to this complaint primarily involve Bitcoin, but also to some extent Ethereum.  These and other digital assets are distinct from "real" currencies, which are the coin and paper money of the United States or currencies of other countries that are issued, designated and circulated as legal tender, and customarily used and accepted as a medium of exchange.

**B.     Defendants' Roles in the Fraudulent Solicitation Schemes**

1.     <u>Binary Options Scheme (October 2013-November 2016)</u>

a.     *Fingerhut's Role (June 2014-October 2016)*

36.     During much of the Binary Options Period, as an affiliate marketer and an unregistered Associated Person ("AP") of AIP, an unregistered Commodity Trading Advisor

("CTA"), Fingerhut solicited customers and prospective customers to open and fund trading accounts using Trading Systems that would purportedly automatically trade on their behalf in binary options involving forex, metals, commodities, swaps, and other underlying assets.

37.     Fingerhut did so by creating and/or disseminating solicitations that included materially false or misleading statements advising prospective customers to open an account and trade binary options with automated trading software through brokers that agreed to pay AIP and DPL commission for at least twenty campaigns:  (1) Push Button Millionaire (February 2014-September 2015); (2) Auto Money App ("AMA") (June 2014-July 2015); (3) Cash Code ("CC") (June 2014-April 2016); (4) Free Money System ("FMS") (June 2014); (5) Free Money App (June 2014-June 2015); (6) Quick Cash System (June 2014-May 2016); (7) Easy Money Machines (June 2014-June 2015); (8) Free Cash (July 2014-October 2015); (9) Secret Millionaire Society (October 2014-June 2015); (10) Cash Software (October 2014-December 2014); (11) Money Platform (January 2015); (12) Push Button Commissions (January 2015-April 2015); (13) Copy Op (February 2015-May 2015); (14) Copy Trade Profit (April 2015); (15) Binary Cash Creator ("BCC") (May 2014-March 2015); (16) Free Millionaire System (May 2015); (17) Easy Money Method (May 2015); (18) Fast Cash (October 2015-June 2016); (19) Push Money App ("PMA") (June 2016- October 2016); and (20) Click Money System ("CMS") (October 2016).

38.     Among other things, Fingerhut sent bulk email solicitations designed to entice the recipients to click an embedded electronic link in the email that routed the user to AIP's and DPL's binary options campaign websites, including but not limited to the twenty campaigns identified in Paragraph 37.  The websites generally included some variation of the campaign name like http://automoneyapp.com for AMA or http://fastcash.biz for Fast Cash.

39.     Fingerhut opened and/or used autoresponders for or on behalf of AIP to send out fraudulent email solicitations to hundreds of thousands of prospective customers and customers at the same time.

40.     The email solicitations contained an embedded link that directed the prospective customers and customers to AIP's corresponding campaign websites.  The websites generally contained multiple webpages, including a landing page, members' page, and registration page. The landing pages for AIP's and DPL's binary options campaigns all included a sales video created or procured by AIP or DPL.

41.     As part of his duties at AIP, Fingerhut tested the links embedded in the solicitation emails to ensure that the recipients would be directed to the proper campaign website and to make sure that the sales videos streamed automatically once a customer accessed the website through the link in the email.  In the process, Fingerhut viewed the sales videos.

42.     The binary options solicitations that Fingerhut created and/or disseminated advised customers and prospective customers to open and fund a binary options trading account with a "recommended broker" so that they could obtain free access to the offered Trading System.  The solicitations further promised that the Trading Systems activated and began accumulating profits automatically once the customers opened and funded their trading account.

43.     Fingerhut admitted that the solicitations he created and/or disseminated on behalf of AIP included false or misleading statements as to profit, risk, users' experience with the trading systems, the background and experience of the creators of the trading systems, and performance of the trading systems.

44.     The fraudulent solicitations were designed to:  (i) capture potential customers' attention; (ii) entice them to enter their personal information on the campaign websites AIP

owned or operated; and (iii) click through the funnel to open and fund a trading account with a broker that DPL, through Valariola and Barak, directed them to, mainly by promising free access to Trading Systems with no risk and guaranteed profits.

45.     In those instances where Fingerhut only disseminated, but did not create AIP's solicitations, he knew that those emails and videos also included false or misleading statements.

46.     Some of the solicitation materials created and/or disseminated by Fingerhut explicitly referenced the underlying asset for binary options as commodities like metals, forex, and/or swaps.  Other solicitations depicted screenshots showing those assets as available to trade and/or as having been traded using the marketed Trading Systems.

47.     For example, the Fast Cash sales video that Fingerhut distributed featured actors who pretended to be the "creators" of that Trading System who claimed that it had made them over $55 million.  The video shows a screenshot of one of their purported trading accounts, with a pending binary options transaction involving EUR/USD, along with other currency pairings displayed in the ticker.  Another minute in, the "creators" remind viewers that the clock is ticking to take advantage of their offer if they want a "real chance to get hands on software that makes big money like this," and then the video shows a screenshot of the other creator's account with a similar upcoming expiry on the binary options EUR/USD transaction, along with reference to other binary option assets that are "hot" including currencies and commodities, indices, and stocks.

48.     Other videos, including but not limited to the videos for the Free Money System, Cash Code, and Push Money App campaigns, similarly display screenshots of executed binary options in forex and reference to commodities as an available asset to trade using the marketed Trading System.

b.     *DPL's Role (October 2013-November 2016)*

49.     Between at least October 2013 and November 2016, DPL, through Valariola and Barak, and others, willfully aided and abetted AIP's binary options solicitation scheme, including for at least twenty-four (24) fraudulent binary options campaigns, including the twenty (20) campaigns in which Fingerhut participated (identified in Paragraph 37, *supra*), and four (4) additional campaigns prior to June 2014:  (1) Automated Income App (late 2013/early 2014); (2) Golden Goose Method ("GG") (January 2014-March 2014); (3) Binary Pilot (~February 2014); and (4) Rock Star Commissions (March 2014).

50.     Specifically, DPL, through Valariola, Barak and others knew that the binary options solicitations AIP created and disseminated included false or misleading statements.  For example, Valariola procured two sales videos (at least one of which was created by a video producer in the United States with a script provided by Valariola), which he gave to AIP for use in the GG and Rock Star Commissions binary options campaigns.

51.     The sales video for GG included materially false or misleading statements, including where the "creator" of the marketed Trading System repeatedly stresses the ease of earning profits automatically by reference to fake results of a fictitious user:

- "I put $200 in here to start, I fired up the software and took my wife out for breakfast. When I got home and checked the account and there was already $390 in it."

- "A profit of $4550 streamed into my account [since the day before] while I spent the day playing with my wife."

52.     Valariola and Barak, on behalf of DPL, knew that the sales videos AIP created after GG (mostly with the same video producer) that did not come from DPL followed the same model and were similarly fabricated by Atkinson or a copywriter.  Valariola and Barak also

knew that AIP's solicitations did not reflect real people's results from use of the marketed Trading System that they supplied because they did not provide that information to AIP.

53.     DPL, through Valariola and Barak, and others, also supplied the marketed Trading Systems knowing that the systems did not operate as depicted in AIP's solicitations.

