UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-CV-21887-DPG

COMMODITIES FUTURES TRADING
COMMISSION,

      Plaintiff,

v.

DANIEL FINGERHUT,
DIGITAL PLATINUM, INC., DIGITAL PLATINUM,
LTD., HUF MEDIYA (A/K/A HOOF MEDIA), TAL
VALARIOLA, and ITAY BARAK

      Defendants,

AICEL CARBONERO,

      Relief Defendant.

_____/

## **RECEIVER'S INITIAL REPORT**

Melanie E. Damian, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits her first status report setting forth her activities and efforts to fulfill her duties under the Order Appointing Temporary Receiver (the "Appointment Order") [ECF No. 33] for the period from the date of appointment, May 8, 2020, through July 7, 2020.

## <u>TABLE OF CONTENTS</u>

I.  **PROCEDURAL BACKGROUND AND OVERVIEW OF RECEIVER'S ACTIVITIES TO DATE**.................................4

    A.  **Appointment and Duties of Receiver** ................................6

    B.  **Duty to File Initial and Periodic Status Reports**.....................7

    C.  **Executive Summary of Initial Report** ...............................7

        1.  *Steps Taken to Implement the Appointment Order* ...............7
        2.  *The Known Assets of the Defendants*...........................8
        3.  *Steps the Receiver Intends to Take in the Future to Protect and Recover Assets* ...............................................8

    D.  **Overview of Receiver's Activities to Date**.........................9

II.  **THE RECEIVER'S ACTIVITIES AND EFFORTS TO DATE TO MARSHAL ASSETS, ADMINISTER THE ESTATE, AND IMPLEMENT THE TERMS OF THE APPOINTMENT ORDER** .......................10

    A.  **Receiver's Employment of Professionals**...........................10

    B.  **Receiver's Initial Efforts to Marshal and Preserve Assets and Records of the Receivership Estate**................................12

    C.  **Obtaining Information and Records from the Defendants**...........14

    D.  **Recovery of Defendants' Records and Assets from Financial Institutions**.......................................................15

    E.  **Securing Real and Personal Property and Other Assets of the Defendants** ...............................................17

    F.  **Preliminary Analysis of Defendants' Accounts and Transfer of Assets/Funds** .......................................17

        1.  *Accounts at Financial Institutions* .............................17
        2.  *Digital Devices*............................................18

    G.  **Investigation of the Defendants' Business Operations** ............19

    H.  **The Estate's Potential Claims Against Third Parties**..............19

    I.   **Transfers of Assets Between Fingerhut and Carbonero** ...........20

**III. RECEIPTS AND EXPENDITURES, ASSETS OF ESTATE, AND PROPERTIES OF DEFENDANTS**........................................................................21

**IV. RECEIVER'S RECOMMENDATIONS AND CONCLUSION**..........................22

I.    **PROCEDURAL BACKGROUND AND OVERVIEW OF RECEIVER'S ACTIVITIES TO DATE**

On May 5, 2020, the Commodity Futures Trading Commission ("CFTC") filed a Complaint for, among other things, injunctive relief against Daniel Fingerhut ("Fingerhut"), Digital Platinum, Inc. ("DPI"), Digital Platinum, LTD ("DPL"), Huf Mediya, LTD (a/k/a Hoof Media, LTD) ("Huf"), Tal Valariola ("Valariola"), Itay Barak ("Barak") and, as a Relief Defendant, Aicel Carbonero ("Carbonero") (collectively, the "Defendants" or "Receivership Defendants") commencing the above-captioned enforcement action (the "CFTC Enforcement Action").  *See* ECF No. 1.[1]  On May 6, 2020, the CFTC filed an Expedited Motion for Preliminary Injunction [ECF No. 11] and an Expedited Motion for Appointment of Temporary Receiver [ECF No. 12] to preserve the status quo during the pendency of litigation in the CFTC Enforcement Action and to secure the assets and documents of the Defendants.  *See* ECF No. 12.  On May 6, 2020, the Court issued an Order setting a telephonic hearing for May 7, 2020 to address the various motions filed by the CFTC.  *See* ECF No. 16.  Following the hearing on May 7, 2020, to provide additional time for the CFTC to effectuate service of process on several of the Defendants, the Court set the CFTC's Motion for Preliminary Injunction for hearing to take place on June 3, 2020.  *See* ECF No. 20.  On May 8, 2020, the Court entered the Appointment Order which appointed Melanie E. Damian, Esq. as temporary Receiver with the full powers of an equity Receiver over each of the Defendants named in the CFTC's Complaint.  *See* ECF No. 33.  On May 18, 2020, the CFTC filed an Emergency Motion for Statutory Restraining Order seeking an Order from the Court freezing the assets of the Receivership Defendants and further permitting an inspection of records and prohibiting the destruction of documents due to the Receivership Defendants' failure to

---

[1] On June 12, 2020, the CFTC filed their first Amended Complaint.  *See* ECF No. 101.

