UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:20-cv-21887-GAYLES

**COMMODITY FUTURES TRADING COMMISSION**,

    Plaintiff,

v.

**DANIEL FINGERHUT,
DIGITAL PLATINUM, INC.,
DIGITAL PLATINUM, LTD.,
HUF MEDIYA (A.K.A. HOOF MEDIA),
TAL VALARIOLA, and ITAY BARAK**,

    Defendants,

**AICEL CARBONERO**,

    Relief Defendant.
_____/

## TEMPORARY STATUTORY RESTRAINING ORDER

**THIS CAUSE** comes before the Court on Plaintiff Commodity Futures Trading Commission's (the "Commission") Motion for Statutory Restraining Order ("SRO") with Notice (the "Motion") [ECF No. 58]. Pursuant to Section 6c(a) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 13a-1(a) (2012), and in accordance with Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65, the Commission moves for entry of an SRO with notice, freezing assets, allowing inspection of records, and prohibiting their destruction. Having reviewed the Motion and the record and having heard arguments from the parties at the hearing via videoconference on June 25, 2020,[1] the Court finds that all Defendants save Huf Mediya (a.k.a. Hoof Media) ("Huf") have received notice of the Motion and further finds that:

---

[1] Counsel for all parties save Huf Mediya (a.k.a. Hoof Media) attended this hearing, *see* [ECF No. 122 at 4, 5, 29, and 30], and the Court gave the parties an opportunity to call live witnesses, *see* [ECF No. 84].

1

1. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1335 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c of the Act authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

2. Venue lies properly within this District pursuant to Section 6c(e) of the Act, 7 U.S.C. §13a-1(e) (2012).

3. The Commission has made a proper showing that Defendants Daniel Fingerhut ("Fingerhut"), Digital Platinum, Inc. ("DPI"), Digital Platinum, Ltd. ("DPL"), Huf, Tal Valariola ("Valariola") and Itay Barak ("Barak"), by and through their agents, principals and control persons (hereinafter collectively referred to as "Defendants"), violated the core anti-fraud provisions of the Act, 7 U.S.C. §§ 1-26 (2012), by operating a fraudulent solicitation scheme involving binary options and digital assets.

**Binary Options Fraud**

The Court also finds that there is good cause to believe that:

4. Between October 2013 and August 2018, Defendants, through Fingerhut and others at his direction (from June 2014 until August 2018), or others acting on behalf of Defendants, scammed prospective customers by creating and/or disseminating fraudulent solicitations in binary options and digital asset affiliate marketing campaigns. [ECF No. 71-1 at Ex. 1 ¶¶ 40, 41, 75–76, 79–80, 90, 94, 114; Ex. 2 ¶¶ 3, 23, 24; ECF No. 80-1 ¶¶ 2–6, 9].

5. The binary options fraud occurred between October 2013 and November 2016 (the "Binary Options Period") through All In Publishing, LLC ("AIP"), a company in the United States.

AIP conducted at least twenty-four affiliate marketing campaigns that involved soliciting at least millions of prospective customers to open and fund off-exchange binary options trading accounts using false or misleading email, video, and website solicitations. [ECF No. 71-1 at Ex. 1 ¶¶ 38, 42, 74, 77, 91–94; Ex. 2 ¶¶ 40–42].

6. During the Binary Options Period, Valariola, Barak, and DPL willfully aided and abetted AIP's fraud by relying on AIP to manage the affiliate marketing while they handled certain logistics and back-end functions, including serving as an intermediary between AIP and brokers, supplying at least two fraudulent sales videos, managing funds from the scheme, and providing the marketed trading software. [ECF No. 71-1 at Ex. 1 ¶¶ 38, 40, 42–62, 74–77, 86; Ex. 2 ¶¶ 3–14, 40, 42; Ex. 4 at 51–58, 63–64, 76–81, 97, 189–92, 219–20, 230–31; Ex. 5 at 51:25–54, 57–59, 64–69, 74–76, 79; Ex. 8; Ex. 11].

