## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1:20-cv-21887-GAYLES

COMMODITY FUTURES TRADING
COMMISSION,

      Plaintiff,

v.

DANIEL FINGERHUT,
DIGITAL PLATINUM, INC.,
DIGITAL PLATINUM, LTD.,
HUF MEDIYA (a/k/a HOOF MEDIA),
TAL VALARIOLA, and ITAY BARAK,

      Defendants,

AICEL CARBONERO,

      Relief Defendant.

_____/

### ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

    **THIS CAUSE** comes before the Court on Plaintiff Commodity Futures Trading Commission's (the "CFTC" or the "Commission") Expedited Motion for Preliminary Injunction and Other Equitable Relief (the "Motion") [ECF No. 11]. In its Motion, the Commission moves for entry of a preliminary injunction against Defendants Daniel Fingerhut ("Fingerhut"), Digital Platinum, Inc. ("DPI"), Digital Platinum, Ltd. ("DPL"), Huf Mediya ("Huf"), Tal Valariola ("Valariola"), and Itay Barak ("Barak") and Relief Defendant Aicel Carbonero ("Carbonero" or "Relief Defendant") (hereinafter collectively referred to as "Defendants") for alleged violations of sections of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1–26, and accompanying regulations (the "Regulation(s)"), 17 C.F.R. pts. 1–190. The Court has reviewed the Motion and

the record, heard oral arguments on the Motion via videoconference in August and September 2020, and is otherwise fully advised. The Court concludes that the Commission has made a proper showing that Defendants, by and through their agents, principals, and control persons, violated core anti-fraud provisions of the Act and Regulations by operating a fraudulent solicitation scheme involving binary options and digital assets. Accordingly, a preliminary injunction is necessary to preserve the status quo pending the resolution of this litigation.

## I.      PROCEDURAL BACKGROUND

On May 5, 2020, the Commission filed a four-count Complaint against the Defendants. [ECF No. 1], *amended by* [ECF No. 101]. The Complaint sets forth the following allegations:

1) Count I claims Fingerhut, DPL, Valariola, and Barak violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 ("Options Fraud").

   a) Section 4c(b) of the Act makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, *inter alia*, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

   b) Regulation 32.4 provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person directly or indirectly: (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered

2

for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

2) Count II alleges Fingerhut violated Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), which makes it unlawful for a Commodity Trading Advisor ("CTA") or associated person of a CTA using the instrumentalities of interstate commerce directly or indirectly to: (a) employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant ("CTA Fraud");

3) Count III alleges Fingerhut, DPL, and DPI violated: (1) Section 6c(1) of the Act, 7 U.S.C. § 9(1) and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) ("Swaps and Commodities Fraud").

   a) Section 6c(1) of the Act provides that it is unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall prescribe.

   b) Regulation 180.1(a)(1)–(3) provides, in relevant part, that it shall be unlawful for any person, directly or indirectly, in connection with any swap or contract of sale of any commodity in interstate commerce or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ any manipulative device, scheme, or artifice to defraud; (2) make or attempt to make any untrue or misleading statement of

3

material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage or attempt to engage in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; and

4)  Count IV claims Fingerhut made false or misleading statements to the Commission in violation of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), which provides, in relevant part, that it shall be unlawful for any person to make any false or misleading statement of a material fact to the Commission, including any other information relating to a swap or a contract of sale of a commodity in interstate commerce, if the person knew or reasonably should have known the statement to be false or misleading. *Id.*

On May 6, 2020, the Commission filed the instant Motion for a preliminary injunction and moved for the appointment of a temporary receiver. [ECF Nos. 11, 12]. Following a telephonic status conference on May 7, 2020, the Court appointed Melanie Damian as a temporary receiver (the "Temporary Receiver") for Defendants and any affiliates or subsidiaries owned or controlled by Defendants, as well as all of the funds, properties, premises, accounts, income, now or hereafter due or owing to the Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Defendants. [ECF No. 33]. On July 13, 2020, the Court granted the Commission a temporary statutory restraining order ("SRO") pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a)–(b), and in accordance with Federal Rule of Civil Procedure 65. [ECF Nos. 58, 129].

The Court held a multi-day evidentiary hearing on the Motion in August and September 2020. The Commission relied on 72 Exhibits, *see* [ECF No. 157-1], and the testimony of six witnesses: (1) William Berry, a videographer who created many of the videos used by Defendants in their scheme; (2) Defendant Fingerhut; (3) Jay Passerino, a defendant in a related action for

international fraud based on overlapping facts with the instant action, *Commodity Futures Trading Comm'n v. Atkinson et al.*, No. 18-CIV-23992 (S.D. Fla. Sept. 27, 2018) ("*Atkinson* litigation"); (4) Joseph Patrick, the Commission investigator; (5) Relief Defendant Aicel Carbonero; and (6) Receiver Melanie Damian, [ECF Nos. 171, 175, 179].

## II.    FINDINGS OF FACT

### A.    The Parties

The Commission is the independent federal regulatory agency that administers and enforces the Act and Regulations promulgated thereunder. *See* 7 U.S.C. §§ 1–27.

Defendant Fingerhut engaged in affiliate marketing as an employee of All In Publishing, LLC ("AIP") from at least 2014 through 2016, primarily by creating and disseminating marketing material related to binary options trading systems. [ECF No. 71-1 at 14]; [ECF No. 175 at 25–27]. He subsequently worked on behalf of Valariola, Barak, DPI, DPL, and Huf (collectively, "Digital Platinum Defendants") from 2016 through August 2018, where he focused on affiliate marketing concerning digital assets trading systems. [ECF No. 71-1 at 24–25]; [ECF No. 175 at 49–50, 67]. During that time, Fingerhut "controlled the marketing part of the business, pretty much from A to Z," which included creating content, hiring and firing employees, reviewing and editing content created by subordinate employees, and analyzing data. [ECF No. 175 at 49–53]. As of May 22, 2019, Fingerhut continued to work in affiliate marketing. [ECF No. 71-1 at 355].

Defendant DPL is an Israeli company with its principal place of business in Tel Aviv, Israel. *Id.* at 9; [ECF No. 175 at 42]. From at least October 2013 through at least November 2016, DPL worked directly with United States brokers to assist AIP in marketing its binary options campaigns. [ECF No. 71-1 at 23]; [ECF No. 175 at 31]. DPL supplied AIP with the trading systems used in the campaigns and made (or directed others to make) payments to AIP's United States

bank accounts for creating solicitations of the digital asset campaigns in the United States. [ECF No.71-1 at 23, 39]; [ECF No. 175 at 39–42, 188–190]. DPL is the parent company to DPI and Huf. [ECF No. 175 at 42–43].

Defendant DPI is a Florida corporation under the DPL umbrella with a principal place of business in Miami, Florida. [ECF No. 71-1 at 9]; [ECF No. 175 at 42]. Between October 2016 and August 2018, DPI leased office space in Florida. [ECF No. 71-1 at 25]; [ECF No. 175 at 46–47]. During that same time, Fingerhut managed DPI's digital asset marketing in Florida on behalf of the Digital Platinum Defendants. [ECF No. 71-1 at 24–25]. DPI has never been registered with the Commission in any capacity. *Id.* at 9.

Defendant Huf, a Bulgarian company, is also under the DPL business umbrella. [ECF No. 175 at 42–43]. At the direction of Defendant Valariola, Fingerhut executed a contract whereby Fingerhut would address invoices to Huf for work performed by DPI and DPL. *Id.* at 64. Beginning in August 2017, Huf sent payments to Fingerhut's and DPI's bank accounts in the United States as compensation for their digital asset affiliate marketing campaigns. [ECF No. 71-1 at 15, 25]. Huf has never registered with the Commission. *Id.* at 10.

At all relevant times, Defendants Valariola and Barak owned or controlled DPL, DPI, and Huf. *Id.* at 9–10, 24; [ECF No. 175 at 38, 43]. Between at least October 2013 and November 2016, Valariola and Barak, on behalf of DPL, assisted AIP with its binary options solicitations by providing sales videos, selecting brokers, acting as intermediary with brokers, supplying the marketed trading systems, tracking results of AIP's marketing campaigns, and paying commissions to AIP. [ECF No. 71-1 at 23]; [ECF No. 175 at 31]. Valariola used a videographer in the United States to create at least two binary options marketing videos used by AIP. [ECF No. 171 at 41]. Between at least October 2016 and August 2018, Valariola and Barak, on behalf of

DPL, DPI, and Huf, directed, approved, and participated in the digital assets solicitation schemes, including delegating marketing to DPI, serving as the broker intermediary, and managing funds. [ECF No. 71-1 at 25]. Valariola resides in Tel Aviv, Israel, and Barak resides in Israel. *Id.* at 9. Neither Valariola nor Barak has ever registered with the Commission. *Id.*

**B.    Defendants' Affiliate Marketing Schemes**

**1.    Solicitations Fraud**

Throughout the relevant time period, Defendants engaged in various binary options and digital assets affiliate marketing campaigns.[1] The core of Defendants' campaigns was the creation and use of false or misleading emails fabricated by employees of AIP or DPI, including Fingerhut. [ECF No. 175 at 23–24, 26–27]. DPL would direct customers who opened new trading accounts as a result of the email solicitations to brokers who agreed to pay DPL a commission. *Id.* at 31. The brokers paid a $350–$450 commission, which Defendants shared,[2] for each first-time customer that made a minimum deposit of $250 into their fund trading account. *Id.* at 37, 61.

The content of the marketing emails was based on AIP's and DPI's fictitious sales videos. *Id.* at 23–24, 26–27, 59–60. The binary options and digital asset email solicitations created or disseminated by or on behalf of Defendants included an embedded link to the corresponding campaign websites. *Id.* at 24–26. If an email recipient clicked on a link, he or she would be redirected to a landing page where a sales video played automatically. *Id.* A customer could enter his or her name and email to the website to get full access to the marketing video and additional information to sign up for access to the free marketed trading system. *Id.* at 23–24.

---

[1] In this case, "affiliate marketing" means the creation and dissemination of millions of emails to prospective customers promoting select brokers with the goal of persuading the recipients to open and fund brokerage accounts in return for payment of a commission. [ECF No. 71-1 at 562, 661]; [ECF No. 175 at 22–24].

[2] AIP and DPL shared commissions from the binary options campaigns and DPL, Huf, and DPI shared commissions for the digital asset campaigns. *See* [ECF No. 71-1 at 14]; [ECF No. 175 at 61–62].

AIP and DPI, through Fingerhut, others at AIP with Fingerhut's knowledge, and/or individuals that Fingerhut supervised at DPI, used "autoresponders" to send out solicitation emails marketing trading systems to thousands of recipients per day at both AIP and DPI. *Id.* at 24. One of Fingerhut's duties was to set up autoresponders for AIP's and DPI's email spamming. [ECF No. 71-1 at 582]. When someone visited the website landing page and filled-out the form giving his/her name and email, "an auto respond or [], an email service provider would collect that data and it would go into a list and from there you were able to market to those email addresses via email marketing in mass quantities." [ECF No. 175 at 23–24]. Defendants used this information to send targeted follow-up emails with false or misleading information to prospective customers who failed to immediately open or fund an account. *See* [ECF No. 71-1 at 492].

 Between June 2014 and October 2016, Fingerhut worked on behalf of AIP and conducted at least 20 binary options campaigns where he knowingly created and/or disseminated millions of fraudulent solicitations that advised prospective customers to trade with a "recommended broker" using fool-proof Trading Systems that automatically traded for the prospective customer in binary options involving foreign exchange currency pairings, metals, and other assets. *Id.* at 14, 22. DPL, through Valariola and Barak, willfully aided and abetted Fingerhut's and AIP's binary options fraud for at least 24 campaigns. *Id.* at 19, 23; [ECF No. 171 at 41].

### 2.   Binary Options Fraud

The binary options fraud occurred between October 2013 and November 2016 (the "Binary Options Period") through AIP. All of AIP's and DPL's binary options campaigns, including the 20 campaigns that Fingerhut worked on, involved solicitation emails and sales videos posted on websites rife with materially false or misleading statements about the advertised trading systems. *See* [ECF No. 71-1 at 23–24, 26]; [ECF No. 175 at 57–60]. The emails and videos included made-

up statements from fictional users and fake trading performance, fake accounts, and fabricated profits depicted as real. *See* [ECF No. 71-1 at 23–24, 26]; [ECF No. 175 at 57–60]. Fingerhut knew that the email solicitations he and his colleagues created for AIP's binary options campaigns included false statements. [ECF No. 71-1 at 429–30].

Each of AIP's binary options campaigns featured at least one sales video that depicted a fictional story about users' results with the relevant trading system. For example, the solicitation video entitled "Free Money System," included fake testimonials and false reports that customers made hundreds in profits in seconds, thousands in a day, and became millionaires in a few months. *See, e.g.*, *id.* at 45–46. The individuals portrayed were actors reading from a script about trading results, risk of loss, and profits earned. [ECF No. 171 at 45]; [ECF No. 175 at 33]. The sales videos typically included props like luxury vehicles, private jets, and mansions, which were not owned or purchased by any purported user of the advertised trading system but in fact were often rented for the video. [ECF No. 171 at 44–45]; [ECF No. 175 at 33]. The videos were intended to create a narrative that the person using the software made a lot of money and had created a luxurious lifestyle for themselves. [ECF No. 171 at 44–45]; [ECF No. 175 at 33].

The videos also included fake testimonials where fictional users would show fake trading performance, fake accounts, and fabricated profits. *See* [ECF No. 71-1 at 19]; [ECF No. 171 at 46–47]. Defendants took screenshots of the fake bank or trading account statements and referred to the screenshots as "proof shots." [ECF No. 171 at 64]. AIP's sales videos not only portrayed fictional customers' fake profits, but they also guaranteed those profits. *E.g.*, [ECF No. 71-1 at 20]. Valariola and Barak knew the information in the sales videos were fictitious. *Id.* at 24. Further, DPL, through Valariola, supplied AIP with at least two sales videos used in two marketing

9

campaigns, the "Golden Goose" and "Copy Op" campaigns—each of which included materially false or misleading statements or omissions. [ECF No. 171 at 41].

As a result of the Defendants' efforts, AIP sent fraudulent solicitations to millions of recipients during the Binary Options Period. [ECF No. 175 at 24]. At least 51,917 recipients opened and funded forex and metals binary options trading accounts with at least $12,979,250 in initial deposits from campaigns that DPL participated in; at least 42,945 of those customers joined while Fingerhut worked on behalf of AIP. [ECF No. 71-1 at 14]. AIP received over $27 million related to its binary options activities, at least $17,300,780.50 of which came from DPL. *Id.* at 13. Between June 2014 and October 2016, Fingerhut earned at least $154,956 from AIP. *Id.* at 10–11.

## C.    Defendants' Digital Marketing Schemes

From October 2016 to August 2018 (the "Digital Assets Period"), Fingerhut, Valariola, and Barak, on behalf of DPL, DPI, and Huf, engaged in a similar fraudulent solicitation scheme involving digital assets. Beginning in October 2016, Fingerhut left AIP and went to work with DPL and DPI to manage their digital asset campaigns from Florida. *Id.* at 24–25. Fingerhut, and others that he recruited, hired, trained, and supervised in Miami, Florida, created and disseminated fraudulent solicitations for DPL's digital assets campaigns. *Id.* at 26–27.

The email solicitations created and disseminated in the digital assets campaigns were similar to those in the binary options campaigns: they included fictitious profits and performance results to lure prospective customers to open accounts and trade digital assets or digital asset options (swaps) with recommended brokers that agreed to pay Defendants commissions. *Id.* at 26. The digital asset campaigns included fake limits on how many people could take advantage of an offer and fictitious profit and risk guarantees. For example, in or around December 2017, Fingerhut

(or others he supervised) created and disseminated the following email solicitations for the Digital Platinum Defendants' Bitcoin campaigns:

- "Had you started using our system just one month ago you'd be sitting on a minimum of $400,000 in profit. Isn't it amazing." *Id.* at 429.

- "Obviously, Bitcoin is volatile, so there's plenty of risk. But thanks to our revolutionary system, you can profit with bitcoin with zero risk." *Id.* at 432–433.

- "I would take action fast as this new members' group is limited only to a hundred new members who want too [sic] fast track their success." *Id.* at 435–437.

- "As of right now our system has created 2903 first time millionaires in 2017 with nine more members about five days away from hitting the millionaire mark! . . . Recently we reopened the enrollment and everyone who joins in 2017 we can guarantee you'll become a millionaire in 2018." *Id.* at 439–440.

Fingerhut knew the above statements were false but effective in misleading prospective customers to open and fund accounts after receiving his emails. He even told his close friend and business colleague Passerino, "my content is proven to convert no matter the niche." *Id.* at 459. Moreover, Fingerhut and his team created fake names to appear as the sender to prevent recipients from discovering the identity of the senders. *Id.* at 412.

Digital Platinum Defendants' digital asset campaign websites all included a sales video that automatically streamed upon opening just like AIP's binary options campaigns. [ECF No. 175 at 49]. In a similar fashion, these videos also included false and misleading statements. By way of example, Digital Platinum Defendants' "Ethereum Code" campaign website included the following materially false and misleading statements:

- "Each member inside The Ethereum Code earns well above that [$10,000] every single week . . . ." [ECF No. 71-1 at 288].

- "This is only for SERIOUS investors who want to make a guaranteed $10,000 a week." *Id.* at 287.

- "It's a small group of everyday people who make a killing online working from home . . . and they do it by using an incredibly robust software I developed that automatically generates profits from trading Ethereum." *Id.* at 290.

The other sales videos used by the Digital Platinum Defendants during the Digital Assets Period mirrored the Ethereum Code sales video. [ECF No. 175 at 59].

During the Digital Assets Period, Fingerhut and his team sent millions of fraudulent digital asset solicitations for the Digital Platinum Defendants. [ECF No. 71-1 at 25–26, 30]. Defendants caused at least 8,043 people to open and fund new digital asset trading accounts as a result of the solicitations for a total of $2,010,750 in initial deposits. *Id.* at 15, 27. Between October 2016 and August 2018, DPI received at least $3,619,391.31 in payments from its digital assets affiliate marketing activities, primarily from Huf. *Id.* at 14. During that time, Fingerhut invoiced the Digital Platinum Defendants for his affiliate marketing services and received at least $360,269.98 in his United States bank accounts. *Id.* at 13.

### D.     Fingerhut's False and Misleading Statements to the Commission

Between August 2018 and May 2019, Fingerhut made materially false or misleading statements to the Commission to disguise his role in the fraudulent schemes and prevent the Commission from discovering relevant evidence before he could destroy it.

First, in August and September 2018, Fingerhut falsely told the Commission that the only email account he used to conduct business while working with DPI and DPL was

dan@digitalplatinum.com. *Id.* at 29; [ECF No. 179 at 18]. Similarly, at a deposition in May 2019, Fingerhut falsely testified to the same until confronted with contradictory evidence. *Compare* [ECF No. 71-1 at 357], *with* [ECF No. 71-1 at 367–68]. However, the truth of the matter is that Fingerhut regularly used two other email accounts to conduct DPI and DPL's business: danhutbiz@gmail.com and dhut3@hotmail.com. [ECF No. 175 at 52]; [ECF No. 179 at 19–20]. After speaking with the Commission and receiving "do not destroy" letters and subpoenas from the Commission, Fingerhut deleted the danhutbiz@gmail.com and dhut3@hotmail.com email accounts used to conduct the binary options and digital assets solicitations fraud. [ECF No. 71-1 at 31]; [ECF No. 179 at 20–21]. As to the Hotmail account, Fingerhut produced a handful of emails, of which only a small sub-set were responsive to the Commission's subpoenas. *See* [ECF No. 71-1 at 296–339]. Fingerhut failed to produce any emails from the Gmail account. Nevertheless, Fingerhut repeatedly falsely testified at his deposition that he did not delete or destroy any documents or communications that would be responsive to the Commission's subpoenas. *E.g.*, *id.* at 360.

Second, Fingerhut made false statements about his role and involvement in the fraudulent schemes. Fingerhut described his role at DPI to the Commission as limited and minimal. Fingerhut claimed that his role was to promote and test new verticals and/or products via email and report back on the performance from those emails, as well as verify tracking links worked. *See id.* at 589–600, 605. He told the Commission he had no other role in hiring other than hiring individuals "to develop and design an Email Marketing System and an interactive sports game app for the NBA/WNBA." *Id.* at 376; [ECF No. 179 at 18]. Fingerhut also claimed that he primarily acted at the direction of Passerino. [ECF No. 71-1 at 599–600].

However, Fingerhut's role and involvement was far from minimal. Fingerhut's close friend and business colleague, Passerino, testified that "Dan controlled the marketing part of the business, pretty much from A to Z." [ECF No. 175 at 49–53]. Fingerhut recruited, hired, trained, and supervised at least four individuals in Miami whose primary job was to create email solicitations and disseminate them using the autoresponders—a fact Fingerhut disputed in his deposition until confronted with conflicting evidence. *See* [ECF No. 71-1 at 390–91]. Fingerhut also hired, trained, and supervised an individual residing in Israel who worked on digital asset marketing. *Id.* at 27. Moreover, Fingerhut wrote content for the email solicitations, which was widely disseminated to at least 20,000 email addresses. *Id.* at 30; [ECF No. 175 at 25–26]. On behalf of DPL, he searched for the company's office space in Miami, hired and oversaw staff, and traveled to Israel to meet with the company's principals, Valariola and Barak. [ECF No. 175 at 46–47].

Third, Fingerhut falsely testified during the *Atkinson* litigation that the laptop he used for his DPI activities was the property of the company and that he handed it to Passerino when he resigned from DPI on August 13, 2018. *See* [ECF No. 71-1 at 366, 370]. The Commission relied on Fingerhut's testimony that he gave Passerino the laptop on his birthday at his home. *Atkinson*, No. 1:18-CIV-23992, [ECF Nos. 103, 103-2]. Consequently, when Passerino failed to produce the laptop after multiple demands in the *Atkinson* litigation, the Commission filed a Motion for Rule to Show Cause as to why Passerino should not be held in contempt for failure to comply and produce the laptop. *Id.* Yet, the truth of the matter is that the laptop did not belong to DPI—Fingerhut purchased it and DPI did not reimburse him for the cost. *Compare* [ECF No. 71-1 at 359], *with* [ECF No. 71-1 at 25]. And, despite Fingerhut's statement, he never gave Passerino the laptop when he resigned. [ECF No. 71-1 at 27]. In fact, upon knowledge of the Commission's subpoena to DPI, he told Passerino that he would throw his laptop into the ocean from his boat.

14

*Id.*; [ECF No. 175 at 68]. Fingerhut's statements about his email accounts, role in the fraudulent scheme, and the laptop caused the Commission to lose valuable time to retrieve and examine pertinent documents and evidence before its destruction.

## III.   CONCLUSIONS OF LAW

### A.    Legal Standard

Generally, a party must demonstrate four criteria to obtain a preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam). However, the standard to obtain a preliminary injunction under the Commodity Exchange Act is lower. *Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014). "[T]raditional standards applicable to private parties seeking injunctive relief do not apply [to the CFTC.]" *Commodity Futures Trading Comm'n v. Sterling Trading Grp.*, 605 F. Supp. 2d 1245, 1290 (S.D. Fla. 2009); *accord Commodity Futures Trading Comm'n v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) ("In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits. A prima facie case of illegality is sufficient."). Under the Act, the CFTC is entitled to a preliminary injunction when it shows (1) a prima facie violation of the Act has occurred or is occurring; and (2) that there is a "reasonable likelihood" of future violations. *Sterling Trading Grp.*, 605 F. Supp. 2d at 1290. Based on the foregoing, the Court makes the following conclusions of law.

### B.    Prima Facie Showing of Violation of the Act

The CFTC has met its burden of showing prima facie violations of the Act. The CFTC has shown evidence of: Options Fraud in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 as to Fingerhut, DPL, Valariola, and Barak; CTA Fraud in violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) as to Fingerhut; Swaps and Commodities Fraud in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) as to Fingerhut, DPL, and DPI; and that Fingerhut made false and misleading statements in violation of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2).

**1.    Options Fraud in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4[3]**

Options Fraud occurs when a person or entity (1) makes a material misrepresentation or omission in connection with a commodity options transaction (2) with scienter. *U.S. Commodity Futures Trading Comm'n v. Gutterman*, No. 12-CIV-21047, 2012 WL 2413082, at *5 (S.D. Fla. June 26, 2012). The CFTC has established both elements.

First, AIP, through Fingerhut, made material misrepresentations in connection with a commodity options transaction when it created and disseminated solicitations that included false or misleading profits, risks, and user experiences with the trading systems in their binary option campaigns. Whether a statement or omission is misleading depends on the "overall message" and the "common understanding of the information conveyed." *See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). A statement or omission is "material" if a reasonable person would consider it important in deciding whether to invest. *See id.* at 1328–29. "[P]ast success and experience are material factors which a reasonable investor would consider when deciding to invest in commodity options through that firm or broker." *See*

---

[3] DPL, Valariola, and Barak's liability for Options Fraud is discussed later in detail in Section B(5) of this Order.

*Commodity Futures Trading Comm'n v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1353–54 (S.D. Fla. 1994). Thus, the fake testimonials and trading results guaranteeing profits in the solicitations that AIP created and disseminated are material. *See Commodity Futures Trading Comm'n v. Matrix Trading Grp., Inc.*, No. 00-CIV-8880, 2002 WL 31936799, at *6 (S.D. Fla. Oct. 3, 2002) ("[P]romises of large and certain profits . . . are material and fraudulent.").

Moreover, the solicitations are "in connection with" offers to enter into commodity options transactions because they marketed access to automated trading systems. "[C]ampaigns market[ing] Trading Systems that purport[] to automatically trade binary options on commodities" fall within purview of the CFTC's jurisdiction under the Act as "in connection with" commodities. *Commodity Futures Trading Comm'n v. Montano*, No. 618CV1607ORL31GJK, 2020 WL 5793633, at *5 (M.D. Fla. Sept. 29, 2020). The solicitations created and disseminated by AIP, through Fingerhut, explicitly marketed trading systems that purported to automatically trade binary options on commodities. In *R.J. Fitzgerald*, the defendants' commercial about the trading system that overemphasized the profit potential, downplayed risk of loss, and urged viewers to take immediate action or risk missing the opportunity was in connection with commodity options and was materially misleading despite inclusion of boilerplate risk disclosures. 310 F.3d at 1329. Such is true in this case as well.

Second, the CFTC has established the second prong of "scienter." In the Options Fraud context, "scienter is met when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations . . . that present a danger of misleading customers which is either known to the Defendant or so obvious that Defendant must have been aware of it.'" *Id.* at 1328. Valariola, Barak, and Fingerhut all knew the misrepresentations about "user's" experience, trading results, and profits presented an obvious danger of misleading customers because the goal of the solicitations

17

was to influence customer behavior and persuade customers to open and fund brokerage accounts. Accordingly, each of the elements of Options Fraud under Section 4c(b) of the Act and Regulation 32.4 is met in this case, and Defendants, therefore, violated Section 4c(b) of the Act and Regulation 32.4.

### 2.    CTA Fraud in violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1)

The Act prohibits a CTA, associated person ("AP") of a CTA, commodity pool operator, or AP of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly to (A) employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant. 7 U.S.C. § 6*o* (1)(A)–(B). This section of the Act prohibits both registered and unregistered CTAs from making material misrepresentations and omissions to their clients regarding futures and options transactions. *Commodity Futures Trading Comm'n v. Smithers*, No. 05-CIV-80592, 2006 WL 6355688, at *6 (S.D. Fla. Oct. 11, 2006). The CFTC has provided sufficient evidence that Fingerhut engaged in CTA Fraud during the Binary Options Period under both § 6*o*(1)(A) and (B).[4]

As a threshold matter, AIP acted as an unregistered CTA and Fingerhut acted as an unregistered AP of a CTA during the Binary Options Period. A CTA is any person, who for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any

---

[4] While § 6*o*(1)(A) requires scienter, it is not necessary to establish a violation of § 6*o*(1)(B). *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677–79 (11th Cir. 1988). As discussed in detail above, Fingerhut violated Section 4(c)(b) and its corresponding regulation with scienter.

commodity option. 7 U.S.C. § 1a(12). "Those who provide access to trading systems can be commodity trading advisors." *Commodity Futures Trading Comm'n v. Atkinson*, No. 18-CIV-23992, 2019 WL 2125026, at *1 (S.D. Fla. Feb. 4, 2019). AIP, through its email solicitations, provided prospective customers with access to trading systems through a recommended broker. *See Commodity Futures Trading Comm'n v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1269 (D. Kan. 2003), *aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005) (finding defendants "acted as CTAs in that the trading systems they author and sell provide specific recommendations for clients and prospective clients to use to trade commodity futures and commodity options."); *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 174 n.39 (5th Cir. 2000) (describing CTAs as "individuals who are involved either directly or indirectly in influencing or advising the investment of customers' funds in commodities") (citing H.R. Rep No. 93–963, at 37 (1974)). As such, AIP acted as an unregistered CTA under the Act.

Further, Fingerhut acted as an unregistered AP of a CTA. An AP is any person who associates with a CTA as an agent or employee, in any capacity which involves the solicitation of a client's or prospective client's discretionary account or the supervision of any person or persons so engaged. 17 C.F.R. § 1.3. There is no dispute that Fingerhut was an employee at AIP, which acted as an unregistered CTA.  As discussed above, AIP and Fingerhut solicited prospective clients to open and fund new trading accounts with brokers who paid them commissions. AIP only earned commissions when someone funded a new binary options trading account in connection with its solicitations. Thus, AIP and Fingerhut, on behalf of AIP, advised customers "for compensation or profit" as a CTA and AP of a CTA, respectively.[5]

---

[5] Neither Fingerhut nor AIP can shelter under the publisher exception. Under the statute, a publisher or producer of any print or electronic data of general and regular dissemination, including its employee, is exempt from liability but only if the furnishing of such services is solely incidental to the conduct of their business or profession. *See* 7 U.S.C. § 1a(12)(B)–(C).

Further, AIP and Fingerhut employed a scheme to defraud prospective clients and engaged in transactions and a course of business that operated as a fraud or deceit upon prospective and actual clients. *See* 7 U.S.C. § 6*o* (1)(A)–(B). As discussed above, Fingerhut's primary responsibility at AIP was to create and disseminate, and supervise the creation and dissemination of, false and misleading marketing content for the purpose of soliciting prospective clients to open and fund new trading accounts with brokers. Fingerhut executed this fraudulent scheme against prospective clients via channels of interstate commerce. *See United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The Internet is an instrumentality of interstate commerce." (citations omitted)). Accordingly, Fingerhut's conduct as an AP of a CTA violated this Section of the Act.

**3.      Swaps and Commodities Fraud in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3)**

One commits Swaps and Commodities Fraud when he or she, directly or indirectly, uses, employs, or attempts to use or employ, any manipulative or deceptive device or contrivance in connection with any swap, or a contract for sale of any commodity in interstate commerce. 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a)(1)(3). Here, Fingerhut, DPL, and DPI engaged in Swaps and Commodities Fraud by creating and disseminating fraudulent solicitations to persuade customers to open and fund illegal, off-exchange binary options (swaps) trading accounts involving foreign exchange currency, pairings, metals, and/or digital asset trading accounts through websites operated by unregistered brokers. The fraudulent solicitations were inherently manipulative and deceptive as evidenced by Defendants' purpose in creating and disseminating them—to induce customers to open and fund new trading accounts. These manipulative and deceptive devices are in connection with swaps and commodities because binary options qualify as swaps, digital assets qualify as commodities, and options on digital assets qualify as swaps. 7 U.S.C. § 1a(47)(A).

20

Further, these manipulative devices were used in interstate commerce because they were sent via electronic mail over the internet and linked to various websites. *See Hornaday*, 392 F.3d at 1311 ("The Internet is an instrumentality of interstate commerce." (citations omitted)). Thus, Fingerhut, DPL, and DPI violated Section 9(c) of the Act.

> **4.    Fingerhut made false and misleading statements in violation of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2)**

An individual violates Section 6(c)(2) of the Act by "(1) [making] a false or misleading statement or omission; (2) of material fact; (3) to the CFTC; (4) which he knew or reasonably should have known was false or misleading." *U.S. Commodity Futures Trading Comm'n v. Gramalegui*, No. 15-CIV-02313-REB-GPG, 2018 WL 4610953, at *23 (D. Colo. Sept. 26, 2018) (citing 7 U.S.C. § 9(2)). Each material representation or omission is a separate and distinct violation of the Act. *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1111 (11th Cir. 2008). "[A] statement is actionable under this section when it is either literally untrue or when it fails to include all information necessary to give the recipient a complete and accurate picture of the state of affairs communicated." *Gramalegui*, 2018 WL 4610953, at *24. For the purpose of this Section, "[a] statement made to the Division of Enforcement during the course of an investigation, whether under oath, in response to an investigative subpoena, or voluntarily, is a statement 'made to the Commission.'" *Id.* (internal citations omitted).

During both the *Atkinson* litigation and this litigation, Fingerhut intentionally or recklessly made false or misleading statements of material fact and omitted material facts to the Commission concerning: (1) his use and deletion of email accounts for business; (2) the nature and extent of his role in the Digital Platinum Defendants' fraud; and (3) the whereabouts of the laptop he used to conduct the Digital Platinum Defendants' business. First, Fingerhut knew or, at a minimum, reasonably should have known that his statements about his email accounts were false because he

routinely sent and received business emails from his personal accounts and then sought to conceal their contents. Second, Fingerhut knew or reasonably should have known the substantial and integral nature and extent of his role in the fraudulent solicitation schemes. His concealment and misstatements regarding the nature and extent of his role are material because they would have provided the Commission with the information necessary to appreciate the complete "state of affairs communicated." *See id.* Third, Fingerhut falsely testified that he turned over to Passerino on his birthday in 2018 a "company" laptop he used for the Digital Platinum Defendants' business. This statement was material because the Commission filed a Motion for Rule to Show Cause for why Passerino should not be held in contempt for failing to produce Fingerhut's laptop in reliance on Fingerhut's false statement. Therefore, the Court finds Fingerhut's statements and omissions were in violation of Section 6(c)(2) of the Act.

### 5.      DPL, Valariola, and Barak's Liability

#### a)      Aiding and Abetting Liability

DPL, Valariola, and Barak willfully aided and abetted Fingerhut's and AIP's Options Fraud and Swaps and Commodities Fraud. Under Section 13(a) of the Act, an individual is liable as an aider and abettor if he "willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of the Act or CFTC Rules." *Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir. 1999); 7 U.S.C. § 13c(a). "A defendant will be found liable if it 'knowingly associates itself with an unlawful venture, participates in it to bring it about, and seeks by its actions to make it succeed.'" *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1348 (S.D. Fla. 2014).

During the Binary Options Period, DPL, through Valariola and Barak, willfully aided and abetted AIP's and Fingerhut's binary options (swaps) fraud by providing the trading software,

serving as a broker intermediary, supplying fraudulent sales videos, and willfully relying on and using the fraudulent solicitations created by AIP to earn commissions. During the Digital Asset Period, Valariola and Barak knew of and gave consent to Fingerhut to hire and supervise others to create and widely disseminate fraudulent digital asset solicitations on behalf of the Digital Platinum Defendants. These actions constitute willful aiding and abetting. *See id.* (finding that a wholesale precious metals trading firm and its managers aided and abetted its brokers and dealers who misled customers about the storage of the metals and the trading firm's managers "masterminded and facilitated th[e] process of cheating retail customers").

### b) Derivative Liability

Valariola and Barak are derivatively liable for Fingerhut's and AIP's Options Fraud and Swaps and Commodities Fraud as control persons. Anyone who directly or indirectly controls someone that violated the Act or Regulations "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person." 7 U.S.C. § 13c(b). Control person liability requires a showing of (1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation. *In re First Nat'l Trading Corp.*, CFTC No. 99-28, 1994 WL 378010, at *11 (July 20, 1994), *aff'd without opinion sub nom. Pick v. Commodity Futures Trading Comm'n*, 99 F.3d 1139 (6th Cir. 1996); *R.J. Fitzgerald*, 310 F.3d at 1334 (citing *JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557, 1567 (11th Cir. 1995)). First, a defendant must possess general control over the entity principally liable and "the power or ability to control the specific transaction or activity upon which the primary violation was predicated." *Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852, 859 (7th Cir. 1993). Being an officer, founder, principal, or authorized signatory on a company's bank account shows power to control a company. *See In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *8 (Jan. 12, 1988).

Second, "a controlling person knowingly induce[s] conduct which violates the Act, . . . [where] 'the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue.'" *JCC, Inc.*, 63 F.3d at 1568.

Valariola and Barak are the owners and principals of DPL and control all decisions and company funds. They directly controlled DPL's participation in the binary options scheme by acting as a broker intermediary, supplying the trading software, providing at least two fraudulent sales videos to AIP, and collecting and distributing commissions. Valariola and Barak knew that AIP's solicitations contained inaccurate trading results, profits, testimonials, and statements about its operation and risk but continued to rely on and use them. Accordingly, Valariola and Barak are liable as control persons for knowingly inducing DPL's violation.

### c)  Principal Liability

Further, DPL is principally liable for Valariola's and Barak's violations because their acts, omissions, and/or failures occurred within the scope of their employment or agency with DPL. Under Section 2(a)(1)(B) of the Act and Regulation 1.2, strict liability is imposed upon principals for the actions of their agents acting within the scope of their employment. This Court has found principal liability under analogous circumstances where the wrongful conduct occurred within the scope of the owners' and principals' employment. *See Gutterman*, 2012 WL 2413082, at *7 (finding the company principally liable when the company's employees' actions, including the founder's and managing member's, were committed within the scope of their employment with, and operation of the company). Because Valariola's and Barak's violations occurred within the scope of their employment or agency with DPL, DPL is principally liable.

### C.      Reasonable Likelihood of Future Violations

The Commission has established a reasonable likelihood of a risk of future violations. District courts in the Eleventh Circuit consider a number of factors to determine the likelihood of future violations including: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood defendant's occupation will present opportunities for future violations." *U.S. Commodity Futures Trading Comm'n v. K.B. Concepts Grp., LLC*, No. 16-CIV-24022, 2017 WL 3085088, at *4 (S.D. Fla. May 8, 2017) (citing *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)). Likelihood of future violations may be inferred from past conduct. *Gutterman*, 2012 WL 2413082, at *7.

Having considered these factors, the Court finds that the Commission has established a reasonable likelihood of future violations. This was not a one-time violation; rather, the Defendants exhibited a pattern of egregious behavior over the course of almost five years in deliberate pursuit of financial gain. *See U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, No. 12-CIV-81311, 2013 WL 718503, at *11 (S.D. Fla. Feb. 26, 2013), *aff'd*, 749 F.3d 967 (11th Cir. 2014) (finding a reasonable likelihood of future violations because "[t]his is not a one-time fraud. This is a careful and calculated system designed to maximize profits by taking advantage of ill-advised investors."); *Commodity Futures Trading Comm'n v. Rubio*, 2012 WL 13014711, at *6 (S.D. Fla. Dec. 21, 2012) (granting injunction based on "the egregious nature of Defendant's long conduct of fraud"). Further, the Defendants fail to appreciate the nature of their wrongdoing as evidenced by their apparent reluctance to comply with the SRO and temporary receiver order. Moreover, Defendants have stated that they have stopped the schemes discussed above but have not provided this Court with sufficient assurances against future violations despite

numerous opportunities to do so. Based on the nature and extent of Defendants' experience in online marketing and their ability to easily resume such activity, there is a reasonable likelihood of future violations. Accordingly, the Commission has met its burden of showing a reasonable likelihood of future violations.

### D.   Requested Relief

#### 1.   Preliminary Injunction

The Commission moves the Court for an order of preliminary injunction against the Defendants enjoining them from committing further violations of the Act. The Court finds, as detailed above, that the Commission has met its burden and is entitled to the requested injunctive relief.

#### 2.   Asset Freeze

The Commission also seeks to freeze all the Defendant's assets. An asset freeze is appropriate where, as here, the Commission seeks disgorgement and restitution. *See Levy*, 541 F.3d at 1114 (holding in the context of an injunction pending satisfaction of judgment that "a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy") (citing *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (permitting asset freezes "as a means [to] preserv[e] funds for the equitable remedy of disgorgement")); *Commodity Futures Trading Comm'n v. E-Metal Merchants, Inc.*, No. 05-CIV-21571, 2005 WL 8155180, at *10 (S.D. Fla. July 27, 2005) ("The Act clearly permits district courts to issue restraining orders and asset freezes and the legislative history of the Act clearly demonstrates that Congress intended an asset freeze to preserve the status quo pending trial"). The "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: 'a reasonable approximation of a defendant's ill-gotten gains . . . .'" *ETS Payphones, Inc.*, 408 F.3d at 735. In addition, the

Commission does not need to present evidence that the assets will be dissipated; rather, it need only show a concern that the Defendants' assets will disappear. *See Fed. Trade Comm'n v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1364 (S.D. Fla. 2019), *aff'd*, 801 F. App'x 685 (11th Cir. 2020).

The Defendants' conduct during the pendency of this action have given the Commission and the Court reasonable concern that that assets will disappear: (i) Fingerhut dissipated his assets by paying off his mortgage and providing the quit-claim deed to his girlfriend, Relief Defendant, for $10; (ii) according to counsel, as of October 2020, Valariola and Barak have assets that have not been relinquished to the Temporary Receiver; and (iii) DPL has insufficient funds to cover disgorgement and restitution as charged in the Amended Complaint. Therefore, an asset freeze is appropriate to preserve the remaining assets pending trial.

### 3.       Continuation of Receivership and Preservation of Documents

The Commission also asks the Court to continue the receivership. The Commission claims that the Temporary Receiver is critical to administering the preliminary injunction, including by identifying, marshaling, and distributing assets in this complex case, particularly where the matter involves myriad international accounts and parties and thousands of victims. *See* 7 U.S.C. § 13a-1(a). The Court finds good cause to continue the appointment of the Temporary Receiver as a permanent receiver for the duration of this case based on the foregoing findings of fact and conclusions of law.

The Court also finds it appropriate to require Defendants to preserve and allow inspection and copying of records. Defendants are not registered with the Commission and therefore are under no regulatory obligation to maintain records that may be material to determining the full extent of the violative conduct. Moreover, none of the Defendants fully complied with the Commission's

lawful subpoenas and requests for information, nor have all Defendants fully complied with the preservation and inspection requirements of the Temporary Receiver Order, [ECF No. 33], or SRO, [ECF No. 129]. Therefore, it is appropriate to continue the Order preserving documents and allowing the Commission to inspect or copy relevant records, [ECF No. 33].

IV.    **CONCLUSION**

The record supports a finding that Defendants violated core anti-fraud provisions of the Act. The Court thus finds a preliminary injunction is necessary to maintain the status quo pending a trial on the merits. Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Preliminary Injunction, [ECF No. 11], is **GRANTED** as follows:

1.    Defendant Daniel Fingerhut is preliminary enjoined from:

a.    offering to enter into, entering into, confirming execution of, maintaining positions in, or otherwise conducting activities relating to binary options or any commodity interest (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy));

b.    acting as an affiliate marketer, CTA, or Associated Person of a CTA in any capacity that involves binary options or any commodity interest (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy));

c.    offering so-called autotrading systems or services that purport to trade binary options or any commodity interest (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy));

d.    using the instrumentalities of interstate commerce to: (1) cheat or defraud, or attempt to cheat or defraud, customers or prospective customers; (2) make or cause to be made false reports or statements to customers or

prospective customers; or (3) deceive or attempt to deceive customers and prospective customers, or in connection with, an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction or otherwise violating Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4;

e.  using the mails or any means or instrumentality of interstate commerce, directly or indirectly to: (A) employ any device, scheme, or artifice to defraud any participant; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any participant, in violation of Section of 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1);

f.  using the instrumentalities of interstate commerce to: (1) use or employ, or attempt to use or employ, manipulative devices, schemes, and artifices to defraud; (2) make, or attempt to make, untrue or misleading statements of a material fact; (3) omit to state material facts necessary in order to make statements not untrue or misleading; or (4) engage, or attempt to engage, in acts, practices, and courses of business, which operate or would operate as a fraud or deceit upon customers or prospective customers in connection with swap transaction or otherwise violate Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1), (3);

g.  making false or misleading statements to or using false documents with the Commission or otherwise violate Section 6(c)(2) of the Act, 7 U.S.C. § 9(c)(2);

29

      h.     destroying, deleting, deactivating, or altering in any way any email account used to conduct business related to All In Publishing, Digital Platinum, Inc., Digital Platinum Ltd, and/or Huf Mediya; and

      i.     destroying or altering in any way any laptop computer, tablet, mobile telephone, or other electronic device used to conduct business related to All In Publishing, Digital Platinum, Inc., Digital Platinum Ltd., Huf Mediya, Tal Valariola, and/or Itay Barak.

2.     Defendants Digital Platinum Ltd., Tal Valariola, and Itay Barak are preliminarily enjoined from:

      a.     offering to enter into, entering into, confirming execution of, maintaining positions in, or otherwise conducting activities relating to binary options or any commodity interest (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy));

      b.     offering so-called autotrading systems or services that purport to trade binary options or any commodity interest (as that term is defined in Regulation 1.3(yy), 17 C.F.R § 1.3(yy)); and

      c.     using the instrumentalities of interstate commerce to: (1) cheat or defraud, or attempt to cheat or defraud, customers or prospective customers; (2) make or cause to be made false reports or statements to customers or prospective customers; or (3) deceive or attempt to deceive customers and prospective customers, or in connection with, an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option

transaction or otherwise violating Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4.

3.    Defendants Digital Platinum, Inc., Huf Mediya, Tal Valariola, and Itay Barak are preliminarily enjoined from:

a.    using the instrumentalities of interstate commerce to: (1) use or employ, or attempt to use or employ, manipulative devices, schemes, and artifices to defraud; (2) make, or attempt to make, untrue or misleading statements of a material fact; (3) omit to state material facts necessary in order to make statements not untrue or misleading; or (4) engage, or attempt to engage, in acts, practices, and courses of business, which operate or would operate as a fraud or deceit upon customers or prospective customers in connection with any swap transaction or commodity in interstate commerce, or otherwise violate Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1), (3);

b.    Destroying, deleting, deactivating, or altering in any way any email account, backend system, websites, and communications used to conduct business related to All In Publishing, binary options, and any commodity interest (as that term is defined in 17 C.F.R. § 1.3(yy)); and

c.    destroying or altering in any way any laptop computer, tablet, mobile telephone, or other electronic device used to conduct business related to All In Publishing, binary options, and any commodity interest (as that term is defined in 17 C.F.R. § 1.3(yy)).

4.    Each of the Defendants are preliminary enjoined from:

       a.      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

       b.      entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy)) for their personal account or for any account in which they have a direct or indirect interest;

       c.      (i) having any commodity interests traded on their behalf; (ii) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests; or (iii) soliciting, receiving, or accepting any funds from person for the purpose of purchasing or selling any commodity interests;

       d.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

       e.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

5.      Each of the Defendants and the Relief Defendant and all persons insofar as they are acting in the capacity of any Defendant's agents, servants, successors, employees, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with

Defendants and Relief Defendant who receive actual notice of such Order by personal service or otherwise, are preliminarily enjoined from:

      a.      refusing to permit authorized representatives of the CFTC to inspect, image, and copy, when and as reasonably requested, any books, records, or other documents of Defendants and Relief Defendant, including all such records concerning Defendants' and Relief Defendant's solicitation and trading activities, assets, and property, wherever located, and whether they are in the possession of Defendants or others, either on or off the premises where they may be situated; and

      b.      destroying, mutilating, concealing, altering, disposing of, in any manner, any books, records, or other documents of Defendants and Relief Defendant, including all such records concerning Defendants' solicitation and trading activities, wherever located.

6.      Each Defendant and the Relief Defendant and any firm, corporation, or other person or entity with notice that holds any accounts, funds, assets, or other property of Defendants from withdrawing, transferring, removing, dissipating, concealing, assigning, pledging, encumbering, disbursing, converting, selling, or otherwise disposing of, in any manner, any funds, assets, or other property of Defendants, wherever situated.

7.      Each Defendant is required to file with the Court, within ten (10) days of the date of this Order, a complete and accurate accounting of all of their assets and liabilities, wherever located, together with all funds they received from and paid to others in connection with: (i) work related to All In Publishing, Digital Platinum, Inc., Digital Platinum Ltd., and Huf Mediya; and

(ii) commodity futures transactions or purported commodity futures transactions, including binary options and digital assets.

8.      During the pendency of this action or until further ordered by this Court, Melanie Damien shall continue as the Receiver and shall execute the powers vested within the Order Appointing Temporary Receiver. [ECF No. 33].

9.      This Order shall remain in effect during the pendency of this action, or until further ordered by this Court.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of January, 2021.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE