# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ) | Case No.: 20-Civ-21887-GAYLES |
| COMMODITY FUTURES TRADING ) COMMISSION, ) | Hon. Darrin P. Gayles |
| Plaintiff, ) | |
| v. ) | |
| DANIEL FINGERHUT, DIGITAL PLATINUM, ) INC., DIGITAL PLATINUM, LTD., HUF ) MEDIYA, LTD (a.k.a HOOF MEDIA LTD.), ) TAL VALARIOLA, and ITAY BARAK, ) | |
| Defendants, ) | |
| and ) | |
| AICEL CARBONERO, ) | |
| Relief Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF CFTC'S MOTION FOR SUMMARY
JUDGMENT AGAINST RELIEF DEFENDANT AICEL CARBONERO**

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .......................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................ 2

  A.   The Parties ................................................................................................ 2

  B.   Fingerhut's Role in the "Affiliate Marketing" Schemes ........................... 4

    1.   Overview of the affiliate marketing fraud ........................................ 4

    2.   Binary Options Fraud ...................................................................... 5

    3.   Digital Assets Fraud ........................................................................ 6

  C.   Fingerhut Transferred Ill-Gotten Funds from the Fraudulent Scheme to Carbonero 7

    1.   All funds deposited into Fingerhut's accounts during the Relevant Period were payments received in connection with the fraud ......................... 7

    2.   Fingerhut transferred ill-gotten gains to Carbonero. ...................... 9

    3.   Carbonero has no legitimate claim to the ill-gotten gains. ............ 10

III.  LEGAL STANDARDS ............................................................................... 11

  A.   Summary Judgment Standard .................................................................. 11

  B.   Relief Defendant Liability ...................................................................... 11

IV.   ARGUMENT .............................................................................................. 12

  A.   Fingerhut Committed Fraud During the Relevant Period. ....................... 12

    1.   During the Binary Options Period, Fingerhut committed options fraud and CTA fraud. ............................................................................................. 13

    2.   Fingerhut committed swaps and commodities fraud ...................... 16

  B.   Fingerhut's Transfers of Cash and Real Property to Carbonero Were Composed of Ill-Gotten Gains. ................................................................................... 17

  C.   Carbonero Does Not Have a Legitimate Claim To the Cash and Property Transferred to Her By Fingerhut. ............................................................ 18

  D.   The Commission Produced a Reasonable Approximation of the Amount of Ill-Gotten Funds Transferred to Carbonero. .......................................... 20

V.    Conclusion ................................................................................................. 20

## I.   INTRODUCTION

Plaintiff Commodity Futures Trading Commission ("CFTC") submits this memorandum in support of its motion for summary judgment against Relief Defendant Aicel Carbonero ("Carbonero") pursuant to Local Rule 7.1(c).

Carbonero's live-in boyfriend, Defendant Daniel Fingerhut ("Fingerhut"), engaged in a long-running "affiliate marketing" fraud scheme involving spam emails and sales videos containing false statements concerning the purported performance of automated trading systems.[1]  The target of the fraud was retail investors, many of whom were fooled by Fingerhut and his co-fraudsters and lost money after opening trading accounts based on Fingerhut's false promises of guaranteed profits.  In return for his role in the fraud, Fingerhut earned income and bonuses while working for two different employers, first non-party All In Publishing, LLC ("AIP") and later Defendant Digital Platinum, Inc. ("DPI").  Fingerhut's bank records reflect that he transferred approximately $75,000 worth of ill-gotten gains, in cash, directly to Carbonero. And in June 2018, Fingerhut used his fraud proceeds to pay off the $314,510 balance on his mortgage and then immediately quit-claimed the residential property to Carbonero for $10. Carbonero has never had any legitimate claim to that money or property.

None of these facts are in dispute.  Fingerhut admitted his role in the fraud during an October 2018 hearing and in his May 2019 deposition, and between 2014 and 2018, Fingerhut's only source of money was fraud proceeds.  Under well-established legal standards, Carbonero is required to disgorge all money and property received from Fingerhut because it consists of ill-

---

[1] Following a hearing conducted by videoconference featuring live testimony from five witnesses and dozens of documentary exhibits the Court granted the CFTC's motion for a preliminary injunction against all the Defendants, including Fingerhut, necessarily finding he likely committed fraud in violation of the Commodity Exchange Act and CFTC Regulations.  (ECF No. 199 (order granting motion for preliminary injunction).)  Fingerhut entered into a settlement with the CFTC to resolve all claims against him.  (*See* ECF No. 273.)

gotten gains for which she did not provide cognizable consideration.  With no facts in dispute the CFTC is entitled to judgment as a matter of law; thus, the Court should grant the motion.

## II.    FACTUAL BACKGROUND

### A.  The Parties

The CFTC is the independent federal regulatory agency that enforces the Commodity Exchange Act ("CEA") and Regulations promulgated thereunder. *See* 7 U.S.C. §§ 1–27.

Fingerhut engaged in an "affiliate marketing" fraud as an employee of AIP[2] from at least 2014 through 2016, by creating and disseminating marketing materials for automated systems that purported to generate guaranteed profits through trading binary options.  (Plaintiff's Statement of Undisputed Facts ("SOF") ¶¶5,10,11.) He subsequently worked on behalf of Tal Valariola, Itay Barak, Digital Platinum Inc. ("DPI"), Digital Platinum, Ltd. ("DPL"), and Huf Mediya, Ltd. ("Huf") (collectively, "Digital Platinum Defendants") out of DPI's Miami office from approximately October 2016 through August 2018, conducting affiliate marketing that was materially identical to AIP's fraud, only concerning digital assets trading systems.  (SOF ¶13.) From October 2016 through August 2018, Fingerhut "controlled the marketing part of the business, pretty much from A to Z," which included creating "content," hiring and firing employees, reviewing and editing content created by subordinates, and analyzing data.  (SOF ¶10.)  As set forth in detail below, Fingerhut has admitted in (1) testimony in an October 12, 2018 hearing in *CFTC v. Atkinson*, (2) a deposition taken on May 22, 2019, and (3) a sworn declaration executed in the *Atkinson* matter that he was aware that AIP and DPI's emails and sales videos have no basis in fact, that he drafted those emails as part of his multi-faceted role in

---

[2] AIP, along with its principal Timothy Atkinson, Jay Passerino, and Passerino's entity, were sued in in 2018.  *See CFTC v. Atkinson et al.*, No. 1:18-cv-23992-JEM (S.D. Fla.).  All the claims against all the defendants in that action have been resolved.  Fingerhut did not invoke his Fifth Amendment rights in connection with the *Atkinson* litigation and testified during the Court's hearing on the CFTC's motion for a preliminary injunction against Passerino, which was held on October 12, 2018, (*see* Ex. A Excerpts from October 12, 2018 Hr'g Tr.).

the fraud, and that he was aware that his compensation was based on how successfully AIP's and DPI's fraudulent emails and videos fooled their victims.

DPL is an Israeli company with its principal place of business in Tel Aviv, Israel.[3]  (SOF ¶1.)  From at least October 2013 through November 2016, DPL supplied AIP with marketing materials (emails and videos) used in the marketing "campaigns" and made (or directed others to make) payments to AIP's United States bank accounts for the binary options campaigns in the United States.  (SOF ¶1.)  DPL is the parent company to Defendants DPI and Huf.  (SOF ¶1.)

DPI is a Florida corporation under the DPL "umbrella" (Valariola and Barak are corporate officers) with a principal place of business in Miami, Florida.  (SOF ¶2.)  Between October 2016 and August 2018, Fingerhut managed DPI's digital asset affiliate marketing "campaigns" from DPI's Miami office on behalf of the Digital Platinum Defendants.  (SOF ¶2.)

Huf, a Bulgarian company, is also under the DPL business "umbrella."  (SOF ¶3.)  At the direction of Valariola, Fingerhut executed a contract with Huf and sent it invoices for the affiliate marketing fraud.  (SOF ¶3.)  Beginning in August 2017, Huf sent payments to Fingerhut's and DPI's bank accounts in the United States for their fraudulent digital asset marketing campaigns. (SOF ¶3.)

Relief Defendant Carbonero has been in a romantic relationship with Fingerhut for over a decade.  (SOF ¶4.)  She currently resides at 7276 Gary Avenue, Miami Beach, Florida (the "Residence).  (SOF ¶4.)  Carbonero is the President and sole owner of Smiles MIA, a dental practice.  (SOF ¶4.)

---

[3] DPL, Valariola, and Barak, have agreed to resolve all claims against them via consent order.  (*See* ECF No. 273)

**B. Fingerhut's Role in the "Affiliate Marketing" Schemes**

   **1. Overview of the affiliate marketing fraud**

Between 2014 and August 2018 (the "Relevant Period"), Defendants engaged in binary options and digital assets "affiliate marketing" fraud "campaigns." The core of the campaigns was the creation and large-scale spamming of false or misleading emails fabricated by AIP or DPI employees, including Fingerhut. (SOF ¶5.) The campaigns advertised "trading systems" purporting to automatically generate trading profits with limited or no risk of loss. (SOF ¶5.)

The content of the marketing emails was based on AIP's and DPI's fictitious sales videos, which were based on fictitious scripts (as opposed to real events or real trading performance). (SOF ¶6.) According to Fingerhut, all of the content in the emails was fake. (SOF ¶7 (Fingerhut testimony that he "made up" information to include in AIP emails and that everyone else at AIP did, too); *id.* (Fingerhut testimony that information in DPI emails was "just made up" and that none of the statements in the emails were true); *id.* (describing fabricated screenshots and scripts).)

The binary options and digital asset email solicitations created or disseminated by Fingerhut and his co-fraudsters included an embedded hyperlink to the corresponding campaign websites. (SOF ¶8.) If an email recipient clicked on a link, he or she would be redirected to a "landing page" where a sales video played automatically. (SOF ¶8.) A prospective customer could then get full access to the marketing video and additional information to sign up for access to the free marketed trading system. (SOF ¶8.) AIP and DPI earned commissions when customers opened and funded a trading account, which they then shared with employees like

Fingerhut as income and bonuses.  (SOF ¶9 (Passerino testifying about commission structure at AIP and DPI).)

As described below, at AIP, Fingerhut's duties included drafting emails, testing web links to the fake videos, and sending out millions of fraudulent emails per day.  (SOF ¶10.)  At DPI, Fingerhut's duties expanded.  He ran the marketing operation from "A to Z," including hiring copywriters, training subordinates to draft fraudulent solicitations, and drafting and disseminating fraudulent solicitations himself.  (SOF ¶10 (describing Fingerhut's duties at DPI).)

## 2.  Binary Options Fraud

The binary options fraud occurred between October 2013 and November 2016 (the "Binary Options Period") when Fingerhut was employed by AIP.  Fingerhut worked on at least 20 fraud campaigns for AIP and each involved solicitation emails and sales videos rife with materially false or misleading statements about the advertised trading systems.  (SOF ¶11.)  The trading systems purported to trade binary options involving foreign exchange or precious metals. (SOF ¶11.)  The emails and videos were based on fictional scripts and depicted actors portraying users of the trading systems.  (SOF ¶11.)  The videos included fake testimonials describing fake trading performance, fake accounts, and fabricated profits.  (SOF ¶11.)  Defendants took screenshots of fabricated bank or trading account statements and referred to the screenshots as "proof shots."  (SOF ¶11.)  Fingerhut knew that the email solicitations he and his colleagues created for AIP's binary options campaigns included false statements—for example, Fingerhut

was aware that the solicitations used in AIP's fraudulent affiliate marketing campaigns were based on fictional scripts and were "silly" and "ridiculous."  (SOF ¶11.)

AIP received over $27 million in commissions related to its binary options affiliate marketing fraud campaigns, at least $17,300,780.50 of which came from DPL.  (SOF ¶12.) Between June 2014 and October 2016, Fingerhut earned at least $154,956 from AIP.  (SOF ¶12.)

### 3.   Digital Assets Fraud

From October 2016 to August 2018 (the "Digital Assets Period"), Fingerhut worked for DPI and engaged in affiliate marketing fraud involving trading systems that purported to deal with digital assets (like Bitcoin) and was materially the same as AIP's fraud.  (SOF ¶13.)  In October 2016, Fingerhut left AIP and went to work for DPI to manage its digital asset campaigns from Miami, Florida.  (SOF ¶13.)  Fingerhut, and others that he recruited, hired, trained, and supervised in Miami, created and disseminated fraudulent solicitations for DPI's digital assets campaigns.  (SOF ¶13.)

Like AIP's fraudulent emails, the email solicitations created and disseminated during the Digital Assets Period included false statements about the systems' trading performance to lure prospective customers to open accounts with recommended brokers and trade digital assets or digital asset options (swaps).  (SOF ¶14.)  As with AIP, DPI received commissions for every new account that was opened and funded by a victim of the fraud.  (SOF ¶14.)  Fingerhut has testified that none of the information in the fraudulent campaigns at DPI had any basis in fact—the emails were fabricated by Fingerhut or other DPI employees.  (SOF ¶15.)  For example, in or

around December 2017, Fingerhut (or others he supervised) created and disseminated emails

with the following fraudulent misrepresentations:

- "Had you started using our system just one month ago you'd be sitting on a minimum of $400,000 in profit. Isn't it amazing." (SOF ¶15.)

- "Obviously, Bitcoin is volatile, so there's plenty of risk. But thanks to our revolutionary system, you can profit with bitcoin with zero risk." (SOF ¶15.)

- "As of right now our system has created 2903 first time millionaires in 2017 with nine more members about five days away from hitting the millionaire mark! . . . Recently we reopened the enrollment and everyone who joins in 2017 we can guarantee you'll become a millionaire in 2018." (SOF ¶15.)

Fingerhut knew the emails disseminated by DPI contained false statements and he

bragged that he was an effective fraudster, stating: "my content is proven to convert [i.e., trick

victims] no matter the niche." (SOF ¶16.)  Fingerhut and his team created fake names to appear

as the sender of the emails to prevent recipients from discovering the true identity of the senders.

(SOF ¶16.)

During the Digital Assets Period, Fingerhut and his team sent millions of fraudulent

digital asset solicitations.  (SOF ¶17.)  Between October 2016 and August 2018, DPI received at

least $3,619,391.31 in payments from its digital assets affiliate marketing activities, primarily

from Huf.  (SOF ¶17.)  During that time, Fingerhut invoiced the Digital Platinum Defendants

for his affiliate marketing services and received at least $360,269.98 into his United States bank

accounts.  (SOF ¶17.)

**C.  Fingerhut Transferred Ill-Gotten Funds from the Fraudulent Scheme to Carbonero**

**1.  All funds deposited into Fingerhut's accounts during the Relevant Period were payments received in connection with the fraud.**

Fingerhut's bank records and sworn declaration indisputably tie his income during the

Relevant Period directly to the fraud at AIP and DPI, as described in greater detail below.

*Bank Accounts Under Fingerhut's Control*

During the Relevant Period, Fingerhut owned or controlled three different companies: Fingerhut Group, Inc. ("FGI"), Recruiting Hut, LLC ("Recruiting Hut"), and Media Hut, Inc. ("Media Hut").  (SOF ¶18).  While he worked at AIP and DPI, Fingerhut received deposits into the accounts for those entities (together the "Fingerhut Accounts") as compensation for his work in furtherance of the fraud described above.  (SOF ¶19 (summarizing deposits into accounts controlled by Fingerhut from bank records and stating that from November 2016 through August 2018 he was "paid via wire transfers" into "bank accounts in the name of [FGI] and Media Hut").)

*Amounts and Sources of Deposits Into Bank Accounts Under Fingerhut's Control*

Deposits into the Fingerhut Accounts from AIP were ill-gotten gains because Fingerhut's work for AIP was related to the fraud.  (SOF ¶20.)  Deposits into the Fingerhut Accounts from the Digital Platinum Defendants were ill-gotten gains because the work Fingerhut performed for DPL and DPI was related to the fraud.  (SOF ¶21.)  Huf Mediya was controlled by DPL and paid Fingerhut for work performed on behalf of DPI related to the fraud.  (SOF ¶22 (DPL and Huf Mediya bank accounts were "used interchangeably" to make payments concerning DPI).) And substantially all deposits into the Fingerhut Accounts from third party payment processors (i.e., Payoneer, Chexx, and Moneynetint) were ill-gotten gains because AIP used Payoneer and Chexx to transfer funds related to the fraud, and as explained above all revenue earned by Fingerhut during the Digital Assets Period was related to the affiliate marketing fraud scheme.  (SOF ¶23.)

The below table summarizes the amounts and sources of deposits into the FGI, Recruiting Hut, and Media Hut accounts that are directly connected to the fraud schemes described above. (SOF ¶24.)

| Entity | Binary Options Period Amount (Source) | Digital Asset Period Amount (Source) | Total |
|---|---|---|---|
| **FGI** | • $154,956 (AIP) | • $270,686.40 (DPI)<br>• $64,410 (DPL)<br>• $25,173 (Huf Mediya) | **$515,225** |
| **Recruiting Hut** | • $83,595 (Payoneer, Inc.)<br>• $5,492 (Chexx, Inc.) | • $5,376 (Moneynetint, Ltd.) | **$94,463** |
| **Media Hut** | | • $23,049 (DPI) | **$23,049** |
| **Total** | | | **$632,738** |

The undisputed evidence shows that deposits into the Fingerhut Accounts in the Relevant Period were related to the fraud described herein.  Consistent with his conduct throughout this litigation, during his deposition Fingerhut invoked his Fifth Amendment right not to incriminate himself when asked if he had any legitimate sources of income from 2014 through 2018.  (SOF ¶25.)[4]

### 2.  Fingerhut transferred ill-gotten gains to Carbonero.

*The Mortgage Payoff and Quit-Claim Transfer*

In June 2018, Fingerhut transferred $249,498.90 from FGI's account to Recruiting Hut's account.  (SOF ¶26.)  On July 6, 2018, Fingerhut wired $314,510.98 from the Recruiting Hut account to "Ditech Financial."  (SOF ¶26.)  Recruiting Hut's July 2018 bank statement shows this transaction and a notation: "Mortgage Payoff – Account Name: Daniel Fingerhut Re: Ditech Financial LLC Account No. xxxx968 Address: 7276 Gary Ave Miami Beach FL 33141."  (SOF ¶26.)

---

[4] The Court may draw an adverse inference based on Fingerhut's decision not to answer questions put to him at his deposition.  *See Hamilton Group Funding v. Inc. v. Basel*, 311 F. Supp. 3d 1307, 1316 (S.D. Fla. 2018) ("The Court will infer that the answers to questions to which Defendant invoked his right not to testify against himself would not be favorable to Defendant."); *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) (an adverse inference based on the invocation of the Fifth Amendment is appropriate in a civil case).

Approximately one month after Fingerhut paid his mortgage with fraud proceeds he transferred the Residence to Carbonero.  (SOF ¶27.)  Fingerhut and Carbonero have lived together in the Residence for the entire Relevant Period, and continue to live in there to this day. (SOF ¶27.)

*Cash Transfers from Fingerhut to Carbonero*

According to FGI's bank records, between March 2015 and January 2018, Fingerhut transferred $74,950 to an account controlled by Carbonero.  (SOF ¶28.)  As set forth above, all the money in the FGI bank account was composed of ill-gotten gains from Fingerhut's participation in the affiliate marketing fraud.

Carbonero has disclaimed any knowledge of Fingerhut's activities concerning AIP and DPI or the source of the cash and property he transferred to her.  (SOF ¶29.)

**3.  Carbonero has no legitimate claim to the ill-gotten gains.**

The undisputed record shows that Carbonero does not have any legitimate claim to the fraud proceeds she received from Fingerhut.  She did not perform any professional services for Fingerhut and Fingerhut and Carbonero have never had any agreement—written or otherwise—to establish any legitimate entitlement to Fingerhut's fraud money.  (SOF ¶30.)

Carbonero's only support for a purported entitlement to some of Fingerhut's ill-gotten funds is one email sent to Carbonero's counsel from Jonathon Groth, an attorney at the Receiver's law firm.  (SOF ¶¶31, 32.)  Mr. Groth's email contains a potential, albeit heavily caveated, initial *settlement* proposal that contemplates an offset for payments made by Carbonero to Fingerhut.  (SOF ¶¶33, 34.)  In her deposition, Carbonero testified that the referenced post-

10

June 2018 cash transfers to Fingerhut were not related to the Residence but rather "food or cleaning, laundry, medicine, dogs, family, life."  (SOF ¶35.)[5]

## III.   LEGAL STANDARDS

### A.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), the Court should enter summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Pons v. Latin Motors Intern. LLC*, No. 17-cv-22439, 2018 WL 2688797, at *1 (S.D. Fla. May 8, 2018) (Gayles, J.).  The moving party may support its motion with sworn testimony, declarations, pleadings, or other documents.  *See id.* To avoid summary judgment, the non-moving party must "make a showing sufficient to permit the jury to reasonably find on its behalf."  *Id.* (citing *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015)); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (once a party has moved for summary judgment, the opposing party "must identify affirmative evidence from which a jury could find that the [opposing party] has carried his or her burden...")

### B.  Relief Defendant Liability

The Commodity Exchange Act authorizes equitable relief in the form of disgorgement from a "relief defendant."  *See CFTC v. Gresham*, No. 12-10040, 2012 WL 1606073, at *2 (N.D. Ga. May 7, 2012).  Ordering disgorgement from a relief defendant is appropriate if he or she (1) possesses illegally obtained profits and (2) has no legitimate claim to them.  *SEC v. Huff*, 758 F. Supp. 2d 1288, 1361 (S.D. Fla. 2010) (ordering disgorgement against relief defendant who received funds "for no legitimate reason" from entities controlled by her husband, the

---

[5] Statements made during settlement discussions are not admissible to "prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408(a).  Thus, Mr. Groth's email should not be considered for any purpose here. Moreover, Mr. Groth's email was based on a premise that turned out to be false—as Carbonero testified, her cash payments to Fingerhut were not made pursuant to an agreement to repay him for the mortgage payoff.

defendant); *see also, e.g.*, *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (relief defendant required to disgorge value of a "pricey diamond ring" she received from defendant who "obtained the money through fraud").  Funds are ill-gotten if they are traceable to a fraud.  *SEC v. Natural Diamonds Investment Co.*, No. 9:19-cv-80633, 2019 WL 2583863, at *7–8 (S.D. Fla. June 11, 2019) (funds transferred to relief defendant from accounts containing investors' misappropriated money subject to disgorgement).  A relief defendant has "no legitimate claim" to fraud proceeds if he or she receives money or property as a gift or for no consideration—a contrary rule "would allow almost any defendant to circumvent the [CFTC's] power to recapture fraud proceeds, by the simple procedure of giving [fraud proceeds] to friends and relatives."  *Id.* at *7; *see also SEC v. Cavanagh*, 155 F.2d 129, 136–37 (2d Cir. 1998).

## IV.   ARGUMENT

There are no genuine issues of material fact and the CFTC is entitled to judgment as a matter of law for Carbonero's disgorgement.  First, it is undisputed that Fingerhut committed fraud; he has admitted to it under oath numerous times.  Fingerhut's bank records and testimony confirm his income during the Relevant Period consisted exclusively of fraud proceeds.  Second, there is no dispute that Fingerhut transferred at least $389,000 to Carbonero that is directly traceable to the fraud.  Finally, Carbonero has no "legitimate claim" to the money and property transferred to her over the years by Fingerhut as that term is used by federal courts.

### A.  Fingerhut Committed Fraud During the Relevant Period.

Fingerhut committed fraud by violating various anti-fraud provisions in the CEA, including options fraud, commodity trading advisor ("CTA") fraud, and swaps and commodities

fraud.  (*See* ECF No. 199 at 16–21 (finding CFTC established a prima facie case that Fingerhut violated all three provisions).)

    **1.**   **During the Binary Options Period, Fingerhut committed options fraud and CTA fraud.**

*Fingerhut Committed Options Fraud*

The CEA prohibits options fraud, which occurs when a person or entity (1) makes a material misrepresentation or omission in connection with a commodity options transaction (2) with scienter.  *CFTC v. Gutterman*, No. 12-21047-CIV, 2012 WL 2413082, at *5 (S.D. Fla. June 26, 2012).

Fingerhut committed options fraud between June 2014 and October 2016.  Fingerhut made material misrepresentations in connection with commodity options transactions when he created and disseminated email solicitations with false or misleading statements about the trading systems' profits, risks, and user experiences for AIP's campaigns.  Fingerhut testified that the information he included in the solicitations had no basis in fact and he "just made it up."

Whether a statement or omission is misleading depends on the "overall message" and the "common understanding of the information conveyed."  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002).  The message of Fingerhut's email solicitations was that a user of the marketed systems could generate guaranteed trading profits with no risk.  Fingerhut has admitted he did not base his emails on real trading performance or historical results.

A statement or omission is "material" if a reasonable person would consider it important in deciding whether to invest.  *See id.* at 1328–29.  Statements about historical trading performance are material as a matter of law.  *See CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp. 1345, 1353–54 (S.D. Fla. 1994) ("[P]ast success and experience are material factors which a reasonable investor would consider when deciding to invest in commodity options . . . ."); *see*

*also CFTC v. Matrix Trading Grp., Inc.*, No. 00-CIV-8880, 2002 WL 31936799, at *6 (S.D. Fla. Oct. 3, 2002) ("[P]romises of large and certain profits . . . are material and fraudulent.").

Fingerhut's email solicitations were "in connection with" offers to enter into commodity options transactions because they marketed access to automated trading systems that purported to trade binary options on commodities. *CFTC v. Montano*, No. 6:18-cv-1706-Orl-31GJK, 2020 WL 5793633, at *5 (M.D. Fla. Sept. 29, 2020) ("[C]ampaigns market[ing] Trading Systems that purport[] to automatically trade binary options on commodities" fall within purview of the CFTC's jurisdiction under the Act as "in connection with" commodities.).

In the options fraud context, "scienter is met when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations . . . that present a danger of misleading customers which is either known to the Defendant or so obvious that Defendant must have been aware of it." *R.J. Fitzgerald & Co.*, 310 F.3d at 1328.  Fingerhut has admitted he "just made up" the content of his fraudulent emails.  The record is also undisputed that Fingerhut knew the goal of the solicitations was to influence customer behavior and persuade customers to open and fund brokerage accounts (because that is how he got paid); he even boasted about how effective his fraudulent tactics were to his co-fraudsters.  (*See* SOF ¶16.)

Because Fingerhut made false and misleading statements that are material as a matter of law, with scienter, he committed options fraud in violation of 7 U.S.C. § 6c(b).

*Fingerhut committed CTA Fraud*

Second, during the Binary Options Period, Fingerhut engaged in CTA fraud.  The CEA prohibits a CTA or associated person ("AP") of a CTA from using interstate commerce, directly or indirectly to (1) employ any device, scheme, or artifice to defraud; or (2) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or

14

participant or prospective client or participant.  7 U.S.C. § 6o (1)(A)–(B).  This provision prohibits even unregistered CTAs or APs from making material misrepresentations and omissions regarding futures and options transactions.  *CFTC v. Smithers*, No. 05-CIV-80592, 2006 WL 6355688, at *6 (S.D. Fla. Oct. 11, 2006).

As a threshold matter, AIP acted as an unregistered CTA and Fingerhut acted as an unregistered AP of a CTA during the Binary Options Period.  A CTA is any person, who for compensation or profit, advises others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any commodity option. 7 U.S.C. § 1a(12).  "Those who provide access to trading systems can be commodity trading advisors."  *CFTC v. Atkinson*, No. 18-CIV-23992, 2019 WL 2125026, at *1 (S.D. Fla. Feb. 4, 2019).  AIP, through its solicitations, provided prospective clients access to trading systems that automatically traded on their behalf through a recommended broker.  *See CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1269 (D. Kan. 2003), *aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005) (defendants held to be unregistered CTAs where "the trading systems they author and sell provide specific recommendations for clients and prospective clients to use to trade commodity futures and commodity options"); *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 174 n.39 (5th Cir. 2000) (describing CTAs as "individuals who are involved either directly or indirectly in influencing or advising the investment of customers' funds in commodities").  Because its solicitations advised prospective clients to use specified automated trading systems, AIP acted as an unregistered CTA under the CEA.

Fingerhut acted as an unregistered AP of a CTA.  An AP of a CTA includes a CTA's agent or employee who, in any capacity is involved in solicitation of a client's or prospective client's discretionary account.  17 C.F.R. § 1.3.  It is undisputed that Fingerhut was an employee

at AIP, an unregistered CTA, and Fingerhut solicited prospective clients to open and fund new trading accounts with pre-selected brokers.  The brokers then paid AIP commissions when a victim opened and funded a new trading account based on AIP's solicitations.  Thus, AIP and Fingerhut, on behalf of AIP, advised customers "for compensation or profit" as a CTA and AP of a CTA, respectively.

Further, AIP and Fingerhut employed a scheme to defraud and engaged in transactions and a course of business that operated as a fraud or deceit upon prospective and actual clients.  *See* 7 U.S.C. § 6*o*(1)(A)–(B).  As discussed above, Fingerhut's primary responsibility at AIP was to create and disseminate false and misleading marketing content for the purpose of soliciting prospective clients to open and fund new trading accounts with brokers.  Fingerhut executed this fraudulent scheme through email.  *See United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The Internet is an instrumentality of interstate commerce." (citations omitted)).  Accordingly, Fingerhut's conduct as an AP of a CTA violated this Section of the Act.

### 2. Fingerhut committed swaps and commodities fraud

The CEA prohibits swaps and commodities fraud.  *See* 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a)(1)–(3).  Swaps or commodities fraud occurs when one, directly or indirectly, uses, employs, or attempts to use or employ, any manipulative or deceptive device or contrivance in connection with any swap, or a contract for sale of any commodity in interstate commerce.  (ECF No. 199 at 18.)  Fingerhut committed swaps fraud during the Binary Options Period for the same reasons he committed options fraud:  he created and disseminated (via email) false or misleading binary options (swaps) solicitations to persuade recipients to open and fund trading accounts using automated trading systems.  (*See* ECF No. 199 at 20.)

Fingerhut also committed commodities fraud during the Digital Assets Period.  That scheme was substantially the same as the binary options fraud, except the underlying product

16

was digital assets like Bitcoin instead of binary options involving foreign exchange or metals. Digital assets constitute commodities in interstate commerce.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) (finding violations of § 9(1) and Regulation 180.1 for fraudulent misrepresentations in connection with digital asset transactions.)

Just as the emails Fingerhut wrote and disseminated at AIP were materially false or misleading and made with scienter, so too were the solicitations at DPI inherently manipulative and deceptive.  Fingerhut has admitted his fraudulent solicitations during the Digital Assets Period had no basis in fact and he created and disseminated them "to induce customers to open and fund new trading accounts."  (ECF No. 199 at 20–21.)  These manipulative and deceptive devices are in connection with commodities because digital assets qualify as commodities, and also in connection with swaps because options on digital assets qualify as swaps.  (*See id.*); *see also McDonnell*, 287 F. Supp. 3d at 228.

Further, these manipulative devices were used in interstate commerce because they were sent via email and linked to various websites.  *See Hornaday*, 392 F.3d at 1311 ("The Internet is an instrumentality of interstate commerce." (citations omitted)).  Thus, Fingerhut committed swaps and commodities fraud in violation of 7 U.S.C. § 9(1) and CFTC Regulation 180.1.

### B. Fingerhut's Transfers of Cash and Real Property to Carbonero Were Composed of Ill-Gotten Gains.

During the Relevant Period, Fingerhut transferred approximately $389,000 to Carbonero that he earned by committing fraud.  The money deposited into the Fingerhut Accounts during the Relevant Period (approximately $600,000) consisted of proceeds of the affiliate marketing fraud.  *See SEC v. Chemical Tr.*, No. 00-8015-CIV, 2000 WL 33231600, at *12 (S.D. Fla. Dec. 19, 2000) ("[I]t is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains.").  Fingerhut transferred $74,950 in cash directly to

Carbonero from the Fingerhut Accounts.  He also used money from the Fingerhut Accounts to pay off the $314,510 mortgage on the Residence and then immediately gave the property to Carbonero.

Because Fingerhut directly or indirectly transferred at least $389,000 to Carbonero from the Fingerhut Accounts (which held funds traceable to the affiliate marketing fraud schemes), the first element of the relief defendant disgorgement standard is met.  *See Natural Diamonds Investment Co.*, 2019 WL 2583863, at \*7 (relief defendant required to disgorge transfers because they were traceable to defendants' bank accounts that held fraud proceeds); *see also SEC v. Byers*, No. 08-cv-7104, 2009 WL 33434, at \*3 (S.D.N.Y. Jan. 7, 2009) (value of residential property was "ill-gotten" where fraudster made mortgage payments out of account that held investor funds before transferring the property to the relief defendant).[6]

### C. Carbonero Does Not Have a Legitimate Claim To the Cash and Property Transferred to Her By Fingerhut.

Carbonero must disgorge the approximately $389,000 worth of ill-gotten funds that she received from Fingerhut's illegal activity because she has no legitimate claim to that money.  A relief defendant has no legitimate claim to funds she did not earn.  *See FTC v. Holiday Enter., Inc.*, No.1:06-cv-2939, 2008 WL 953358, at \*12 (N.D. Ga. Feb. 5, 2008) (no legitimate claim to property where relief defendant did not engage in any activities to earn the property); *SEC v.*

---

[6] Because money is fungible, it is not relevant whether there were other sources of deposits into the Fingerhut Accounts during the Relevant Period beyond the sources related to the fraud described above; all the CFTC is required to show is that the mortgage payoff and transfers to Carbonero came from accounts that received fraud proceeds.  *See Natural Diamonds*, 2019 WL 2583863, at \*7; *see also Byers*, 2009 WL 33434, at \*3 (relief defendant disgorgement "need not be limited only to funds that can be directly traced to defendant's illegal activity for the reason that the defendant should not benefit from the fact that he commingled his illegal profits with other assets").

*McGee*, 895 F. Supp. 2d 669, 688 (E.D. Pa. 2012) (denying motion to dismiss because no legitimate claim to profits relief defendants did not earn).

To the extent a claim to fraud proceeds could ever be viewed as "legitimate," such a transfer must be made pursuant to a pre-existing, formalized agreement.  *See Janvey v. Adams*, 688 F.3d 831, 835 (5th Cir. 2009) (finding legitimate claim where "a debtor-creditor relationship between the [relief defendants] and the [transferee was] based on written agreements well before the underlying SEC enforcement action against [the transferee]"); *see also CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (6th Cir. 2002) ("a claimed ownership interest [in ill-gotten gains] must not only be recognized in law, it must also be valid in fact"); *SEC v. Founding Partners Capital Mgmt.*, 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009) (legitimate claim to funds where transferee and transferor had a pre-existing, documented creditor-debtor relationship).

Carbonero did not produce any documents in discovery showing that she provided valid consideration for any of the Fingerhut transfers and she acknowledged that any payments she made to him over the years were pursuant to their spouse-like sharing of household costs such as "food or cleaning, laundry, medicine, dogs, family, life."  Accordingly, the undisputed evidence shows she has no legitimate claim to the fraudulently transferred funds or value of the mortgage payoff.  *See SEC v. Merrill*, No. RBD-18-2844, 2021 WL 1117280, at *4 (D. Md. Mar. 23, 2021) (denying motion to dismiss relief defendant where "the proceeds used to purchase the two homes in question were 'ill-gotten funds'"); *see also CFTC v. Nations Investments, LLC*, No. 07-61058-CIV, 2008 WL 4376887, at *6 (S.D. Fla. Aug. 25, 2008) (relief defendants had no legitimate claim where transfer of funds to pay off home equity loans was a fraudulent transfer).

19

**D. The Commission Produced a Reasonable Approximation of the Amount of Ill-Gotten Funds Transferred to Carbonero.**

The CFTC produced a reasonable approximation of the ill-gotten funds transferred from Fingerhut to Carbonero by establishing the amount of fraud proceeds Fingerhut used to pay off the mortgage on the Residence and the amount of fraud proceeds transferred from Fingerhut's bank accounts to Carbonero.  Once the CFTC meets this burden, "[t]he burden then shifts to the defendant to demonstrate that [the CFTC's] estimate is not a reasonable approximation." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).  "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.*

Here, Carbonero has produced no documents or evidence in discovery to demonstrate that the Commission's estimate of ill-gotten gains is not reasonable.

## V.    Conclusion

The Commission respectfully requests that the Court grant the CFTC's motion for summary judgment and order Carbonero to disgorge $389,460 (the aggregate value of Fingerhut's mortgage payoff and cash transfers to Carbonero).

Dated: November 5, 2021

Respectfully submitted by:

*/s/ Joseph C. Platt*

Candice Haan
Senior Trial Attorney
Special Bar ID#A5502564
chaan@cftc.gov

Joseph Platt
Trial Attorney
Special Bar ID#A5502676
jplatt@cftc.gov

Allison Passman
Chief Trial Attorney
Special Bar ID#A5502489
apassman@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney with Plaintiff Commodity Futures Trading Commission, hereby certifies that a true and accurate copy of CFTC's Memorandum in Support of Plaintiff's Motion For Summary Judgment Against Relief Defendant Aicel Carbonero was served on all counsel of record via the CM/ECF system.

Dated: November 5, 2021

/s/ Joseph C. Platt

ONE OF THE ATTORNEYS FOR
PLAINTIFF COMMODITY FUTURES
TRADING COMMISSION

Joseph C. Platt
Trial Attorney
Special Bar ID #A5502676
jplatt@cftc.gov