54.     DPL, through Valariola and Barak, served as a liaison with the brokers and encouraged brokers to review AIP's false or misleading solicitations to hone their sales pitch when following up on Fingerhut's and AIP's leads to increase the number of conversions and resulting commissions.

55.     Specifically, DPL, through Valariola, Barak, and DPL's other agents, officers, and employees, worked with brokers to make sure that their sales representatives were ready to "convert" prospective customers directed to them through AIP's marketing campaigns, into customers.

56.     For example, before AIP and DPL launched a binary options campaign, Valariola disseminated links to the campaign website to the brokers, including brokers in the United States, with instructions for them to watch the sales video and try the Trading System "so they'll know how to attack it and get the right bullets" when speaking with potential customers.

57.     Valariola also disseminated to brokers, including brokers in the United States, emails from AIP, who he identified as "my partner," explaining the marketing strategy for the binary options campaign.  One such email from September 2015 revealed that AIP spent over $50,000 on the sales video and used the "best copy writer money can buy (think movie scripts/infomercial status)."

58.     DPL, through Valariola and Barak, also managed the broker relationships and distributed commissions from the brokers to AIP's account in the United States.  The brokers

that DPL selected for AIP's binary options campaigns, including at least one in the United States, agreed to pay a pre-determined, flat commission, generally between $350 and $450 for every "first time depositor" ("FTD") resulting from the campaign solicitations. Brokers also generally required a customer to deposit at least $250 to open a trading account in order for a customer to qualify as a FTD, but brokers continued soliciting customers to deposit additional funds after they opened an account, which is how the brokers benefitted from the relationship. Brokers paid DPL and then DPL shared the profits with AIP, or at times brokers paid AIP directly at DPL's direction.

59.     DPL managed the backend operations for the binary options affiliate marketing campaigns, including by routing the customers from AIP's campaign website to the broker websites. For example, in February 2014, Barak agreed to send one broker in the United States "U.S. traffic, you want to get as much as we can send you starting upcoming Monday."

60.     DPL also tracked progress of AIP's campaigns and created and sent AIP weekly reports via email that showed leads, customers, traders, conversion rates and AIP's earnings per campaign, among other things. DPL collected commission from the brokers and paid AIP its portion of the proceeds in bank accounts in the United States or directed brokers to pay a certain amount to AIP directly based on those weekly reports.

61.     DPL also assured brokers, including at least one broker in the United States in January 2016, that they would handle all customer issues related to the trading software through DPL's service representatives who would "manage every error, bug, question that users have so your sales will not spend any time dealing with that and do what they do best–making them deposit."

18

2.    Digital Assets Fraud (October 2016-August 2018)

62.    During the Digital Assets Period, Digital Platinum Defendants, through Fingerhut and others that he supervised, engaged in a fraudulent solicitation scheme similar to the one carried out at AIP, but focused on digital assets instead of binary options.

63.    Specifically, on behalf of the Digital Platinum Defendants, Fingerhut and others that he supervised, created and disseminated tens of millions of solicitations that included materially false or misleading statements advising prospective customers and/or customers to open and fund a digital assets trading account and trade digital assets and/or digital assets options (swaps) off-exchange through an unregistered broker using the offered DA Trading System, which would purportedly automatically trade digital assets and/or options on digital assets automatically on their behalf.  The solicitations further advised that the DA Trading Systems began accumulating profits right away once the account was funded and set up with just a couple of clicks.

64.    Fingerhut did this for at least eleven campaigns during the Digital Assets Period, including: (1) Crypto Shield; (2) Bitcoin Code;(3) Ethereum Code; (4) The Crypto Software; (5) Symantic Investment App; (6) Crypto Tonics Lab;  (7) Bitcoin Trader; (8) Bitcoin Focus Group; (9) Crypto Genius; (10) Kryptonex labs; and (11) Bitcoin Loophole.

65.    During the Digital Assets Period, Digital Platinum Defendants, through their employees, officers, owners, and agents, including Fingerhut, handled the marketing, broker intermediary, and backend roles.  Fingerhut managed Digital Platinum Defendants' affiliate marketing program from DPI's offices in Florida, or by working out of his home in Miami Beach, Florida.

66.    Fingerhut hired, directed, and/or supervised at least four individuals in Florida and one individual in Israel to write solicitation emails and disseminate them in bulk through

19

autoresponders that he and others he supervised created for the digital assets campaigns. Just like his binary options activities for AIP, when Fingerhut wrote digital assets solicitation emails, he fabricated profits and performance results based on fictional accounts of fictitious characters' use of the DA Trading System that was marketed; Fingerhut directed those that he supervised to do the same.

67.     DPL and Huf, through Valariola, Barak, and others acting on their behalf, managed the backend, supplied the marketed DA Trading Systems, worked directly with the brokers, tracked progress of the campaigns and handled payments to DPI and its employees and agents, including Fingerhut.

68.     Digital Platinum Defendants' digital assets campaigns operated the same way as the previous binary options campaigns at AIP. Fingerhut and others that he supervised created and/or disseminated mass email solicitations using autoresponders. Those emails included an embedded link that directed anyone who clicked it to the corresponding digital assets campaign website operated by DPL and/or Huf through an affiliate network controlled by Valariola and Barak called Roi Boutique. Upon arrival at the landing page for each campaign, a sales video automatically played to further persuade a prospective customer and/or customer to open and fund a digital assets trading account.

69.     Fingerhut and others he supervised used more than ten autoresponders on behalf of Digital Platinum Defendants during the Digital Assets Period. On average, five auto responders were used on a daily basis and, on average, each autoresponder contained around two-hundred thousand (200,000) email addresses obtained by Digital Platinum Defendants and used as leads for their digital assets solicitation campaigns.

70.     Digital Platinum Defendants' websites generally included some variation of the campaign name like http://thecryptosofware.co/ for the Crypto Software campaign or http://ethereumcode.net/index.php for the Ethereum Code campaign.

71.     The landing pages for Digital Platinum Defendants' digital assets campaigns all included a sales video that streamed automatically.  As part of his duties, Fingerhut tested the links embedded in the solicitation emails to ensure that the recipients would be directed to the proper campaign website and to make sure that the sales videos streamed automatically once a customer accessed the website.  In doing so, Fingerhut viewed the sales videos.

72.     Brokers selected by DPL and/or Huf for the digital assets campaigns agreed to pay a pre-determined, flat commission resulting from each new customer that opened and funded a digital assets trading account ("FTD") as a result of Digital Platinum Defendants' solicitations. Brokers also generally required a customer to deposit at least $250 to open a trading account and qualify as a FTD.

3.     **Defendants' False or Misleading Solicitations**

a.     *AIP's Fraudulent Binary Options Solicitations*

73.     AIP, through Fingerhut and others, intentionally or recklessly created and/or procured false or misleading email solicitations and follow-ups (known as "swipes") and sales videos for each of the binary options campaigns that it launched with DPL's assistance.

74.     As described above, DPL, through Valariola and Barak, knew or willfully disregarded that the swipes and sales videos that AIP created and disseminated for its binary options campaigns included false or misleading information about the Trading System and purported users' experiences with and profits resulting from the Trading System, particularly since DPL did not share results of any Trading System with AIP for AIP to include in its solicitations.

21

75.     The swipes created and/or disseminated by Fingerhut contained numerous false or misleading statements about the advertised Trading Systems, e.g., that customers can and have already "made millions" trading with the Trading Systems, or that customers made hundreds in profits in seconds, thousands in a day, and became millionaires in a few months.  AIP's swipes prior to June 2014 included the same false or misleading statements about the Trading Systems.

76.     When Fingerhut wrote swipes for AIP, he made up profits and performance results instead of referring to real users' experiences with the marketed Trading Systems. Fingerhut also created the appearance of fake urgency in the solicitation emails by stressing that spots are limited ("Only 50 people around the world are accepted each month") or "time is running out" and "this download link expires in 24 hours."  Prior to June 2014, others at AIP similarly included fake profits, performance results, and false urgency in the swipes.

77.     Fingerhut knew that the swipes prepared by others for AIP also included materially false or misleading information about profits, trading results, background and experience of the creators of the Trading Systems, and/or purported users' experience with the Trading Systems.

78.     Even though Fingerhut and others at AIP sent the swipes to prospective customers and customers, those emails often appeared as though the fictional character(s) who were depicted in the corresponding sales video sent the communications.  In other instances, the emails appeared to come from the fake owner or support department of the advertised Trading System so the solicitation looked more persuasive and credible.

79.     For example, Fingerhut worked on the Push Money App ("PMA") campaign by creating and disseminating false or misleading email solicitations and testing the link to the sales video.  The following swipe from on or about February 23, 2016 exemplifies solicitations

Fingerhut and others at AIP disseminated for the PMA campaign, which references a fake "PMA company" and was signed by fake founders of the fake PMA company:

> We have just closed a special deal with one of our major brokers. Everyone that registers their PMA App today gets a matching deposit bonus . . . up to $10k if you're so fortunate . . . Just in the past 24 hrs the PM App has made the new members a combined $118,927.36. Just in the last 24hrs! My friend, you are missing out on serious money if you haven't activated your app yet. I know last year you were scammed with Binary Options bots. Trust me, this is not one of those scams. Not even close. PMA Company received the Most Profitable Trading System award at the NY convention of 2015. Yes we are a real legit company that really wants to help you become filthy rich.

There were no new members who earned over $118,000 in 24 hours, no 2015 convention, and there was never a company called PMA Company.  Fingerhut knew that the trading results of purported users in the PMA emails were fake.

80.     In May 2016, AIP, through Fingerhut and others, sent various emails to a disabled veteran in the United States living on disability payments, reminding the recipient to fund a trading account "to make possibly 7 figures in 180 days just like our first group of beta testers!" One email stressed the "limited availability" of PMA and urged that customer to fund his account "so you'll be able to start making money right away."  These emails included fake trading profits and false time and availability restrictions, all of which Fingerhut knew was regularly included in AIP's solicitations despite the fact that the information was not true.

81.     In addition to false statements in the email solicitations Fingerhut created or disseminated, Fingerhut knew that all of the binary options campaign websites featured at least one sales video that depicted a fictional story about a Trading System portrayed by paid actors representing fictional characters making false or misleading statements about the Trading System's trading results, risk of loss, experience of the founders, and profits earned.  The videos

also included props like luxury vehicles, a private jet, and mansions–all rented to create the

video and not in fact owned or purchased by any user of the advertised Trading System.

82.     Fingerhut knew that the stories depicted in AIP's sales videos were fabricated by

Atkinson or a copywriter and did not reflect real people's results from use of the marketed

Trading Systems.

83.     In fact, none of AIP's binary options sales videos involved real users or creators

of the advertised Trading System.  As scripted, and as Fingerhut knew, the actors brazenly lied

in the videos about their role and the fictional story line.  For example, the SMS video included

the following false statements delivered by an actor:

> See anyone can throw numbers around and whip up some proof shots. All the
> scamers  [sic] do it.  This isn't that.  This is a completely different playing
> field.  And you're going to see real proof . . . you can't deny . . . and . . . in a
> way you've never seen before in your life.

> Everything I'm about to tell you is 100% real and was experienced by me
> firsthand.

All of these statements were fabricated.

84.     Historical and/or live trading results depicted in AIP's sales videos were also

fake.  For example, the sales video for CC portrays "Robert Allen" as the star.  Allen, a doctor,

apparently received the CC System from a "true billionaire" and "financial mogul" on his

deathbed after Allen cared for him in the hospital.  The sales video shows screenshots of Allen's

trading account from July 2009 through August 2009 and also a "live" video of the account with

big red letters across the screen, "LIVE ONLINE PROOF."  Allen explains that he "just"

deposited $250 "risk-free" into his account and he will "show you the money it makes LIVE

over the next 60 seconds.  We can back up every word we say with real life results."  The sales

video shows the account increasing nine times then settling at $356,910 in the span of one

minute.  However, Robert Allen was a fictional character portrayed by an actor, there was no

billionaire mogul creator, and Allen had no trading account from 2009 or any trading profits

from the CC System.

85.    AIP's sales videos also purported to guarantee profits by using the "risk-free"

Trading System:

> The AMA campaign promised:
>
>> In sum total . . . we know . . . you will be earning at least $300,000 per month–
>> also known as . . . $3.6 million dollars per year . . . starting just 30 days from
>> now . . . just as sure as 1 plus 1 equals 2. Gosh, I love numbers! These are
>> mathematical certainties . . . .
>>
>> The Auto Money App only picks winning trades . . . .  These brokers only
>> work for the Auto Money App and they are designed to make sure your initial
>> deposit turns you into a millionaire in 90 days or less.
>
> SMS includes:
>
>> And when you do get to the end of this video, you will also be rewarded with a
>> guaranteed $1000 in your first 60 seconds and $10,000 in your first two days
>> for free . . . .  There will be no losses.  None at all.

>> b.    *Fingerhut's & Digital Platinum Defendants' Digital Assets*
>>        *Fraudulent Solicitations*

86.    Digital Platinum Defendants, through Fingerhut and others at his direction,

intentionally or recklessly created and/or procured false or misleading swipes for each of its

digital assets campaigns during the Digital Assets Period.

87.    The swipes created and/or disseminated by Fingerhut and others that he

supervised, contained numerous false or misleading statements about the advertised DA Trading

Systems.

88.    Fingerhut's swipes generally referred to the digital assets involved, most often

Bitcoin, and explained that the DA Trading System resulted in profits regardless of what

happened to the price of Bitcoin and without the customer needing to purchase any Bitcoin.  The

sales videos further showed screenshots of executed transactions that purported to reflect trading in digital assets and also options (swaps) involving digital assets.

89.     Fingerhut admitted that when he wrote swipes, he fabricated profits and performance results instead of referring to real users' experiences with the marketed DA Trading Systems.  He also instructed the individuals he supervised to do the same and/or he provided the content for them to disseminate (as was the case with the Israeli employee who reported to Fingerhut).  Fingerhut, and others under his supervision, also created the fake appearance of urgency in the solicitation emails by stressing that spots are limited (e.g., "this new members' group is limited to only 100 new members").

90.     Fingerhut further admitted that all the emails/swipes he wrote or that others under his supervision wrote for Digital Platinum Defendants were based on fictional accounts of fictitious characters' use of the offered DA Trading System.  Fingerhut boasted to Passerino that the swipes that were most successful in persuading individuals to open and fund digital assets trading accounts were the ones he created.

91.     For example, in or around November 2017, Fingerhut directed an agent or employee of DPI to disseminate email solicitations for Digital Platinum Defendants' Bitcoin Code campaign, while intentionally or recklessly disregarding that they included the following materially false or misleading statements:

> Kelly Jones writes about this system that delivers huge gains no matter what the price [of Bitcoin] does.
>
> You see, there is a system that will deliver results no matter how high or low Bitcoin goes . . . .  I estimate that if you start now in a month you can be sitting on at least $20K.  Yes, it is a high number but that is what I took in after a month of using this system.
>
> Here's what is about to happen the second you activate your auto-generating profit account.  There is [sic] over 1,000 people just like you using this system

every single day earning thousands in profits.  And don't be
intimidated . . . .  Because you do NOT need any previous experience or any
tech skills.  The system does 100% everything for you.  It is so easy to make
money from this anyone can do it including you . . . .  You start right now, by
this time tomorrow you will have the money already in your account ready to
be spent.  Yes, it works that fast . . . .

92.     All of these statements concerning profits and users' experience with the DA

Trading System were fictitious in that they were not based on actual performance of the system

or any real person's profits resulting from same.

93.     Similarly, the swipes Fingerhut and/or his team created and used for another

Digital Platinum Defendants' Bitcoin campaign included the following materially false or

misleading statements:

Had you started using our system just one month you'd be sitting on a
minimum of $400,000 in profit.  Isn't it amazing.

But thanks to our revolutionary system, you can profit with bitcoin with zero
risk.

I would take action fast as this new members group is limited to only a hundred
new members who want too fast track their success.

As of right now our system has created 2903 first time millionaires in 2017
with nine more members about five days away from hitting the millionaire
mark! . . . .  Recently we reopened the enrollment and everyone who joins in
2017 we can guarantee you'll become a millionaire in 2018

[Y]ou have come this far in the process and have been given a spot to join our
team, let me remind you each of our members is earning $13,000 per day or
more.

[Y]ou activate your account now within exactly 24 hours your payout will be at
least 13,000 period.  Every single day you will receive this amount or
more . . . .

94.     Fingerhut knew that all of the statements in this swipe were fictitious in that they

were not based on real users' experience with the marketed DA Trading System and there was

no basis to include the "guarantee" of profits.

95.     The swipes Fingerhut and his team created and used for the Crypto Software

(//thecryptosoftware.co/) digital assets campaign in or around January 2018 included the

following materially false or misleading statements:

> [I]t only took 29 days for the last 23 people who joined to start getting daily
> gains over $20,000.
>
> Mark my words . . . you will NEVER get the gains you get from the system I
> am about to show you.  There is no way you can earn 13K a day by buying
> coins.  The number above is exactly how much you will gain each day by using
> my system. Plus it requires no experience and can be generating big profits for
> you automatically.

All of the statements in this swipe were similarly fictitious.

96.     Fingerhut included all of the materially false or misleading statements in the

swipes (or directed others to do so) disseminated on behalf of Digital Platinum Defendants to

induce prospective customers to sign up so that he and the Digital Platinum Defendants could

earn compensation and/or commissions.

97.     Fingerhut's email solicitations for all of Digital Platinum Defendants' digital

assets campaigns included an embedded link to the campaign websites, which each featured an

automatically streaming sales video that depicted a fictional story about a DA Trading System

portrayed by paid actors representing fictional characters making false or misleading statements

about the system's trading results, risk of loss, experience of the founders, and profits earned.

98.     Fingerhut viewed Digital Platinum Defendants' sales videos as part of the process

of testing the links in the solicitation emails.  Fingerhut knew that the stories depicted in the

digital assets sales videos were fabricated and did not reflect real people's results from use of the

marketed DATrading System.

99.     For example, the Bitcoin Code sales video described how "anyone can make an

excess of $13,000 in just 24 hours" using the software that trades Bitcoin without buying it with

"an unheard of 99.4% accuracy, which means it's virtually impossible to lose."  The video

shows fake "LIVE" demonstrations that include screen shots of 126 executed options

transactions, which resulted in only 3 losses.  The video also includes three fictitious

testimonials, one of which claimed to have earned $400,000 using the DA Trading System in

thirty-seven days, another claiming to have earned over $750,000 in two months.

### C.      Defendants Scammed Tens of Thousands of Individuals

100.    Tens of millions of individuals received AIP's and Digital Platinum Defendants'

fraudulent solicitations and the fraudulent campaigns were successful.

101.    For example, during a portion of the Binary Options Period, between January

2014 and June 2016, at least 51,917 new customers, some of which were US customers, opened

and funded binary options trading accounts at brokers in connection with fraudulent campaigns

that DPL aided and abetted; at least 42,945 of those customers opened and funded binary options

trading accounts in connection with fraudulent campaigns that Fingerhut participated in from

June 2014 to June 2016.

102.    During the Digital Assets Period, at least 8,043 customers opened and funded

digital assets or digital assets options trading accounts at brokers in connection with Digital

Platinum Defendants' fraudulent campaigns that Fingerhut participated in.

103.    The amount of money customers deposited when opening a new account varied.

For the binary options and digital assets campaigns, customers were generally required to

deposit at least $250 initially.  Therefore, the 51,917 customers that opened new binary options

trading accounts at brokers between January 2014 and June 2016 deposited at least $12,979,250

in trading accounts as a result of AIP's fraudulent solicitations.  Similarly, the 8,043 customers

that opened new digital assets trading accounts between October 2016 and August 2018

deposited at least $2,010,772.95 as a result of Digital Platinum Defendants' fraudulent solicitations.

104.    Brokers paid DPL and AIP a flat commission for each new funded binary option account opened as a result of AIP's fraudulent solicitations and DPL and AIP split the commission between them.  Between October 2013 and November 2016, DPL paid AIP $17,300,780.50 for the binary options campaigns they launched together.  AIP deposited over $154,956 into Fingerhut Group's bank account for Fingerhut's services during the Binary Options Period.

105.    Between October 2016 and August 2018, DPI received $3,619,391.31 in payments for its digital assets affiliate marketing activities, primarily from an account in the name of Huf.  The money deposited in a United States account in DPI's name represents only a portion of the commissions DPL and/or Huf earned as a result of DPI's fraudulent solicitations.

106.    During the Digital Assets Period, Fingerhut invoiced DPL, DPI, and Huf for the affiliate marketing services he provided in connection with digital assets campaign and those entities generally paid him through Fingerhut Group and/or Media Hut.  Fingerhut received at least $383,269.98 during the Digital assets Period from accounts in the name of DPL, DPI, and Huf.  Fingerhut's compensation included a fixed base salary and since at least July 2017, he also received approximately two percent (2%) of the commissions resulting from his (and his team's) fraudulent solicitations.

107.    In the spring and summer of 2018, Fingerhut orchestrated a number of financial transactions among entities he owned and controlled, including Fingerhut Group, Recruiting Hut, and Media Hut.  On June 29, 2018, Fingerhut withdrew the remaining balance in the Fingerhut Group account, approximately $250,000, and transferred the funds to his Recruiting

Hut account.  Fingerhut closed the Fingerhut Group account in July 2018 and used funds from the Recruiting Hut account to pay off his mortgage in July 2018.

### D.   Fingerhut's Materially False or Misleading Statements to the Commission and Under Oath

108.    On August 9, 2018, Staff sent via UPS an investigative subpoena and letters to Fingerhut and his companies requesting that they retain, preserve, and safeguard against destruction of all documents, communications and information related to the binary options and digital assets fraud alleged here ("DND").  The package also included a copy of the form *Statement to Persons Providing Information About Themselves to the Commission* ("*Statement to Persons*"), which advises parties of their duty to speak truthfully and potential penalties for failing to do so.

109.    Staff spoke with Fingerhut on a voluntary basis via telephone twice in August 2018 and once in September 2018.  Fingerhut was not represented by counsel at those times.  As is Staff's practice, before discussing any substantive matters, Staff advised Fingerhut of the ways in which the Commission may use information provided to it, and that if he chose to speak with Staff voluntarily, all statements must be truthful as there could be criminal and civil penalties for making false or misleading statements to Staff.  Fingerhut acknowledged Staff's warnings and agreed to speak on a voluntary basis claiming that he wanted to cooperate.

110.    After speaking with Fingerhut on August 20, 2018, Staff re-sent its original subpoena and DNDs dated August 9 to Fingerhut, Fingerhut Group, and Media Hut via email, attaching a copy of the Division's *Statement to Persons*, which memorialized the warnings Staff conveyed orally at the outset of the telephone conversation.  Fingerhut confirmed receipt on August 21, 2018 via email.

111.    During the telephone conversations with Staff, Fingerhut provided information about AIP, the Digital Platinum Defendants, and his role with those companies.  Fingerhut also agreed to prepare and sign a declaration that Staff could use during litigation in support of its Motion for a Preliminary Injunction in the *Atkinson* case.

112.    Fingerhut executed a declaration under penalty of perjury that Staff used as evidence in its filing in September 2018.  In October 2018, Fingerhut testified as a witness for Staff during the subsequent preliminary injunction hearing.  *Atkinson*, No. 18-cv-23992-JEM, at ECF Nos. 65, 103.2.

113.    The Division deposed Fingerhut in connection with the *Atkinson* litigation on May 22, 2019. Fingerhut testified that he understood that his testimony and declaration were made under oath.

1.    Use & Deletion of Fingerhut's Personal Email Accounts

114.    Fingerhut told Staff during telephone conversations on August 20, 21, 2018 and September 20, 2018, and later testified under oath, that the only email address he used to conduct business for Digital Platinum Defendants was dan@digitalplatinum.com.

115.    During Fingerhut's deposition in connection with the *Atkinson* litigation in May 2019, Fingerhut repeated the assertion several times.  He was asked, and he responded:

Q.  Okay. So you didn't use any other email addresses while at Digital Platinum; right?

A.  No.

Q.  Or related to Digital Platinum work?

A.  No.

116.    However, Fingerhut routinely used his personal Gmail account for business related to Digital Platinum Defendants, including to provide instructions to individuals he

supervised about email solicitations for digital assets campaigns, send and view Google Docs that contained email solicitations for digital assets campaigns, and to access solicitation materials in Dropbox.  In fact, it was Fingerhut's practice to ensure that a copy of Digital Platinum Defendants' email solicitations would be sent to his Gmail address during the Digital Assets Period.

117.    Fingerhut failed to disclose, search or produce any documents from that Gmail account in response to the investigative and judicial subpoenas directed to him.

118.    On or about August 23, 2018, after speaking with Staff, receiving an investigative subpoena and DND letters, and after Passerino notified him that DPI received a subpoena from the CFTC that named Fingerhut, Fingerhut deleted and/or deactivated his personal Gmail account.  During his May 22, 2019 deposition, Fingerhut denied any recollection of deleting or deactivating that account.

119.    Fingerhut admitted, however, that in early 2019 he deleted a Hotmail account that he used to conduct business at AIP and Digital Platinum Defendants.  Fingerhut did so at least five months after receiving the August 2018 investigative subpoena and DNDs and at least three months after receiving a judicial subpoena in October 2018.

120.    In response to those subpoenas, Fingerhut produced only a handful of documents from the Hotmail account related to AIP business.  However, Fingerhut sent or received hundreds of emails related to AIP's and DPL's binary options or Digital Platinum Defendants' digital assets affiliate marketing from his Hotmail account, all of which were relevant to the August 2018 investigative subpoena and October 2018 judicial subpoena.

2.     <u>Fingerhut's Direct & Integral Role in Digital Platinum Defendants' Fraud</u>

121.     Fingerhut made false or misleading statements to Staff and in his sworn declaration to conceal the nature and extent of his integral role in Digital Platinum Defendants' digital assets fraud and production of documents showing same.

122.     During telephone conversations with Staff, Fingerhut described his role related to trading or digital assets email solicitations at DPI as low-level, merely reporting to and following instructions from Passerino.

123.     In his sworn declaration, Fingerhut averred that although he participated in hiring certain individuals to work at DPI, none of those individuals were involved in creating or disseminating solicitations for campaigns related to trading or digital assets:  "Those individuals were hired to develop and design an email marketing system and an interactive sports game app for the NBA/WNBA."

124.     During Fingerhut's deposition, Fingerhut confirmed (until confronted with contradictory evidence) that this statement was true and accurate and went even further:

> Q. Did you hire anyone that was involved in writing swipes?
>
> A. No.
>
> Q. Okay. Did you hire anyone who was involved in sending out emails through auto responders for CFD or virtual currency or any other trading campaigns?
>
> A. No.

125.     However, Fingerhut did in fact recruit, hire, train, and supervise individuals on behalf of the Digital Platinum Defendants to assist him with writing swipes and sending out emails solicitations through autoresponders for digital assets and other trading campaigns.

3.      Fingerhut's Laptop

126.    Fingerhut testified at the *Atkinson* PI hearing that he quit his job at DPI on his birthday in 2018 and gave the laptop computer that he used for DPI business to Passerino that same day by handing it to Passerino at Fingerhut's home.  *Atkinson*, No. 18-cv-23992-JEM, at ECF Nos. 103.2, 136.1.

127.    Passerino failed to turn over the laptop to the appointed receiver or Staff as ordered by the Court during the *Atkinson* litigation.  Relying on Fingerhut's testimony regarding the laptop, Staff filed a Motion for Rule to Show Cause ("RTSC") why Passerino should not be held in contempt for failing to produce the laptop, among other things, on October 30, 2018.  *Id*. at ECF No. 103.  As part of the RTSC proceedings, the CFTC identified, among other things, "Dan Fingerhut's computer which, according to Mr. Fingerhut's uncontroverted testimony, he personally handed to Passerino, along with all the username and password information to access therein, on August 13, 2018."  *Id*. at ECF No. 130 at 7-8, ECF 210 at ¶ 4.

128.    Passerino thereafter produced documents and provided information to Staff contradicting Fingerhut's statements. Staff engaged in additional discovery and discovered that the laptop was purchased by Fingerhut and not DPI, Passerino was not at Fingerhut's home on his birthday in 2018, Fingerhut did not give his laptop to Passerino at his home on his birthday in 2018 or at any other time, Fingerhut had his laptop after he spoke with the CFTC (also after his birthday in 2018), and Fingerhut also used a desktop at his home and his cell phone to conduct Digital Platinum Defendants' business, which he had omitted from discussions with the Division and which he failed to produce.

129.    When Passerino met with Fingerhut at his home after his birthday in 2018 and notified him that the CFTC issued a subpoena directed at DPI that identified Fingerhut, Fingerhut responded by saying that he would go on his boat and throw his laptop into the ocean.

130.    During his deposition, Fingerhut repeated his false statement that he handed the laptop he used while working at Digital Platinum Defendants to Passerino when he quit DPI on his birthday in 2018.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Fingerhut's, DPL's, Valariola's and Barak's Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019) (Options Fraud)**

131.    7 U.S.C. § 6c(b) makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

132.    17 C.F.R. § 32.4 provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly:  (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

133.     As set forth in paragraphs 2-4, 6, 16, 26, 36-48, 73, 75-85, 100-101, and 103-04, between June 2014 and October 2016, Fingerhut, as an agent of AIP, intentionally or recklessly created and/or disseminated fraudulent solicitations in emails, websites, and fictitious sales videos promising free access to Trading Systems to induce prospective customers to open and fund a binary options trading account with a recommended broker so that AIP could earn commissions for twenty binary options campaigns.

134.     Between June 2014 and October 2016, Fingerhut, by the conduct alleged in paragraphs 2-4, 6, 16, 26, 36-48, 73, 75-85, 100-101, and 103-04, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction directly or indirectly: (a) cheated or defrauded, and attempted to cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

135.     As set forth in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, between October 2013 and November 2016, AIP, through the acts of its owners, employees, agents, and/or employees, including Fingerhut's acts between June 2014 and October 2016, intentionally or recklessly created and/or disseminated fraudulent solicitations in emails, websites, and fictitious sales videos promising free access to Trading Systems to induce prospective customers to open and fund a binary options trading account with a recommended broker so that AIP could earn commissions for twenty-four campaigns.

136.     As set forth in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, between at least October 2013 and November 2016, AIP, through the acts of its owners, employees, agents, and/or employees, including Fingerhut's acts between June 2014 and

October 2016, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction directly or indirectly: (a) cheated or defrauded, and attempted to cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

137.    As set forth in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, AIP violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 through the acts of its owners, officers, agents, and/or employees, including Fingerhut's acts between June 2014 and October 2016, because Fingerhut's conduct was within the scope of his employment, office or agency with AIP.  AIP is therefore liable for Fingerhut's acts, omissions, and failures constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

138.    As set forth in paragraphs 2-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-04, between October 2013 and November 2016, DPL, through Valariola and Barak, willfully aided and abetted AIP's twenty-four fraudulent binary options campaigns by supplying certain false sales videos, knowing AIP used similar false or misleading statements in video and email solicitations that it created and disseminated to prospective customers, sharing those solicitations with brokers and encouraging them to use them in the brokers' further solicitations, serving as an intermediary with the brokers, supplying the Trading Systems that did not operate as marketed, and handling the commissions resulting from the fraud.  Therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2016), DPL is liable for AIP's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

139.    As set forth in paragraphs 2-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-04, between October 2013 and November 2016, Valariola and Barak willfully aided and abetted AIP's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 within the scope of their employment, office or agency with DPL. DPL is therefore liable for Valariola's and Barak's acts, omissions, and failures constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. §1.2.

140.    As set forth in paragraphs 2-4, 6, 19-24, 49-61, 74, and 104, Valariola and Barak controlled DPL throughout the relevant period, including between October 2013 and November 2016. Valariola and Barak failed to act in good faith and/or knowingly induced DPL's violations alleged herein.  Valariola and Barak are therefore liable for DPL's violations as controlling persons pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

141.    Each solicitation offering automated trading software that purported to trade binary options automatically on behalf of customers is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

## COUNT II

**Fingerhut's Violations of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2018)**
**(CTA Fraud)**

142.    Section 1a(12)(A) of the Act, 7 U.S.C. § 1a(12)(A) (2018), in relevant part, defines a CTA as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or advisability of trading in" any commodity for future delivery, security futures product, swap, and/or commodity option.

143.    Between October 2013 and November 2016, AIP acted as an unregistered CTA by advising others through email and video solicitations as to the value and advisability of

trading in binary options to earn commission from recommended brokers using automated trading systems as set forth in Paragraphs 1-4, 6, 16, 26-27, 36-61, 73, 75-85, 100-101, and 103-04.

144.     Regulation 1.3(Associated Person)(4), 17 C.F.R. § 1.3(Associated Person)(4) (2019), in relevant part, defines an Associated Person of a CTA to include an employee or agent of a CTA that is involved in the solicitation of a client's or a prospective client's discretionary account.

145.     As set forth in paragraphs 2-4, 6, 16, 26-27, 36-48, 73, 75-85, 100-101, and 103-04, Fingerhut acted as an unregistered Associated Person of a CTA between June 2014 and October 2016 because, as an employee or agent of AIP, he created and/or disseminated solicitations to clients and prospective clients that advised them to: (i) trade in binary options; (ii) with a recommended broker; (iii) using automated trading software that would trade automatically on their behalf; (iv) for compensation.

146.     7 U.S.C. § 6$o$(1) makes it unlawful for a CTA or Associated Person of a CTA, using the instrumentalities of interstate commerce, directly or indirectly:

> (A)     to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B)     to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

147.     As set forth in paragraphs 2-4, 6, 16, 36-48, 73, 75-85, and 100-101, Fingerhut fraudulently solicited members of the public and created and/or disseminated fraudulent websites and emails advising members of the public to open and fund binary options trading accounts with a recommended broker to access the marketed Trading Systems that purported to trade automatically on behalf of the client automatically.  For each of AIP's binary options campaigns,

including but not limited to the twenty (20) AIP launched that Fingerhut was involved with, the solicitations repeatedly misrepresented, among other things:  (i) hypothetical and fictitious trading results as real results; (ii) actors as true users of the Trading Systems; (iii) the fictitious experience, background and skill of the "creators" of the Trading Systems; and/or (iv) that the testimonials reflected real users' experiences.

148.    Between June 2014 and October 2016, Fingerhut, by the conduct alleged in paragraphs 2-4, 6, 16, 36-48, 73, 75-85, 100-101, and 103-104, while acting as an AP of a CTA, used the instrumentalities of interstate commerce and:  (a) employed numerous devices, schemes, or artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients, in violation of 7 U.S.C. § 6*o*(1).

149.    Each solicitation offering automated trading software that purported to trade binary options automatically on behalf of customers is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

**COUNT III**

**Fingerhut's and Digital Platinum Defendants' Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019) (Manipulative & Deceptive Device, Scheme or Artifice)**

150.    Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A) (2018), defines "swap" to include, among other things, any agreement, contract, or transaction that:  (a) is an option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic

interests or properly of any kind, without also conveying an ownership interest in any asset or liability.

151.     During the Binary Options Period (October 2013-November 2016), AIP, through its owners, officers, employees, and/or agents, including Fingerhut during the period of June 2014 to October 2016, engaged in a fraudulent binary options scheme which offered free access to Trading Systems, which in turn traded binary options (swaps under the definition in the Act). DPL willfully aided and abetted twenty-four (24) of those campaigns and Fingerhut participated in twenty (20) between June 2014 and October 2016.

152.     During the Digital Assets Period (October 2016-August 2018), Fingerhut and Digital Platinum Defendants, through the acts of Valariola, Barak, Fingerhut, and other owners, officers, employees, and/or agents of Digital Platinum Defendants, engaged in eleven (11) fraudulent digital assets campaigns which marketed free access to DA Trading Systems, which in turn, traded digital assets, a commodity in interstate commerce under the Act, and options on digital assets, a swap under the Act.

153.     7 U.S.C. § 9(1) provides, in relevant part, "[i]t shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the as the Commission shall promulgate . . ."

154.     17 C.F.R. § 180.1(a)(1)-(3) provides, in relevant part, that it shall be unlawful for any person, in directly or indirectly:

> In connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or

artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of materials fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . .

### Binary Options Swaps Fraud

155.    Between June 2014 and October 2016, as set forth in paragraphs 2-4, 6, 16, 36-48, 73, 75-85, 100-101, and 103-104, Fingerhut, on behalf of AIP, intentionally or recklessly created and/or disseminated fraudulent solicitations for at least twenty (20) of AIP's binary options campaigns that included materially false or misleading statements in emails, websites, and fictitious sales videos promising free access to Trading Systems that purported to trade automatically on behalf of the customer to induce prospective customers to open and fund a binary options trading account with a recommended broker to earn commissions for AIP.

156.    Between June 2014 and October 2016, Fingerhut, on behalf of AIP, by the conduct alleged in paragraphs 2-4, 6, 16, 36-48, 73, 75-85, 100-101, and 103-104, directly and indirectly, in connection with binary options (swaps) intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (2) made, or attempted to make, untrue or misleading statement of a material fact or omitted to state material facts necessary in order to make statements made not untrue or misleading; and (3) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers and prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

157.    Between October 2013 and November 2016, as set forth in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, AIP, through its owners, officers, employees, and/or agents, including Fingerhut's acts during the period of June 2014 to October 2016,

43

intentionally or recklessly created and/or disseminated fraudulent solicitations for at least twenty-four (24) binary options campaigns that included materially false or misleading statements in emails, websites, and fictitious sales videos promising free access to Trading Systems that purported to trade automatically on behalf of the customer to induce prospective customers to open and fund a binary options trading account with a recommended broker to earn commissions for AIP.

158.    AIP, by the conduct alleged in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, directly and indirectly, in or in connection with binary options (swaps), intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (2) made, or attempted to make, untrue or misleading statement of a material fact or omitted to state material facts necessary in order to make statements made not untrue or misleading; and (3) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers and prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

159.    As set forth in paragraphs 1-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-104, between at least October 2013 and November 2016, AIP violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) through the acts of its owners, officers, agents, and/or employees, including Fingerhut's acts between June 2014 and October 2016 because Fingerhut's conduct was within the scope of his employment, office or agency with AIP.  AIP is therefore liable for Fingerhut's acts, omissions, and failures constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. §1.2.

160.     As set forth in paragraphs 2-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-04, between October 2013 and November 2016, DPL, through Valariola and Barak, willfully aided and abetted AIP's twenty-four (24) fraudulent binary options campaigns by supplying certain false sales videos, knowing AIP used similar false or misleading statements in video and email solicitations that it created and disseminated to prospective customers, sharing those solicitations with brokers and encouraging their use in the brokers' further solicitations, serving as an intermediary with the brokers, supplying the Trading Systems that did not operate as marketed, and handling the commissions resulting from the fraud.  Therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2016), DPL is liable for AIP's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

161.     As set forth in paragraphs 2-4, 6, 16, 19-24, 26-27, 36-61, 73-85, 100-101, and 103-04, between October 2013 and November 2016, Valariola and Barak willfully aided and abetted DPL's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) within the scope of their employment, office or agency with DPL.  DPL is therefore liable for Valariola's and Barak's acts, omissions, and failures constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. §1.2.

162.     As set forth in paragraphs 2-4, 6, 19-24, 49-61, 74, and 104, Valariola and Barak controlled DPL throughout the relevant period, including between October 2013 and November 2016.  Valariola and Barak failed to act in good faith and/or knowingly induced DPL's violations alleged herein.  Valariola and Barak are therefore liable for DPL's violations as controlling persons pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

Digital Assets Commodity and Swaps Fraud

163.     Between October 2016 and August 2018, as set forth in paragraphs 5,6, 16, 19-24, 62-72, 86-99, 100, and 102-106, Fingerhut intentionally or recklessly created and/or disseminated fraudulent solicitations for at least eleven digital assets campaigns that included materially false or misleading statements in emails, websites, and fictitious sales videos promising free access to DA Trading Systems that purported to trade Bitcoin or Ethereum digital assets and/or options involving those digital assets automatically on behalf of the customer to induce prospective customers to open and fund a digital assets trading accounts with a recommended broker to earn commissions for eleven (11) campaigns.

164.     Between October 2016 and August 2018, as set forth in paragraphs 5,6, 16, 19-24, 62-72, 86-99, 100, and 102-106, Fingerhut directly and indirectly, in connection with digital assets and/or digital assets options intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (2) made, or attempted to make, untrue or misleading statement of a material fact or omitted to state material facts necessary in order to make statements made not untrue or misleading; and (3) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers and prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

165.     Between October 2016 and August 2018, the Digital Platinum Defendants, through their owners, officers, employees and/or agents including Fingerhut, by the conduct alleged in paragraphs 5,6, 16, 19-24, 62-72, 86-99, 100, and 102-106, intentionally or recklessly created and/or disseminated fraudulent solicitations for at least eleven digital assets campaigns that included materially false or misleading statements in emails, websites, and fictitious sales videos promising free access to DA Trading Systems that purported to trade Bitcoin or Ethereum

digital assets and/or options involving those digital assets automatically on behalf of the customer to induce prospective customers to open and fund a digital assets trading accounts with a recommended broker to earn commissions for eleven (11) campaigns.

166.    Between October 2016 and August 2018, the Digital Platinum Defendants, through their owners, officers, employees and/or agents including Fingerhut, by the conduct alleged in paragraphs 5,6, 16, 19-24, 62-72, 86-99, 100, and 102-106, directly and indirectly, in or in connection with commodities in interstate commerce and/or swaps intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (2) made, or attempted to make, untrue or misleading statement of a material fact or omitted to state material facts necessary in order to make statements made not untrue or misleading; and (3) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers and prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

167.    Between October 2016 and August 2018, Fingerhut's acts, misrepresentations and omissions occurred within the scope of his employment, office or agency with Digital Platinum Defendants as set forth in paragraphs 5, 6, 16, 19-24, 62-72, 86-99, 100, 102-106.  Therefore, Digital Platinum Defendants are liable for his acts omissions, and failures constituting violations of 7 USC. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

168.    As set forth in paragraphs 5, 6, 19-24, 49-61, 74, and 104, Valariola and Barak controlled DPL, DPI and Huf throughout the relevant period, including between October 2016 and August 2018.  Also as set forth in those paragraphs, Valariola and Barak failed to act in good faith and/or knowingly induced DPL's, DPI's, and Huf's violations alleged herein.

Valariola and Barak are therefore liable for Digital Platinum Defendants' violations as controlling persons pursuant to 7 U.S.C. § 13c(b).

169.    Each solicitation offering automated trading software that purported to trade binary options, digital assets, or options on digital assets automatically on behalf of customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT IV

**Fingerhut's False or Misleading Statements to the Commission Violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2018)**

170.    7 U.S.C. § 9(2) provides, in relevant part, that it shall be unlawful for any person:

> [T]o make any false or misleading statement of a material fact to the Commission, including . . . any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known the statement to be false or misleading.

171.    Fingerhut intentionally or recklessly made various material false or misleading statements and/or omissions to Staff during telephone conversations, in his signed declaration, during his testimony at the *Atkinson* PI hearing, and during his deposition as set forth in paragraphs 8, 16, and 108-130, in violation of 7 U.S.C. § 9(2).

172.    For example, as set forth in paragraphs 108-113 and 114-120, Fingerhut falsely represented to Staff in telephone conversations that the only email address he used for the Digital Platinum Defendants' business was dan@digitalplatinum.com.  In fact, he regularly used a second email, a Gmail account, to conduct Digital Platinum Defendants' business and that email account is where he received copies of fraudulent solicitations he created and/or disseminated for Digital Platinum Defendants' digital assets campaigns.  Fingerhut failed to search that Gmail account and produce relevant documents in response to an investigative and judicial subpoena.

48

Fingerhut deleted and/or deactivated the email account after speaking with Staff, receiving a subpoena and do not destroy letters, and after being notified that DPI received a subpoena that named him.

173.    Similarly, as set forth in paragraphs 8, 108-113 and 121-125, Fingerhut included materially false or misleading statements and omissions in his declaration and testified falsely during his deposition as to the nature of his role in Digital Platinum Defendants' digital assets solicitation scheme.  For example, Fingerhut lied about hiring individuals who were involved in writing swipes and sending out email solicitations.

174.    Likewise, as set forth in paragraphs 8, 108-113 and 126-130, Fingerhut falsely testified that he handed the laptop he used while working with Digital Platinum Defendants to Passerino at Fingerhut's home on his birthday in 2018.

175.    Fingerhut's false or misleading statements or omissions were material because they hindered Staff's investigation, resulted in Staff taking legal action and making representations to the Court, and were designed to conceal Fingerhut's substantial and integral role in Digital Platinum Defendants' fraud and related evidence.

176.    Each false or misleading statement or omission, including the three examples set forth above, is alleged as separate and distinct violation of 7 U.S.C. § 9(2).

## VII.    RELIEF REQUESTED

177.    WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to the Court's own equitable powers:

    a.  Find that between June 2014 and October 2016 Fingerhut violated

        Sections 4c(b), 4o(1), and 6(c)(1) and (2) of the Act, 7 U.S.C. §§ 6c(b),

6o(1), 9(1), (2) (2018), and Regulations 32.4 and 180.1(a)(1)-(3), 17

C.F.R. §§ 32.4, 180.1(a)(1)-(3) (2019).

b.  Enter an order of permanent injunction enjoining Fingerhut, his affiliates,

agents, servants, employees, successors, assigns, attorneys, and all

persons in active concert with him, who receives actual notice of such

order by personal service or otherwise, from engaging in the conduct

described above, in violation of 7 U.S.C. §§ 6c(b), 6o(1), and 9(1) and (2)

and 17 C.F.R. §§ 32.4, 180.1(a)(1)-(3).

c.  Find that  between October 2013 and November 2016 Digital Platinum

Ltd., Valariola, and Barak aided and abetted AIP's violations of 7 U.S.C.

§§ 6c(b), 9(1) and 17 C.F.R. §§ 32.4, 180.1(a)(1)-(3);

d.  Enter an order of permanent injunction enjoining Valariola, Barak, Digital

Platinum Ltd., its affiliates, agents, servants, employees, successors,

assigns, attorneys, and all persons in active concert with them, who

receives actual notice of such order by personal service or otherwise, from

engaging in the conduct described above, in violation of 7 U.S.C.

§§ 6c(b), 9(1) and 17 C.F.R. §§ 32.4, 180.1(a)(1)-(3);

e.   Find that between October 2016 and August 2018 Digital Platinum Ltd.,

Digital Platinum Inc., Huf Mediya Ltd. (a.k.a. Hoof Media Ltd.),

Valariola, and Barak violated 7 U.S.C. § 9(1) and 17 C.F.R. §

180.1(a)(1)-(3).

f.  Enter an order of permanent injunction enjoining Digital Platinum

Limited, Digital Platinum Inc., Huf Mediya Ltd. (a.k.a. Hoof Media Ltd.),

Valariola, and Barak, their affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons in active concert with them,

who receive actual notice of such order by personal service or otherwise,

from engaging in the conduct described above, in violation of 7 U.S.C.

§ 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

g. Find that Relief Defendant Aicel Carbonero received assets and/or funds

to which she is not entitled.

h. Enter an order of permanent injunction prohibiting all Defendants and any

of their affiliates, agents, servants, employees, assigns, attorneys, and

persons in active concert or participation with them, from directly or

indirectly:

      i. Trading on or subject to the rules of any registered entity (as

        that term is defined in Section 1a(40) of the Act, 7 U.S.C.

        § 1a(40));

      ii. Entering into any transactions involving "commodity interests"

        (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3

        (2019)) for Defendants' own personal accounts or for any

        accounts in which Defendants have a direct or indirect interest;

      iii. Having any commodity interests traded on their behalf;

      iv. Controlling or directing the trading for or on behalf of any

        other person or entity, whether by power of attorney or

        otherwise, in any account involving commodity interests;

v.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vi.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

vii.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

i.  Enter an order directing all Defendants and Relief Defendant, as well as any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, real and personal property and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and the Regulations, including pre- and post-judgment interest;

j.   Enter an order directing all Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

k.   Enter an order directing each Defendant to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act, as described herein;

l.   Enter an order requiring all Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

m.  Enter an Order providing such other and further relief as this Court may deem necessary and appropriate.

Dated: May 5, 2020

Respectfully submitted,

/s/ Allison V. Passman

Allison V. Passman, trial counsel
Special Bar ID #A5502489
Candice Haan, trial counsel
Special Bar ID#A5502564

Susan Gradman, trial counsel
Special Bar ID #A5501721


Attorneys for Plaintiff
Commodity Futures Trading
Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
apassman@cftc.gov
sgradman@cftc.gov
chaan@cftc.gov