4

comply with the requirements of the Appointment Order and the Court's Order granting the CFTC's Motion for Expedited Discovery.  *See* ECF No. 58.

On June 2, 2020, the Receiver filed a Motion for an Order to Show Cause Why Defendant Daniel Fingerhut Should Not Be Held in Contempt of Court for Refusal to Comply with the Appointment Order ("Show Cause Motion").  *See* ECF No. 88.  On June 3, 2020, the Court held a preliminary hearing on the CFTC's Motion for Preliminary Injunction and the Receiver's Show Cause Motion, and heard other motions,[2] but continued the hearing on the Motion for Preliminary Injunction in part to provide more time for the CFTC to resolve service of process issues and directed the Receiver to submit a proposed Order granting the Show Cause Motion.  On June 7, 2020, the Court entered an Order to Show cause requiring Defendant Fingerhut to comply with the Appointment Order, which Order the Receiver sought to have served on Defendant Fingerhut who had been avoiding service of process.  *See* ECF No. 100.  The Court conducted subsequent hearings on June 17, 2020 and on June 25, 2020 on various motions and considered the status of the CFTC's efforts to serve the Defendants with the Complaint for purposes of resetting the hearing on the CFTC's Motion for Preliminary Injunction and to serve the Show Cause Order on Defendant Fingerhut for purposes of setting a show cause hearing.  At the June 25, 2020 hearing, with Defendant Fingerhut having been served pursuant to the Court's Order granting the CFTC's Motion for Substituted Service on Defendant Daniel Fingerhut [ECF No. 111], the Court set the show cause hearing for July 8, 2020.[3]

On June 26, 2020, Defendant Carbonero entered into a Consent Order for Preliminary

---

[2] The vast majority of motion practice and docket activity in the CFTC Enforcement Action since its inception has concerned the Defendants' efforts to avoid or object to service of process of the Complaint and Appointment Order.

[3] The Court indicated in a call on July 7, 2020 that the hearing on the motion would be continued.

Injunction and Continued Appointment of Temporary Receiver which, among other things, extended the provisions of the Appointment Order as to Carbonero and imposed injunctive relief, an asset freeze, and continued the Receiver's appointment until final disposition of the CFTC's claims as to Carbonero.  *See* ECF No. 120.

### A.  Appointment Order and Duties of Receiver

The Appointment Order appointed Ms. Damian as temporary Receiver of all Defendants named in the CFTC's Complaint as well as all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants (the "Estate" or "Receivership Estate").  *See* ECF No. 33.

The Receiver's mandate in the Appointment Order was to, among other things, take possession, custody and control of the Receivership Estate, which includes but is not limited to being vested with complete authority to sue for, collect, receive, and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, contracts, financial records, funds on hand in banks and other financial institutions, and other papers and records of the Receivership Defendants.  *See* ECF No. 33 at pp. 2-3.  The Appointment Order further required the Receiver to preserve the value of the Receivership Estate and prevent withdrawal or misapplication of funds of the Receivership Defendants.  *See id*.

The Appointment Order further contains provisions that require the Receivership Defendants and third-parties to cooperate with the Receiver and provide the Receiver with full detailed accountings of all funds, records, and assets, and to further transfer and deliver to the possession, custody, and control of the Receiver all records, funds, and assets of the Defendants

and to further provide the Receiver with access to same.  *See* ECF No. 33 at pp. 5-7.

**B.  Receiver's Duty to File Initial and Periodic Status Reports**

The Appointment Order requires the Receiver to periodically file with the Court and serve

on all parties periodic reports, the first of which is due sixty (60) days following entry of the

Appointment Order[4], summarizing efforts to marshal and collect assets, administer the

Receivership Estate, and otherwise perform the duties mandated by the Appointment Order.  *See*

ECF No. 33 at p. 4.  This Initial Status Report ("Initial Report") summarizes the Receiver's

performance of her duties and responsibilities described in the Appointment Order as well as the

actions taken to implement the terms of the Appointment Order, but also details the Receiver's

efforts to marshal and secure assets, steps the Receiver intends to take in the future to protect

Receivership Estate assets, and recommendations as to the continuation of the Receivership.

**C.  Executive Summary of Initial Report**

1. *Steps Taken to Implement the Appointment Order*

- The Receiver imaged, preserved and secured access to the available Receivership Defendants'[5] physical and electronic financial records, data, computers, and digital devices.

- The Receiver took control of or froze 4 accounts belonging to Defendants Fingerhut and Carbonero at 3 financial institutions and had those institutions transfer funds totaling $141,585.11 to the Estate.

---

[4] The Appointment Order was entered on May 8, 2020, making the Receiver's Initial Status Report due on July 7, 2020.

[5] Most of the Receivership Defendants, including Fingerhut, DPI, DPL, Huff, Valariola, and Barak, have not complied with the Appointment Order in that they have not delivered to the Receiver, or granted the Receiver access to, any property, accounts, account summaries, devices, financial accounts, or otherwise as to said Receivership Defendants.  In fact, such violation of the Appointment Order has been discussed at lengths during the many hearings held by this Court.  Indeed, only Relief Defendant Carbonero has granted the Receiver access to her assets/properties.  The other Receivership Defendants' failure to comply with the mandates of the Appointment Order has substantially impeded the Receiver's performance of her duties and obligations thereunder.

- Pursuant to this Court's Order, the Receiver effectuated the transfer of $224,358.60 from defense counsel representing retainer funds paid by Fingerhut and Valariola and Barak.

### 2. *The Known Assets of the Defendants*

- $366,191.19 cash on hand in the Receiver's fiduciary account. *See* detailed accounting of Receivership Fiduciary Account attached hereto as **Exhibit A**.

- $6,292.55 frozen in Defendant Fingerhut's bank account.[6]

- Miami Beach condominium located at 7276 Gary Avenue, Miami Beach FL 33141 ("Residence") (exact value unknown at this time[7]), and personal property therein including, but not limited to, furniture, electronics, and a speedboat. *See* Residence Inventory attached hereto as **Exhibit C**.

- The Receivership Assets in Israel. At this time, while the Israeli Defendants have agreed to have an accounting performed by a forensic accountant and the Parties have engaged in discussions relating to a settlement procedure that would require an additional $1 million transferred to the Receivership Estate pending final resolution, because full disclosure has not been provided, the value of the Israeli Defendant's assets is not yet known.

### 3. *Steps the Receiver Intends to Take in the Future to Protect and Recover Assets*

- The Receiver and counsel for the CFTC are working with the Israeli Defendants on a consent order (to be entered upon service of process on those Defendants) that would preserve their assets, require an accounting of their assets, and potentially provide a mechanism for final resolution of the CFTC's claims, including a voluntary tender of disgorgement. In the interim, counsel for the Israeli Defendants have proffered that the assets are being preserved with an allowance for living expenses.

- Investigate transfers from Defendants to insiders, affiliates, and third parties and explore bringing claims against them to recover funds for the benefit of the

---

[6] Additional amounts remain frozen but not transferred to the Receiver's account at this time. The Receiver continues to identify Defendants' accounts at various financial institutions and to freeze and/or transfer the funds therein.

[7] While the Residence's exact current value is unknown at this time, the Receiver obtained a detailed report dated May 12, 2020 from Miami-Dade County's Office of the Property Appraiser which lists the condominium's 2019 market value and assessed value as $445,400.00. *See* Detailed Report of Office of the Property Appraiser attached hereto as **Exhibit B**.

Estate where appropriate.

- Pursue Defendant Fingerhut's compliance with the Court's Appointment Order and Order to Show Cause.

- Continue to investigate, freeze and/or take control of Defendants' bank accounts in the United States and abroad not already frozen and/or turned over to the Receiver.

- In the event the Court grants the CFTC's Motion for Preliminary Injunction or enters a consent order for preliminary injunction, liquidate, with Court approval, real and personal property of the Estate.

### D. Overview of Receiver's Activities to Date

Since her appointment, the Receiver with the assistance of her legal counsel, forensic accountants and computer forensic professionals, has worked diligently with counsel for the CFTC to identify, preserve and obtain copies off all accessible records of the Defendants and to identify, marshal, and/or freeze all known and accessible assets of the Defendants pursuant to the Appointment Order.  In particular, the Receiver and her professionals obtained and preserved Defendants' financial records through production from various financial institutions and forensic imaging of electronic data on computers, hard drives, storage devices, and mobile phones turned over by Defendant Carbonero and located in the Residence of Defendants Fingerhut and Carbonero.[8]  Further, the Receiver located and inventoried the Residence of Defendants Carbonero and Fingerhut, located and took control of the boat of Defendant Fingerhut, and identified and confirmed the freezing of funds held in bank accounts and investment accounts and real property of Defendants Carbonero and Fingerhut and funds held in the trust accounts of counsel for Defendants Fingerhut, Valariola and Barak.  The Receiver then worked with the financial institutions (at which the Defendants hold assets) and counsel for Defendants Fingerhut, Valariola

---

[8] The Residence mostly contained the assets and records of Defendant Carbonero but also included limited assets and records of Defendant Fingerhut.

and Barak to effectuate the transfer of all funds in those accounts to the fiduciary account the Receiver opened for the Receivership Estate.  To date, the Receiver has secured the transfer of $366,216.71[9] of funds to the Estate's fiduciary account.

Moreover, the Receiver has performed a preliminary analysis of the financial information and records provided by the Defendants, the CFTC, and various financial institutions and has provided all such information and records to her forensic accountants to conduct a more thorough analysis of the account activity and transactions.  This will enable the Receiver to (i) identify and locate additional Receivership assets and accounts of Defendants, (ii) investigate Defendants' business operations and dealings with customers, insiders, and affiliated persons and entities, (iii) determine whether the accounts were used in connection with the Defendants' businesses, (iv) determine the sources of funds transferred into and out of the accounts, (v) identify transfers between and among the various Defendants, (vi) identify transfers from those accounts to affiliates, insiders, and third parties and the accounts of such transferees for purposes of bringing actions to recover for the benefit of the Receivership Estate any improperly transferred funds, and (vii) identify potential Defendants' customers and other creditors and formulate an appropriate claims process and distribution plan, if warranted.

## II.  THE RECEIVER'S ACTIVITIES AND EFFORTS TO DATE TO MARSHAL ASSETS, ADMINISTER THE ESTATE, AND IMPLEMENT THE TERMS OF THE APPOINTMENT ORDER

### A. Receiver's Employment of Professionals

Pursuant to the Appointment Order, the Receiver was directed to, among other things, "[a]ssume full control of Receivership Defendants, . . . [t]ake exclusive custody, control, and possession of the Receivership Estate, which includes but is not limited to complete authority to

---

[9] *See* Exhibit A attached hereto.

sue for, collect, receive, and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information, contracts, financial records, funds on hand in banks and other financial institutions, and other papers and records of the Receivership Defendants . . . [t]ake all steps necessary to secure the business and other premises under the control of the Receivership Defendants . . . conserve, hold, manage, and preserve the value of the Receivership Estate . . . [p]revent the withdrawal or misapplication of funds entrusted to the Receivership Defendants . . . [m]anage and administer the Receivership Defendants and the Receivership Estate by performing all acts incidental thereto that the Temporary Receiver deems appropriate, including hiring or dismissing any and all personnel, suspending operations, and/or entering into agreements. . . . [m]aintain written accounts itemizing receipts and expenditures, describing properties held or managed, and naming the depositories holding funds or other assets of the Receivership Estate . . ." ECF No. 33, at pp. 2-4. As outlined above, the Appointment Order authorized the Receiver to hire any and all personnel including but not limited to the employment of, "investigators, attorneys or accountants, appraisers, and other independent contractors and technical specialists of the Temporary Receiver's choice, including without limitation members and employees of the Temporary Receiver firm, to assist, advise, and represent the Temporary Receiver and [to assist with] the movement and storage of any equipment, furniture, records, files or other physical property of the Receivership Defendants." *Id.*

Accordingly, the Receiver engaged Damian & Valori LLP ("Receiver's Counsel") as her legal counsel in Florida, Kapila Mukamal LLP (the "forensic accountants") as her forensic accountants and tax consultants, and Detekted as her computer/IT forensic professionals, and authorized the Israeli Defendants to engage Grant Thornton Israel as forensic accountants in Israel (pursuant to an agreement with the Israeli Defendants as to the scope of work and cap on fees and

costs) for purposes of performing an accounting of Defendant DPL's assets and business activities to determine an appropriate disgorgement amount for each of the Israeli Defendants, if possible.

### B. Receiver's Initial Efforts to Marshal and Preserve Assets and Records of the Receivership Estate

The Appointment Order grants the Receiver authority to take all steps necessary to secure the business and other premises under the control of the Receivership Defendants, including residential and business premises located in or around Miami and Miami Beach. *See* ECF No. 33 at p. 3.

Pursuant to the authority granted to the Receiver in the Appointment Order as outlined above, on May 12, 2020, the Receiver and the Receiver's Counsel coordinated with Miami Beach Police Department Officers to carry out certain mandates of the Appointment Order at the Residence of Defendant Fingerhut and Defendant Carbonero[10], located at 7276 Gary Avenue, Miami Beach, Florida 33141, which is owned by Carbonero.[11]

Upon arrival at the Residence, the Receiver's Counsel attempted to gain access. However, no one responded to knocks at the outer locked front gate blocking access to the front door. After the Receiver's Counsel determined they would not be able to gain access to the Residence during that visit, Counsel slipped a copy of the Appointment Order through the front gate.[12]

---

[10] The Receiver later learned that Defendant Fingerhut began the process of moving out of the Residence a few days prior to the Receiver's first attempt to gain access and execute the mandates of the Appointment Order.

[11] For a more detailed recitation of the Receiver and Receiver's Counsel's initial attempts to gain access to the Residence and execute the mandates of the Appointment Order, see the Receiver's Emergency Motion for Authority to Forcibly Enter Real Property of Receivership Estate [ECF No. 44].

[12] Prior to the Receiver's Counsel's visit to the Residence, in order to avoid such a scenario, the Receiver had attempted to contact Defendant Fingerhut through the counsel who had appeared on his behalf at the May 7, 2020 telephonic hearing on the CFTC's initial motions in this action and

After the Receiver's Counsel's unsuccessful attempt to gain access to the Residence, the Receiver communicated with new proposed counsel for Defendant Fingerhut and proposed counsel for Carbonero to discuss whether they would comply with the Appointment Order and cooperate with the Receiver in her execution thereof.  However, neither counsel confirmed that their prospective client would immediately comply and cooperate.  As such, on May 13, 2020, the Receiver and her Counsel filed an Emergency Motion for Authority to Forcibly Enter Real Property of Receivership Estate.  *See* ECF No. 44

On May 14, 2020, with Carbonero's cooperation, Receiver's Counsel executed certain mandates of the Appointment Order at the Residence.  In the presence of Carbonero and her counsel, Receiver's Counsel entered the Residence and removed digital devices including computers, phones, mobile storage devices, and other items for the Receiver's computer forensic professionals to document and image.  Receiver's Counsel inspected and took inventory of all personal property located at the Residence, instructed Carbonero to preserve and not sell or otherwise dispose of any property, and discuss with Carbonero and her counsel what items Carbonero could retain and what documents they should have copied and delivered to the Receiver. *See* Exhibit B.  Receiver's Counsel worked with Carbonero's counsel to arrange for the locks at the Residence to be changed to restrict access to the Residence during the initial term of the Appointment Order.

As detailed below, the Receiver also sent copies of the Appointment Order as well as subpoenas to various financial institutions at which the Defendants hold/held accounts during the

---

to contact Carbonero by telephone and email, to gain their cooperation in connection with carrying out the mandates of the Appointment Order, including gaining access to the Residence to secure that property and valuable personal property of the Receivership Estate and to gain possession of all digital devices for purposes of preserving and imaging the data thereon.

relevant period as set forth in the CFTC's Complaint based upon information provided by the CFTC and as discovered during the Receiver's investigation and execution of the provisions of the Appointment Order. The letters directed the financial institutions to freeze all access to and activity in the accounts pursuant to the Appointment Order, to wire account balances to the Receiver's fiduciary account where appropriate, and to produce various account records. The request for production of account records was also included in the Receiver's subpoenas.

### C. Obtaining Information and Records from Defendants

The Appointment Order requires the Defendants, among other things, to:

- provide a full detailed accounting of all funds, records, and assets;

- transfer and deliver to the possession, custody, and control of the Receiver all records, funds, and assets;

- provide the Receiver access to all records of accounts or assets held by financial or brokerage institutions;

- within 24 hours of the issuance of the Appointment Order, provide the Receiver with a detailed and complete schedule of all passwords and identification (ID) numbers for all websites, cloud storage services, email and smartphone accounts, and all accounts at any bank, financial institution or brokerage firm;

- within 24 hours of the issuance of the Appointment Order, provide the Receiver with a detailed and complete schedule of all passwords to, and the location and make and model of, all computers and mobile electronic devices owned and/or used in connection with their business activities and business and personal finances;

- deliver over to the Receiver: (a) possession and custody of all funds, assets, property, and all other assets, owned beneficially or otherwise, wherever situated, (b) possession and custody of records of the Receivership Defendants in connection with their business activities and business and personal finances. controlled or operated by Defendants.

*See* ECF No. 33 at pp. 5-7.

However, as of the filing of this Initial Report and as set forth *supra*, only Defendant

Carbonero has complied with the foregoing requirements.  Despite Defendant Fingerhut's non-compliance, including failing to provide the Receiver with the required documents and information, the Receiver and her counsel through correspondence and subpoenas have obtained a number of documents and records from various financial institutions at which Fingerhut holds or held accounts.

The Receiver will continue to work with her professionals, counsel for the CFTC, and counsel for the Defendants, and use all available resources including seeking judicial intervention, to obtain the required documents and information from all Defendants to enable the Receiver to fulfill her duties and obligations pursuant to the Appointment Order.

### D. Recovery of Defendants' Records and Assets from Financial Institutions

Following her appointment, the Receiver and her professionals swiftly took action to review all available documents associated with the Defendants for the purpose of identifying and investigating their assets, accounts and business operations.  The Receiver and her professionals analyzed the information and records provided by the CFTC and the Defendants and created a database of the bank, investment and credit card accounts that Defendants currently hold or previously held during the time period relevant to the CFTC's claims.  This database includes more than 37 different accounts held by the various Defendants[13] at 9 different financial institutions, including banks in the United States, Panama, and Israel.  *See* List of Accounts at Financial Institutions attached hereto as **Exhibit D.**

The Receiver then issued demand letters to those 9 financial institutions, providing  a copy

---

[13] Not all of these accounts may be associated with the Defendants' business operations and the Receiver's analysis of all of these accounts is ongoing.

15

of the Appointment Order and demanding (i) the freezing of all accounts and assets of all Defendants,[14] (ii) access to the accounts and account records including online access, (iii) detailed information concerning the history, nature and value (where applicable) of each account as required by the Appointment Order, and (iv) records concerning each account including, without limitation, account statements, communications between the Defendants and the recipient of the letters, asset transfer records, and account opening documents.

In some instances, the Receiver received reasonably prompt responses from the financial institutions of the demand letters and the production of some or all of the requested information and records.  In many cases, the Receiver sent subsequent letters, made telephone calls, issued subpoenas, and exchanged a number of emails with representatives and counsel for the institutions. The Receiver and her professionals are working to obtain full responses, documents, data and/or funds from those institutions, many of which have requested additional information to identify accounts held by the Defendants, which information the Receiver provided to the extent possible, or extensions of time to compile and produce the requested records, which extensions the Receiver granted.

After sending demand letters and the Appointment Order as well as subpoenas to the financial institutions,[15] the Receiver received confirmation from most of the institutions that accounts and funds therein were frozen and would be turned over to the Receiver in accordance

---

[14] With respect to the Defendants' credit card accounts, the Receiver, with the assistance of her forensic accountant is analyzing the account records received to date for purposes of identifying potential assets and charges for business expenses and determining whether the accounts, to they were frozen, should be unfrozen.

[15] Receiver's Counsel sent freeze, preserve and/or turnover letters to the following financial institutions: Ally Bank, Ally Invest, Bank of America, American Express, CitiBank, JP Morgan Chase Bank, JP Morgan Chase Credit, Wells Fargo, and Mizrahi Tefahot Bank.

with the terms of the Appointment Order.  Initially, the Receiver was able to freeze $148,150.66 in the accounts of Defendants Carbonero and Fingerhut at Ally Bank, Ally Invest, and CitiBank. As of the filing of this Report, the Receiver effected the transfer of $141,858.11 of these funds to the Receiver's fiduciary account for the Estate.

The Appointment Order's requirements to provide records and transfer assets to the Receiver also applies to accounts and assets held outside of the United States in the name or for the benefit of the Defendants.  *See* ECF No. 33 at p. 5.  As such the Receiver sent letters to all presently known institutions outside of the United States at which Defendants hold accounts and/or assets, demanding that such accounts be frozen and the funds therein be turned over to the Estate. As of the date of this Report, the Receiver has not received any records or assets from these institutions or from the Defendants pursuant to their repatriation obligation.

### E.  *Securing Real and Personal Property and Other Assets of the Defendants*

As discussed above, the Receiver has already inventoried and secured Defendant Carbonero's Residence located in Miami Beach.  With respect to the other Receivership Defendants, the Receiver is still currently unaware of the extent, value, and location of real and personal property due to those Defendants' failure to comply with the mandates of the Appointment Order.  The Receiver continues to search for assets of the Defendants and will take possession of any assets she may discover.

### F.  Preliminary Analysis of Defendants' Accounts and Transfer of Funds/Assets

#### 1. Accounts at Financial Institutions

The Receiver's forensic accountants reviewed the account records that the Receiver received to date, analyzed the account activity, and prepared a spreadsheet of the monthly activity

in each of the 38 bank accounts maintained at 9 different financial institutions for the following Defendants and affiliated entities:

- Aicel Carbonero (personal account)
- Aicel Carbonero, DDS, P.A.
- All In Publishing, LLC
- Daniel Fingerhut (personal account)
- Dental Group Satellite Services, Inc.
- Digital Platinum, Ltd.
- Digital Platinum, Inc.
- Fingerhut Group, Inc.
- Huf Mediya
- Itay Barak
- Media Hut, Inc.
- Recruiting Hut, LLC
- Smiles MIA
- Tal Valariola

The Receiver's forensic accountants are in the process of preparing a reconstruction of the activity in each such account ("Account Reconstructions"). The Receiver, her counsel and her forensic accountants will utilize the data obtained from the Account Reconstructions to trace funds to and from the Receivership Defendants and their affiliated business entities for purposes of identifying potential assets, customers and creditors of the Defendants, and individuals and entities that may have received improper and avoidable transfers from Defendants.

The Receiver's forensic accountants also determined what account records are missing and necessary to complete the Account Reconstructions. The Receiver will continue to follow up with, and the extent necessary issue additional subpoenas to, financial institutions to obtain the necessary records and share any and all additional records received with her forensic accountants so they may complete their analyses of account activity and the Account Reconstructions.

## 2. *Digital Devices*

As explained above, pursuant to the mandates of the Appointment Order, the Receiver had her computer forensic professionals forensically image the computers, external hard drives,

and mobile phone of Defendant Carbonero.  The Receiver will work with her professionals to analyze those images for purposes of investigating the assets of Defendants Carbonero and Fingerhut, their connection to the other Defendants and their business operations, and the flow of funds and other assets between and among the Defendants and affiliated entities and individuals to identify and locate assets of the Defendants and claims against insiders, affiliates and third parties, and to otherwise fulfill her obligations under the Appointment Order.  The other Defendants did not turn over any digital devices to the Receiver for purposes of preserving and imaging the stored data, as required by the Appointment Order.

### G.  Investigation of the Defendants' Business Operations

Due to the failure of all Defendants but Carbonero to comply with the requirements of the Appointment Order as detailed herein, including providing the Receiver with business and personal records, the Receiver has not been afforded the opportunity to investigate those Defendants' businesses.  Nevertheless, the Receiver will continue her efforts to obtain those business and personal records for purposes of her investigation of the Defendants' business operations. And, during the course of Grant Thornton Israel's forensic analysis of DPL's business and accounts, the Receiver will investigate the business operations and dealings of the Israeli Defendants to the extent possible given the information and records she is provided.

### H.  The Estate's Potential Claims Against Third Parties

The Receiver and her professionals will continue to work to identify all potential sources from which the Receivership Estate could recover funds belonging to, or improperly transferred from, the Defendants, including affiliates, insiders, relatives and third parties who received funds or other assets traceable to the Defendants' businesses and/or customers.  In the event the Court enters a preliminary injunction order and extends the Receivership as to Defendants Fingerhut,

Valariola, Barak, DPI, DPL and/or Huf, and authorizes the Receiver to bring recovery clams, the Receiver will complete her investigation of those claims, and after consultation with the CFTC, pursue those claims she believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## I. Transfers of Assets Between Defendants Fingerhut and Carbonero

The Receiver and her professionals have spent significant time analyzing the transfer of funds and assets by and between the Defendants Fingerhut and Carbonero to determine the value of the ill-gotten gains transferred to Carbonero and her liability as a Relief Defendant.   The Receiver identified Fingerhut's payment of Carbonero's mortgage and then regular transfers of large sums of money from Carbonero to Fingerhut over a number of years.   According to the representations of Carbonero and her counsel, these transfers represent Carbonero's repayment of the amount Fingerhut had transferred to pay off the mortgage for the Residence in Miami Beach.[16] The Receiver and her professionals analyzed account statements produced by Ally Bank and JP Morgan Chase Bank to confirm that these transfers were in fact for the mortgage repayment. However, the investigation is not complete.   The exact details and nature of the transfer of funds between Carbonero and Fingerhut is still unclear, and the Receiver will continue to work with her professionals and Carbonero's counsel to complete this investigation and determine the appropriate disgorgement amount for Carbonero as a Relief Defendant.

During the Receiver's analysis of the above-referenced bank records, the Receiver discovered large withdrawals and transfers of funds to and from Fingerhut's various business

---

[16] Carbonero's counsel advised that Fingerhut paid the mortgage in full on or about June 2018. The bank records in the Receiver's possession appear to confirm such mortgage payoff. Thereafter, Carbonero agreed to make monthly installments to Fingerhut personally to repay the mortgage payoff.

entities.  By way of example, Fingerhut's company, Media Hut, Inc., had an account at Chase Bank the account statements for which evidence a number of unexplained large withdrawals and transfers during the years relevant to the CFTC's claims, including withdrawals or transfers in the amounts of $9,000, $19,000, $6,000, and $21,000.  As with the transfers between Carbonero and Fingerhut, the Receiver will continue to analyze these records with her professionals.

### III.   RECEIPTS AND EXPENDITURES, ASSETS OF ESTATE, AND PROPERTIES OF DEFENDANTS

The Receiver presently holds a total of $366,191.19 in cash on hand, which she recovered from accounts of Defendants Fingerhut and Carbonero, from counsel for Fingerhut, and from counsel for Valariola and Barak, and deposited in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida, earning interest at 1.25% (APR).  *See* Exhibit A.

Further, the Receiver identified the following assets of the Estate:

- Liquid Assets at Financial Institutions not yet turned over to the Estate in the amount of $6,292.55.

- Miami Beach condominium located at 7276 Gary Avenue, Miami Beach FL 33141 (exact value unknown at this time[17]), and personal property therein including, but not limited to, furniture, electronics, and a speedboat.

- Businesses associated with Fingerhut, DPI, DPL, Huff, Variola, Barak (nature, location, and value unknown at this time).

Since the inception of the Receivership, the Receiver has made only one disbursement from the Estate's fiduciary account in the amount of $25.52 to pay a bank fee for that account.  *See* Exhibit A.

The Receiver and her professionals are entitled to the payment of the fees and reimbursement of the costs they incurred during the time period covered by this Report because

---

[17] *See* Detailed Report of Office of the Property Appraiser (Exhibit B).

the services they provided and expenses they advanced are reasonably likely to benefit the Receivership Estate and were necessary to the administration of the Estate. *See* ECF No. 33 at p. 9. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and expenses from the funds the Receiver has marshaled and deposited into her fiduciary account in connection with fulfilling her duties under the Appointment Order, and such application will itemize the time and nature of services rendered by the Receiver and her professionals. *See id*.

## IV.    RECEIVER'S RECOMMENDATIONS AND CONCLUSION

In light of her ongoing efforts to secure the assets, accounts, documents, and other items that make up the Receivership Estate from all Defendants and her continued efforts to secure the Defendants' compliance with the Appointment Order and cooperation, the Receiver recommends that the Receivership continue until at least such a time that the Defendants comply with the mandates of the Appointment Order and the Receiver is able to fully satisfy her duties and obligations thereunder.

The Receiver will continue to work with her team of professionals to locate, marshal and preserve all known and potential assets of the Estate. Further, as authorized by the Appointment Order, the Receiver will continue to investigate the Defendants' business operations and, at the appropriate time after consultation with the CFTC, pursue any and all potential claims against third parties that will behalf the Estate. With respect to the Israeli Defendants, the Receiver will work with their counsel and counsel for the CFTC to reach an agreement as to the entry of an order for preliminary injunction and a global resolution of the CFTC's claims, if that is possible. In the event the Parties are unable to reach such agreement or resolution, the Receiver will seek to enforce this Court's Orders in accordance with International Law. The Receiver will also continue to

investigate and gather information regarding all Defendants' assets through cooperation, subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants, to discover potential claims against affiliates, insiders, third parties and other sources of recovery.  Finally, the Receiver will continue to perform all other duties as mandated by the Appointment Order and will update the Court on a regular basis as to the status of the Receivership.

Respectfully submitted this 7th day of July 2020.

Respectfully submitted,

/s/Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No.: 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on July 7, 2020 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*