7. Between June 2014 and October 2016, Fingerhut worked on behalf of AIP and engaged in binary options fraud by knowingly creating and/or disseminating at least millions of fraudulent binary options solicitations that advised prospective customers to trade with a "recommended broker" using fool-proof Trading Systems that automatically traded for them in binary options involving foreign exchange currency pairings, metals, and other assets. [ECF No. 71-1 at Ex. 1 ¶¶ 40, 42–62, 74–76; Ex. 2 ¶¶ 3–14, 40–42; Ex. 5 at 51:25–54, 57–59, 64–69, 74–76, 79; Ex. 11].

8. All of AIP's binary options campaigns, including the twenty that Fingerhut worked on and twenty-four that DPL, through Valariola and Barak aided and abetted, involved emails and sales videos on websites rife with materially false or misleading statements about the advertised Trading Systems that included fictional users and fake trading performance, fake accounts, and fabricated profits depicted as real. [*See, e.g.*, ECF No. 71-1 at Ex. 1 ¶¶ 38–39, 42–62, 76–80; Ex.

3

2 ¶¶ 5, 11–13; Ex. 4 at 20, 174–75, 343, 529; Ex. 5 at 90–93; Ex. 6 at 44, 146–48, 287, 324–25, 550; Ex. 7 at 58–60, 66–68, 73–75].

9. During the Binary Options Period, at least millions of individuals received AIP's fraudulent solicitations. [ECF No. 71-1 at Ex. 1 ¶¶ 90–91; Ex. 2 ¶¶ 40–42]. At least 51,917 of them opened and funded forex and metals binary options trading accounts with at least $12,979,250 in initial deposits from campaigns that DPL participated in; at least 42,945 of those customers joined while Fingerhut worked on behalf of AIP. [ECF No. 71-1 at Ex. 1 ¶¶ 40, 77, 97; Ex. 4 at 87–89].

10. During the Binary Options Period, AIP received over $27 million related to its binary options activities, at least $17,300,780.50 of which came from DPL. [ECF No. 71-1 at Ex. 1 ¶ 35]. Between June 2014 and October 2016, Fingerhut earned at least $154,956 from AIP. [ECF No. 71-1 at Ex. 1 ¶¶ 23–24].

**Digital Assets Fraud**

There is also good cause to believe that:

11. Between October 2016 and August 2018 (the "Digital Asset Period"), Fingerhut, Valariola, and Barak, on behalf of DPL, DPI, and Huf engaged in a similar fraudulent solicitation scheme involving digital assets. [ECF No. 71-1 at Ex. 1 ¶¶ 86, 90–92; Ex. 2 ¶ 25; Ex. 5 at 88, 94, 96, 101–102; Ex. 9 ¶¶ 17–20].

12. Beginning in approximately October 2016, Fingerhut began working for DPI and DPL and managed their digital asset campaigns from Florida. [ECF No. 71-1 at Ex. 1 ¶¶ 83, 85–86, 88, 95; Ex. 2 ¶¶ 20–23; Ex. 3 at 149–50, 152–59; Ex. 9 ¶ 20]. Specifically, Fingerhut, with Valariola's and Barak's knowledge and consent, directly or indirectly created and/or disseminated at least millions of fraudulent solicitations advising customers and prospective customers to open and fund digital asset trading accounts. [ECF No. 71-1 at Ex. 1 ¶¶ 85, 90–91, 109; Ex. 3 at 208–10, 213–14; Ex. 5 at 98].

13. The email and video solicitations that Fingerhut and his team created and/or disseminated included false or misleading statements about the marketed digital asset Trading Systems, including fictitious profits and performance results, to lure prospective customers to open accounts and trade digital assets and/or digital asset options with a specific unregistered broker that agreed to pay DPL and DPI commissions. [ECF No. 71-1 at Ex. 1 ¶¶ 41, 77, 90; Ex. 3 at 173–77, 190]. Like the email solicitations at AIP, the fraudulent solicitations Fingerhut and his team created and disseminated during the Digital Asset Period included fake testimonials from pretend users of the digital asset trading system. [ECF No. 71-1 at Ex. 3 at 173–74, 189–90, 197–98].

14. At least 8,043 customers opened and funded digital asset trading accounts in connection with this fraudulent scheme, depositing at least $2,010,750. [ECF No. 71-1 at Ex. 1 ¶¶ 41, 97].

15. Huf paid DPI over $3.2 million for DPI's digital asset marketing services, but that only represents a portion of the proceeds to DPI, DPL, Huf, Valariola, and Barak resulting from the fraudulent digital asset campaigns. [ECF No. 71-1 at Ex. 1 ¶ 37, Ex. W; ECF No. 80-1 ¶¶ 26, 29, 32–33, 37–38].

16. During the Digital Asset Period, Fingerhut invoiced DPL, DPI and Huf for the affiliate marketing services he provided and they paid him at least $360,269.98 into bank accounts in the United States. [ECF No. 71-1 at Ex. 1 ¶¶ 25, 34, 105].

17. In total, Fingerhut earned over $630,000 for his fraudulent affiliate marketing services between June 2014 and August 2018. [ECF No. 71-1 at Ex. 1 ¶¶ 23–34]. He thereafter transferred the funds among accounts in the name of businesses that he owned and controlled. *Id.* Fingerhut also paid off his mortgage with ill-gotten gains in July 2018 and then quit-claimed the deed to Relief Defendant Aicel Carbonero in August 2018. *Id.* ¶¶ 30–31.

### **Fingerhut's False Statements**

There is also good cause to believe that:

18. Between August 2018 and May 2019, Fingerhut made materially false or misleading statements to the Commission to disguise his role in the fraud and prevent the Commission from discovering related evidence before he could destroy it. [*See, e.g.*, ECF No. 71-1 at Ex. 1 ¶¶ 99–105, 107–108, 110–16].

19. First, in August and September 2018, Fingerhut falsely told the Commission that the only email account he used to conduct business while working with DPI and DPL was dan@digitalplatinum.com. *Id*. ¶¶ 107–108, 114–15; Ex. 9 ¶ 22–24. In May 2019, Fingerhut similarly falsely testified until confronted with contradictory evidence. *Compare* ECF No. 71-1 at Ex. 3 ¶¶ 22–23, 105, 126, *with id*. ¶¶ 149, 150, 159–62, 177–85. In fact, Fingerhut regularly used two other email accounts to conduct DPI and DPL business: danhutbiz@gmail.com and dhut3@hotmail.com. [ECF No. 71-1 at Ex. 1 ¶¶ 81, 84, 115; Ex. 3 at 217–19; Ex. 9 ¶¶ 22–24; Exs. 16–20].

20. After speaking with the Commission and receiving do not destroy letters and subpoenas from the Commission, Fingerhut deleted two email accounts that he used to conduct the binary options and digital assets solicitation fraud. [ECF No. 71-1 at Ex. 1 ¶¶ 111–12; Ex. 3 at 53–55, 184–85]. Nonetheless, Fingerhut repeatedly falsely testified at his deposition that he did not delete or destroy any documents or communications that would be responsive to the Commission's subpoenas. [ECF No. 71-1 at Ex. 3 at 53–55, 133, 184–85]. The Commission is aware of other documents and sources of information currently in Fingerhut's possession that may contain evidence of his fraud. [ECF No. 71-1 at Ex. 1 ¶¶ 113–15]. Fingerhut continues to work in the online marketing business. [ECF No. 71-1 at Ex. 3 at 20:8–21:15].

21.   Fingerhut ran and managed the digital asset marketing campaigns at DPI, but he falsely and misleadingly described his role to the Commission as limited, low-level, and merely directed by Jay Passerino ("Passerino"). [ECF No. 71-1 at Ex. 1 ¶¶ 88–90, 106–08; Ex. 2 ¶¶ 29, 31, 34–35].

22.   Fingerhut falsely testified in a related preliminary injunction hearing and during his deposition that he used a company laptop to conduct DPI and DPL business and that he returned it to Passerino when he resigned. [ECF No. 71-1 at Ex. 3 at 34–38, 43–44; Ex. 5 at 103–105; Ex. 2 ¶ 38]. In fact, Fingerhut's laptop was not a company laptop and most importantly, he did not provide the laptop to Passerino when he resigned or at any other time. [ECF No. 71-1 at Ex. 1 ¶¶ 87, 99]. Instead, on or about August 14, 2018, when Fingerhut learned that the Commission's subpoena to DPI identified him, he told Passerino that he would throw his laptop in the ocean from his boat. [ECF No. 71-1 at Ex. 1 ¶ 100].

### Other Material Facts

There is also good cause to believe that:

23.   Defendants appear to continue to work in the online marketing industry. [ECF Nos. 45-4 ¶ 3; 71-1 at Ex. 3 at 20:6–21:15; 113 at 22].

24.   DPL, Valariola, and Barak have documents and information that they have not produced to the Commission or the Israeli Securities Authority ("ISA") upon request; and Valariola and Barak refused to respond to almost all substantive questions during testimony in October 2019 by relying on the privilege against self-incrimination. [ECF No. 58-2 at Ex. 1 ¶¶ 9–12].

25.   Further, Valariola, Barak, and DPL have taken action in Israel seeking to quash the ISA's warrant for information by inaccurately claiming that they were cooperating with U.S. authorities. [ECF No. 58-2 at Ex. 1 ¶ 9].

26. Finally, Fingerhut, DPL, DPI, Valariola, and Barak have failed to fully comply with the Court's Orders appointing a Temporary Receiver, [ECF No. 33], and continuing the appointment of the Temporary Receiver, [ECF No. 76].

**A Temporary Statutory Restraining Order Is Warranted**

27. The standard to obtain temporary injunctive relief under the Act is lower than the standard under Federal Rule of Civil Procedure 65. *See U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) ("The Act enables district courts to issue permanent or temporary injunctions '[u]pon a proper showing' and without bond.") (citing 7 U.S.C. § 13a–1(b)) (alteration in original); *see also CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) ("In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.").

28. To obtain a temporary statutory restraining order, the Commission need only demonstrate good cause to believe that Defendants have engaged, are engaging, or are about to engage in any act or practice constituting a violation of the Act or Commission Regulations and that absent a temporary statutory restraining order, the Court's ability to grant effective final relief will be impaired. *See* 7 U.S.C. §13a-1(a); *see, e.g.*, *CFTC v. Gutterman*, No. 12-21047-CIV, 2012 WL 1632350 (S.D. Fla. Mar. 15, 2012) (applying the "good cause" standard).

29. In the Amended Complaint, [ECF No. 101], the Commission alleges the following:

   a. <u>Count I</u>: Fingerhut, DPL, Valariola, and Barak violated: (1) Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), which makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of any transaction involving any commodity regulated under the Act which is of the character of or is commonly known to the trade as, inter alia, an "option," "bid," "offer," "put," or "call," contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions

as the Commission shall prescribe; and (2) Regulation 32.4, 17 C.F.R. § 32.4 (2019), which provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of any commodity option transaction, it shall be unlawful for any person directly or indirectly: (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

    b. <u>Count II</u>: Fingerhut violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2018), which makes it unlawful for a Commodity Trading Advisor ("CTA")[2] or associated person of a CTA using the instrumentalities of interstate commerce directly or indirectly: (a) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (b) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

    c. <u>Count III</u>: Fingerhut, Valariola, Barak, DPI, DPL, and Huf violated: (1) Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), which provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the as the Commission shall promulgate[;]" and (2) Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2019), which provides, in relevant part, that it shall be unlawful for any person, directly or indirectly, in

---

[2] Section 1a(12)(A) of the Act, 7 U.S.C. § 1a(12)(A)(i) (2018), in relevant part, defines a CTA as any person who "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or advisability of trading in" any commodity option and/or any contract of sale of a commodity for future delivery, security futures product, or swap.

connection with any swap or contract of sale of any commodity in interstate commerce or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ any manipulative device, scheme, or artifice to defraud; (2) make or attempt to make any untrue or misleading statement of materials fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) engage or attempt to engage in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

        d.      <u>Count IV</u>: Fingerhut violated Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2018), which provides, in relevant part, that it shall be unlawful for any person to make any false or misleading statement of a material fact to the Commission, including any other information relating to a swap or a contract of sale of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew or reasonably should have known the statement to be false or misleading.

30.      Based on the foregoing, the Court finds that there is good cause to believe that Defendants engaged in, are engaging in, or are about to engage in fraud in violation of: Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019); Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2018); Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2019); and Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2018).

31.      There is also good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress will occur from the withdrawal, transfer, removal, dissipation or other disposition of funds, assets

or other property, and/or the destruction, alteration or disposition of books and records and other documents ("records") by Defendants, unless Defendants are immediately restrained and enjoined by Order of the Court.

32. Therefore, there is good cause for the Court to freeze funds, assets or other property owned, controlled, managed, or held by Defendants.

33. There is also good cause for the Court to prohibit Defendants from altering or destroying records and/or denying agents of the Commission access to inspect and copy records, when and as requested, to ensure that Commission representatives have immediate and complete access to those records.

34. In summary, there is a sufficient basis to freeze assets, to allow inspection of records, and to prohibit their destruction because the Commission is likely to succeed on the merits. Moreover, there is a reasonable likelihood that Defendants may transfer or dissipate assets or destroy or alter records. Therefore, the Court orders as follows:

**DEFINITIONS**

For the purposes of this Order, the following definitions apply:

35. The term "funds, assets, or other property" encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including, but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all cash, wherever located, whether in the United States or outside the United States.

36. The term "document" and "electronically stored information" are synonymous in meaning and equal in scope to the usage of the term in Fed. R. Civ. P. 34(a), and includes, but is not limited to, all writings, graphs, charts, photographs, sound recordings, images, and other data or other data compilations stored in any medium from which information can be obtained or translated, if necessary, into reasonable usable form. The terms "document" and "electronically stored information" refer to each and every such item in Defendants' actual or constructive possession, including, but not limited to: (i) all such items within the custody or control of any agents, employers, employees, or partners of Defendants; and (ii) all items which Defendants have a legal or equitable right to obtain from another person. A draft or non-identical copy is a separate item within the meaning of the term. A document also includes the file and folder tabs associated with each original and copy.

## RELIEF GRANTED

**IT IS HEREBY ORDERED AND ADJUDGED that, unless prohibited by any foreign state's or country's laws, which the Court will determine after Defendants petition the Court for relief:**

**I.    Asset Freeze Order Prohibiting the Transfer, Removal, Dissipation and Disposal of Assets**

37. Defendants are immediately restrained and enjoined, except as otherwise ordered by the Court, from directly or indirectly withdrawing, transferring, removing, dissipating, or otherwise disposing of any funds, assets, or other property, wherever located, including Defendants' assets or other property held outside the United States.

38. The funds, assets or other property affected by this Order shall include existing funds, assets or other property and funds, assets or other property acquired after the effective date of this Order.

## II.   Maintenance of and Access to All Records Which Relate to the Business Activities and Business and Personal Finances

39.  Defendants are restrained from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of any documents that refer or relate in any manner to any transaction or matter described in the Amended Complaint in this case, including the business practices or business or personal finances of any Defendant.

40.  Representatives of the Commission shall be immediately allowed to inspect the records that relate or refer to the business and personal finances of Defendants, including, but not limited to, both hard-copy and electronically stored information, wherever they may be situated and whether they are in the possession of Defendants or others. To ensure preservation and facilitate meaningful inspection and review of records, Defendants shall allow representatives of the Commission to make copies or forensic images of said documents and electronically stored information, and if on-site copying of documents and electronically stored information is not practicable, representatives may make such copies off site. After any such off-site copying, the Commission shall promptly return the original documents and devices upon which electronic information is stored.

41.  To further facilitate meaningful inspection and review, Defendants shall, absent a valid assertion of their individual rights against self-incrimination under the Fifth Amendment that identifies the specific basis for invoking the right, promptly provide Commission staff with:

a.   the location of all records relating or referring to the business activities and business and personal finances of Defendants; and

b.   all identification numbers and other identifying information for websites, cloud storage services, email and smartphone accounts, and all accounts at any bank, financial

institution or brokerage firm (including any introducing broker or futures commission merchant) owned, controlled or operated by Defendants, or to which Defendants have access; and

      c.      all passwords to, and the location, make and model of, all computers and/or mobile electronic devices owned and/or used by Defendants in connection with their business activities and business and personal finances.

    42.    When inspecting records that are subject to this Order, including those contained on computer(s) and/or other electronic device(s), the Commission should undertake reasonable measures to prevent review of Defendants' privileged communications and/or other nonbusiness, nonfinancial materials by the Commission's attorneys and other staff who are part of the litigation team in this matter. Moreover, Defendants (or their counsel) shall promptly contact the Commission's counsel to assert any claims of privilege (or other legal objections) relating to the contents of any records that are subject to this Order and promptly cooperate with the Commission's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed privileged and/or other nonbusiness, nonfinancial materials to the Commission's attorneys and other staff who are part of the litigation team in this matter. However, nothing herein shall excuse Defendants from full and immediate compliance with the Court's Order permitting the Commission to inspect the books and records which relate to Defendants' business activities and their business and personal finances.

### III. Notice to Financial Institutions and Others that Hold or Control Assets or Records

    43.    To ensure the effectiveness of the asset freeze and pending further Order of the Court, any financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or asset or other property of Defendants' shall not, in active concert or participation with Defendants, permit Defendants or

other persons to withdraw, transfer, remove, dissipate, or otherwise dispose of any of Defendants' assets, except as directed by further order of the Court; and

44. Any financial or brokerage institution, business entity, or person that receives notice of this Order by personal service or otherwise shall not, in active concert or participation with any Defendants, directly or indirectly destroy, alter, or dispose of, in any manner, any records relating to the business activities and business and personal finances of any Defendant.

45. Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or asset titled in the name of, held for the benefit of, or otherwise under the control of any Defendant, or has held, controlled, or maintained custody of any such account or asset of any Defendant at any time since October 2013, shall not, in active concert or participation with Defendants deny a request by the Commission to inspect all records pertaining to every account or asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendant(s), including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs. As an alternative to allowing inspection of records, a financial or brokerage institution, business entity or other person may provide copies of records requested by the Commission.

## IV. Persons Bound By this Order

46. This Order is binding on any person who receives actual notice of this Order by personal service or otherwise and is acting in the capacity of an officer, agent, servant, employee, or attorney of Defendants or is in active concert or participation with Defendants.

## V. Bond Not Required of the Commission

47. As the Commission has made a proper showing under Section 6c(b) of the Act, 7 U.S.C. 13a-1(b) (2012), it is not required to post any bond in connection with this Order.

## VI. Service of Order and Assistance of U.S. Marshals Service and/or Other Law Enforcement Personnel

48. Copies of this Order may be served by any means, including via email or facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any records or assets of any Defendant or that may be otherwise subject to any provision of this Order.

49. Staff of the Division of Enforcement and representatives of the United States Marshal Service are specially appointed by the Court to effect service.

50. The United States Marshal's Service, the Federal Bureau of Investigation, and local law enforcement are authorized to: (a) accompany the Commission's representatives in the execution of this Order on Defendants, and (b) help maintain lawful order while Commission representatives inspect records as provided in this Order.

## VII. Service on the Commission

51. Defendants shall comply with all electronic filing rules and requirements of the U.S. District Court of the Southern District of Florida and shall serve all pleadings, correspondence, notices required by this Order, and other materials on the Commission by delivering a copy to Allison V. Passman, Senior Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 525 West Monroe Street, Suite 1100, Chicago, Illinois 60661, apassman@cftc.gov, by electronic filing or e-mail.

**VIII.    Further Proceedings**

52.    The Commission's Motion for a Preliminary Injunction, [ECF No. 11], is set for hearing on <u>July 28, 2020, at 10:00 AM</u> in the Miami Division before Judge Darrin P. Gayles. The hearing will be conducted using Zoom, and the Court will provide the parties with the necessary information prior to the hearing. The Court has allotted up to 2 hours for the hearing. The parties shall notify the Court if they need additional time. The parties shall submit witness and exhibit lists to the Court on or before <u>July 24, 2020, at 5:00 PM</u>. If the parties intend to call live witnesses, they shall notify the Court on or before <u>July 24, 2020, at 5:00 PM</u>. During the hearing, the parties may refer to exhibits already filed on CM/ECF by their corresponding docket numbers. Any additional exhibits presented at the hearing shall be sequentially numbered.

**IX.    Force and Effect**

53.    This Order shall remain in full force and effect until further order of the Court, and the Court retains jurisdiction of this matter to enforce this Order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 13th day of July, 2020.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE